UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAISY CHAVEZ,<br>    Plaintiff | : | CIVIL ACTION NO. 3:02CV-458 (MRK) |
| | : | |
| v. | : | |
| | : | |
| THE METROPOLITAN DISTRICT<br>COMMISSION,<br>    Defendant | :<br>:<br>: | DECEMBER 11, 2003 |

## PLAINTIFF'S OBJECTION TO MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Daisy Chavez, respectfully submits the following memorandum in opposition to the Defendant, Metropolitan District Commission's ("MDC"), Motion for Summary Judgment. The Plaintiff asserts that there remain genuine issues of material fact which are not appropriate to be resolved by summary judgment and that the legal arguments made by the Defendant are unsound. Therefore, the Plaintiff asks that the Court deny the Defendant's motion.

**I.  STANDARD OF REVIEW**

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). At summary judgment, the non-moving party's version of any disputed issue of fact is presumed correct. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992); see also Mandell v. County of Suffolk, 316

F.3d 368, 374 (2d Cir. 2003). In considering a motion for summary judgment, "the trial court must first resolve all ambiguities and draw all inferences in favor of the non-moving party, and then determine whether a rational jury could find for that party." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "The trial court's function at this stage is to identify issues to be tried, not decide them. Summary judgment is sparingly used where intent and state of mind are at issue, ... because, as we have emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination ...." (Citations omitted.) Id.; see also Mandell v. County of Suffolk, supra, 316 F.3d 377.[1]

## II.   TITLE VII IS NOT EXCLUSIVE REMEDY

The Defendant argues that, to the extent there is an identity between the Plaintiff's claims pursuant to 42 U.S.C. §§ 1981 and 1983 and Plaintiff's claims pursuant to Title VII, the Title VII claims foreclose all other claims.[2] The Defendant cites Gaynor v. Martin, 77 F. Supp. 2d 272 (D.Conn. 1999), in support of this proposition. The District Court's dicta in Gaynor v. Martin, supra, however, does not provide a foundation for summary judgment on this issue.[3]

---

[1] The language from the Second Circuit Court of Appeals' decision in Mandell is nearly identical to that from Graham, the Mandell decision stating "In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." (Internal quotation marks omitted.) Mandell v. County of Suffolk, supra, 316 F.3d 377.

[2] The Defendant's argument in this regard as to the § 1981 claim goes no further than the initial argument as to the § 1983 claim. In fact, the Defendant clearly has copied the language from its earlier argument, neglecting in the process to change the language which argues that "to the extent there is an identity between the Plaintiff's Section 1983 claim and her Title VII claim, the Section 1983 is foreclosed." (Defendant's Memo., p. 24). The Defendant's error in this portion of its argument is clearly typographical. The Court should note, however, that the Defendant has failed to provide independent authority for the proposition that a § 1981 claim is foreclosed by a concurrent Title VII claim.

[3] In Gaynor v. Martin, 77 F. Supp. 2d 272, 280 (D. Conn. 1999), the District Court did not actually apply

Southard v. Texas Bd. Of Criminal Justice, 114 F.3d 539, 549-50 (5th Cir. 1997); see also Bradley v. Pittsburgh Bd. Of Educ., 913 F.2d 1064, 1079 (3d Cir. 1990) ("the comprehensive scheme provided in Title VII does not preempt section 1983, and ... discrimination claims may be brought under either statute, or both"); Roberts v. College of the Desert, 870 F.2d 1411, 1415 (9th Cir. 1988) ("[w]e agree with the reasoning of those courts that have held that Title VII does not preempt an action under section 1983 for a violation of the fourteenth amendment"); Brown v. Hartshorne Pub. School Dist. No. 1, 864 F.2d 680, 683 (10th Cir. 1988) ("Courts of Appeals addressing the issue have held that causes of action exist under both section 1983 and Title VII for public sector employment discrimination"); Trigg v. Fort Wayne Community Schools, 766 F.2d 299, 302 (7th Cir. 1985) ("the Fourteenth Amendment and Title VII have granted public sector employees independent rights to be free of employment discrimination").

The Defendant's argument fails to acknowledge that the Plaintiff seeks to vindicate her rights under both Title VII and the federal Constitution. Therefore, summary judgment is not appropriate.

### III. GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER ADVERSE TREATMENT OF PLAINTIFF WAS BASED UPON PLAINTIFF'S GENDER OR RACE

The Defendant argues that the litany of inappropriate actions undertaken by the management of the MDC towards the Plaintiff should not be perceived as proving a claim of discrimination based upon gender or race. The Defendant's arguments in this regard amount to nothing more than its interpretation of the facts of this case. The Defendant does not merely

set forth the facts of the case; the Defendant's memorandum makes factual arguments as to what inferences should be drawn from some of the evidence presented. The Plaintiff, on the other hand, would ask a jury to draw a different set of inferences from the evidence presented. Rather than have the Court determine which inference is proper on summary judgment, however, this case should be submitted to a jury. See generally Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) ("The trial court's function at this stage is to identify issues to be tried, not decide them.").

The Plaintiff asks the Court to consider the historical context of the Defendant's conduct which existed both before and after the present claims were filed. The Defendant commissioned the law firm of Levy & Droney, P.C. to conduct a compliance audit of its employment practices.[4] The Levy & Droney report, dated March 15, 2002 describes an organization which has neglected its obligations to female and minority employees and has suffered from a continuing lack of competent leadership to remedy problems with discrimination for an extended period of time. The report notes that "very fundamental policies, programs and documents which govern the employment practices of most employers were not inplace and/or were not being utilized by the MDC." (Exhibit A, p. 8).

"We heard complaints that minorities who apply for entry level positions routinely are placed in the treatment plant. This may be because of education levels and experience. Our investigation revealed, however, that qualified minorities did not achieve supervisor status for

---

[4] The report generated as a result of this compliance audit is described as the "Levy & Droney report" and, occasionally, the "Tarlow & Levy" report in depositions. A true and accurate copy of the pertinent excerpts of this report are attached hereto as Exhibit A.

many years. There is only one Black male in what the MDC describes as its 'administrative/management positions'. He replaced a 'Director', but he is only a Manager. Of the two White females at that level, one is in an 'Acting' position and the other, who replaced a 'Director', is also only a 'Manager'. There are no Hispanics or Asians represented in MDC's administrative/management level positions. Several of the Operations departments include no women at all." (Exhibit A, p. 12).

"It is fair to say that MDC management over time since 1929 can be characterized as an 'old boy' network, featuring almost exclusively white males who have succeeded one another, stayed with the organization during most of their adult, productive lives and hired and promoted persons who look like them. Hiring by word-of-mouth to or from MDC Board members or administrators has long been the practice at the MDC. The current CEO was hired from outside. The current CAO also came from the outside." (Exhibit A, p. 19).

"Also absent from the MDC's policy documentation is an updated Affirmative Action Plan. The first MDC Affirmative Action Plan we were able to locate is dated 1996. The MDC has not sought to review or update its Affirmative Action Plan since 1997. It further has not utilized Affirmative Action goals in reviewing hiring and/or promotional practices. Other than having an outdated policy, the District has done little to ensure Affirmative Action goals are in keeping with the organization's legal obligations. Recall the MDC is, for purposes of the law a 'municipality'. This is significant. An Affirmative Action Policy, updated and correct, which includes the goals for the corporation provides a benchmark for reviewing hiring, retention and promotion practices of protected classes." (Exhibit A, pp. 28-29). The report's reference to

the Defendant's affirmative action legal obligations is further borne out by the fact that the Defendant receives millions of dollars in federal grants every year.[5]

Moving on to the Defendant's treatment of the Plaintiff, in particular, the evidence in support of summary judgment does not support an inference that the actions taken by the MDC are supported by legitimate, non-discriminatory reasons. In fact, it would appear that the Defendant's procedures, as far as qualifications and promotions, are so inconsistent where Plaintiff is concerned that the Defendant's explanations are little more than a pretext masking a pattern of discrimination. For example, the Defendant argues that "[t]he Plaintiff was doing a marginal job as head of the Customer Service area." (Defendant's Memo., p. 6). In fact, there is no documentary support for this statement whatsoever. (Anthony Milano deposition, attached hereto as Exhibit J, pp. 71-72). The Plaintiff can testify that Customer Service was in fine shape and there were no indications given to her that she was doing a "marginal job" in her position. (Chavez Affidavit, attached hereto as Exhibit G, ¶ 9). Furthermore, there was no explanation given to the supervisors in the Engineering and Planning department of why the Plaintiff was being placed there on "special assignment." (Richard Newton deposition, attached hereto as Exhibit K, pp. 82-84). Milano's post hoc rationalization that he "believed that exposure and experience in the Engineering and Planning Department would help Plaintiff accomplish her career goals," (Defendant's Exhibit B, ¶ 13), is nothing short of breathtaking given the fact that he took away any and all supervisory responsibilities from the Plaintiff and did not provide a specific job for her to perform. In addition, the Plaintiff already had worked

---

[5]True and accurate copies of the relevant portions of the Defendant's Comprehensive Annual Financial Reports for the years 1998 through 2002 are attached hereto as Exhibits B through F.

for seven years in the Engineering and Planning Department at the start of her career at the MDC. (Exhibit G, ¶ 4).

Milano offered the Plaintiff the position of Assistant Director of Operations and the Plaintiff had accepted this offer. (Exhibit G, ¶ 6). Milano's own deposition testimony supports an inference that he decided not to follow through on his offer as a result of pressure from the employees in the Operations department. (Exhibit J, pp. 97-99). The affidavit of Alfred J. Amaio further supports the inference that Plaintiff was denied the position in Operations due to gender or racial bias on the part of the employees of the Operations department.[6] (Amaio Affidavit, attached hereto as Exhibit H, ¶¶ 5-9). The fact that Milano, the Chief Executive Officer of MDC decided to withdraw a promotion that the Plaintiff had already accepted due to the prejudices of lower level employees would support a finding of discrimination against the Defendant.[7]

As for the Manager of Utility Services position which was awarded to Mark Hanson, a white, non-Hispanic male, the Defendant's own evidence demonstrates that while Plaintiff is conceded to have met the minimum qualifications for the position, Hanson did not. The job description attached to Dellaripa's affidavit recites that, in order to be qualified, an applicant must have a "bachelor's degree from a recognized college or university in civil engineering or

---

[6] The Court should note that Levy & Droney Report observes "There are no Hispanics or Asians represented in MDC's administrative/management level positions. Several of the Operations departments include no women at all." (Exhibit A, p. 12).

[7] In its memorandum, the Defendant makes the novel argument that the Plaintiff's claims as to the Assistant Director of Operations position are both beyond the statute of limitations and premature. (Defendant's Memo., p. 17). It appears that Defendant claims that the Plaintiff has acted too soon, too late. When the Defendant has explained this logical conundrum, the Plaintiff will attempt to address it.

construction management...." (Defendant's Exhibit D-1). Plaintiff has a Bachelor of Science degree and her major course of study was engineering. (Exhibit G, ¶ 3).[8] Hanson's application demonstrates that he has only an Associates degree, thus not meeting the minimum educational requirements for the position. (Defendant's Exhibit D-2). Despite Hanson's failure to meet the minimum qualifications for Manager of Utility Services, he was promoted and the Plaintiff was not. The affidavit of Richard Demirgan demonstrates that the reason why the Plaintiff did not receive this position was the opposition of employees in Utility Services to a woman being placed in that position of authority. (Demirgan Affidavit, attached hereto as Exhibit I, ¶¶ 4-7).

The Defendant's arguments as to the Manager of Special Engineering projects position are another example of the Defendant's inconsistent treatment of the Plaintiff. After having conceded that Plaintiff met the minimum qualifications for Manager of Utility Services (Defendant's Memo, p. 19), a position which required a "bachelor's degree from a recognized college or university in civil engineering or construction management...." (Defendant's Exhibit D-1), the Defendant then states that the Plaintiff does not have the required degree for Manager of Special Engineering projects, which requires a bachelor degree in Civil Engineering. (Defendant's Memo., p. 19). The Defendant cannot have it both ways. The Defendant tells the Plaintiff that her degree qualifies her for one position, only to give it to an

---

[8] The Defendant's arguments at page 22 of its Memorandum do nothing short of demonstrate the existence of a genuine issue of material fact, namely the Plaintiff's qualifications for the positions she has sought. As pointed out by the Defendant, there is a conflict between the Defendant's evidence and the Plaintiff's deposition testimony. A jury should be allowed to resolve the apparent conflict in the parties' evidence given the facts that the Defendant employed the Plaintiff as an engineering technician/draftsperson for her first seven years at the MDC (see Defendant's Exhibit A-1), that Plaintiff was deemed qualified for the Manager of Utility Services position, and that the Plaintiff can testify as to the courses she took in engineering in order to receive her Bachelors degree.

unqualified white, non-Hispanic male due to pressures from lower-level employees. Then the Defendant states that the identical degree does not qualify for a different position to which Plaintiff has applied. Such inconsistency should support an inference that the Defendant's asserted justifications for its treatment of the Plaintiff are no more than a poorly disguised pretext covering discrimination against the Plaintiff.

The Plaintiff applied for the position of Manager of Treasury. The position was awarded to Stephanie Russo, a white, non-Hispanic applicant who was not an employee of MDC prior to her appointment. The Defendant claims that the Plaintiff did not meet the minimum qualifications for this position. This factual claim is completely false. Defendant argues that the Plaintiff lacked the requisite eight years of progressively responsible governmental financial management experience, including two years at a supervisory level. According to the Defendant's evidence, the Plaintiff was given the title of Customer Services Administrator in August, 1989. (Defendant's Exhibit A). The Plaintiff worked in that position until 1998 when she was placed on "special assignment" in the Engineering and Planning department by Milano. The job description for Plaintiff's position as Customer Services Administrator (Defendant's Exhibit A-1) contains the following "Examples of Duties" which she was expected to perform: "Schedules, assigns, directs and evaluates employees in a medium size clerical work group in water and sewer billing .... Oversees the preparation of reports, forms and compilation of information on completed work assignments and employee effort. Analyzes information on work group efficiency and effectiveness. ... Draft the unit budget and controls and accounts for expenditures within fund allocations. Trains and

counsels employees. Administers union contract language and oral and written warnings and recommends higher level discipline. Assists in employee selection." (Defendant's Exhibit A-1). By her experience as Customer Services Administrator, the Plaintiff exceeded the minimum qualifications for this position. (Exhibit G, ¶ 17). Furthermore, the fact that Plaintiff has a Master of Public Administration whereas Russo has only a similar Bachelors degree, (Compare Defendant's Exhibit B-2 to Defendant's Exhibit B-4), and the Plaintiff's decades of devotion to the MDC appear to be meaningless when the candidate is a minority employee such as Plaintiff. The Defendant's denial of Plaintiff's qualifications for the position of Manager of Treasury is astonishing given the fact that Plaintiff worked directly under the Manager of Treasury for over ten years. The Defendant's alleged legitimate, non-discriminatory reason for failing to even consider the Plaintiff for this position is contradicted by the Defendant's own evidence.

All of these facts taken together demonstrate the existence of a pattern of adverse treatment against the Plaintiff by upper management employees of the Defendant and even with the direct participation of the Chief Executive Officer of the MDC. The Court should deny the Defendant's motion and allow a jury to determine the reasons behind the Defendant's treatment of the Plaintiff.

### IV.    PLAINTIFF HAS PROVEN FACTS SUFFICIENT TO ESTABLISH DEFENDANT'S LIABILITY UNDER SECTION 1983

The Defendant argues that the Plaintiff has made allegations against "individual employees only" and that these "random incidents or acts by employees" is not sufficient to

establish the Defendant's liability under 42 U.S.C. § 1983. (Defendant's Memo., p. 16). The Defendant cites to <u>Jett v. Dallas Independent School District</u>, 491 U.S. 701, 736-37 (1989) for the proposition that, in order for the Defendant to be held liable under § 1983, "the act must be performed by a body or official with final policy making authority." (Defendant's Memo., p. 16). In the present case, a number of the adverse actions taken by the MDC were done at the direction of Milano (the Defendant's former Chief Executive Officer) and Moore (the Defendant's Chief Administrative Officer).[9] The Supreme Court held in <u>Jett</u> that a court should look to state law to determine whether a particular official has final policymaking authority. <u>Jett v. Dallas Independent School District</u>, supra, 491 U.S. 737. The Defendant has provided no reasoned analysis of how two of its highest-ranking officers failed to have final policymaking authority according to state law. Thus, the Defendant has failed to demonstrate that summary judgment is appropriate.

As to "deliberate indifference or gross negligence on the part of any supervisors," (Defendant's Memo., p. 16), one need look no further than the Defendant's present Chief Executive Officer, Stephen Rhoades. Where evidence of discrimination is concerned, Rhoades appears to feel that the less he does, the better. Though aware of discrimination complaints, Rhoades does nothing to investigate or remedy the problems that exist in the MDC. (See, e.g.,

---

[9] It is interesting to note that Moore appears to be a beneficiary of the Defendant's custom of preferential treatment for white, non-Hispanic males. The positions of Chief Operating Officer and Chief Administrative Officer were created, and Moore, who was not previously an MDC employee, was invited to choose which position he wanted without being required to compete against other potential candidates. (See Exhibit J, pp. 168-69; Robert Moore deposition, attached hereto as Exhibit L, pp. 12-13).

Stephen Rhoades deposition, attached hereto as Exhibit M, pp. 16-18, 24-27, 29, 34-36). The Defendant's quotation of <u>Turpin v. Mailet</u>, 619 F.2d 196 (2d Cir. 1980),[10] could not be located by the Plaintiff, but the following language from <u>Turpin</u> should nonetheless be considered by the Court in the context of Rhoades' testimony: "We see no reason why an official policy cannot be inferred from the omissions of a municipality's supervisory officials, as well as from its acts. <u>The issue of authorization, approval or encouragement is generally one of fact, not law.</u> For example, where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." (Emphasis added.) <u>Id.</u>, 201.

## V. STATUTE OF LIMITATIONS

---

[10] See Defendant's memorandum at page 16.

The Defendant's Motion for Summary Judgment raises the statute of limitations as to each of the causes of action alleged in the Complaint: 42 U.S.C. § 1983, 42 U.S.C. § 1981, and Title VII, 42 U.S.C. § 2000e. The Defendant argues that the Complaint contains allegations of discriminatory actions, which are beyond the reach of the respective statute of limitations for each cause of action. With the exception of Defendant's argument as to Title VII, the Defendant's arguments fail to take into account the fact that the present matter was brought within the time frame set by the statutes of limitations as to certain discriminatory actions that were merely portions of a continuous policy of discrimination on the part of the Defendant.

The holding of the Second Circuit Court of Appeals in <u>Association Against Discrimination in Employment, Inc. v. City of Bridgeport</u>, 647 F.2d 256 (2d Cir. 1981), cert. denied, 455 U.S. 988, 102 S. Ct. 1611, 71 L. Ed. 2d 847 (1982), is applicable to the various causes of action in the present matter. That case involved a class action brought on behalf of blacks and Hispanics challenging the civil service employment examination for a city fire department as violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. <u>Id</u>. In that case, one of the defendants' principal challenges to the District Court's determination that the city was liable under Title VII was that the plaintiffs' claims were barred by the statute of limitations. <u>Id.</u>, 274. The defendants argued that the plaintiffs' claims related to actions that occurred beyond the 300-day period of limitations set by Title VII. <u>Id</u>. The Second Circuit held "[w]here ... the defendant has engaged in a continuous policy of discrimination, acts in furtherance of that policy are not viewed in isolation. In such circumstances if the charge has been filed no later than 300 days after the <u>last</u> act by the

defendant pursuant to its policy, the plaintiff may recover for earlier acts of discrimination as well." (Emphasis in original.) Id.

Although it would appear that the Supreme Court's holding in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002),[11] creates a difficulty for Plaintiff's Title VII claim, the Court should consider whether the Defendant's actions prior to October 14, 2000 are truly discrete discriminatory acts. In fact, although the Defendant asserts that the Plaintiff's assignment to Engineering and Planning took place on September 23, 1998, it is unclear when the Plaintiff should have known that this assignment was no longer temporary as she was lead to believe at the outset. (See Exhibit G, ¶ 10). In fact, the key event to Plaintiff's status did not take place until March 13, 2001, when she was stripped of her title as Customer Services Administrator and redesignated as Special Services Administrator. (Def. Exh. A, ¶ 5). Were the Defendant allowed to use the statute of limitations in the manner it requests, it would create a loophole for intentional discrimination for every employer: place the employee in a "temporary" position long enough to get past the statute of limitations and then take away the position which she had held previously. Such a result would allow deliberate subterfuge to prevail over justice.

The continuing violation doctrine described in Association Against Discrimination in Employment, Inc. v. City of Bridgeport, supra, 647 F.2d 256, has been applied to claims involving a three-year statute of limitations under 42 U.S.C. §§ 1983 and 1985. See Velez v. City of New London, 903 F. Supp. 286 (D. Conn. 1995) (denying motion to dismiss claims

---

[11] Quoted at page 25 of Defendant's memorandum.

under 42 U.S.C. §§ 1983, 1985 and 1988 and Title VII on basis of "continuing violations" doctrine). In <u>Cornwell v. Robinson</u>, 23 F.3d 694 (2d Cir. 1994), the Second Circuit stated "When a plaintiff experiences a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." (Internal quotation marks omitted.) <u>Id.</u>, 703. "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." <u>Id.</u>, 704. See also <u>Allen v. Amalgamated Transit Union Local 788</u>, 554 F.2d 876, 880-81 (8th Cir.) (holding denial of seniority rights a continuing discriminatory act tolling statute of limitations), cert. denied, 434 U.S. 891, 98 S. Ct. 266, 54 L. Ed. 2d 176 (1977).

The continuing violations doctrine clearly is applicable to the present case, because there is proof of ongoing discriminatory policies or practices and of specific and related instances of discrimination permitted by the Defendant to continue unremedied for so long as to amount to a discriminatory policy or practice.

## VI. CONCLUSION

The Defendant has failed to satisfy its burden of demonstrating the absence of any genuine issues of material fact and that a judgment should enter in its favor. Therefore, the Defendant's motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED,
PLAINTIFF, DAISY CHAVEZ

By: _/s/ R.W. Heagney_
Robert W. Heagney (ct 5658) and
Stuart E. Brown, Esq. (ct 24659)
Hassett & George, P.C.
555 Franklin Avenue
Hartford, Connecticut 06114
(860) 296-2111

## CERTIFICATION

    I hereby certify that a copy of the foregoing has been mailed this 11th day of December, 2003 to the following counsel of record:

Anthony J. Palermino, Esq.
Law Offices of Anthony J. Palermino
945 Wethersfield Avenue
Hartford, CT 06114

_____
Robert W. Heagney