## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

DAISY CHAVEZ             )      **Case No. 302CV458(SRU)**
    **Plaintiff**         )

VS.                    )

THE METROPOLITAN DISTRICT  )
COMMISSION           )
    **Defendant**        )      **SEPTEMBER 2, 2003**

## AMENDED COMPLAINT

### JURISDICTION

1. This is a civil action seeking redress against defendant, The Metropolitan District Commission who committed acts under color of state law, depriving plaintiff, Daisy Chavez, of her rights under the Constitution of the United States, particularly under the provisions of the First and Fourteenth Amendments, and under the laws of the United States, particularly under The Civil Rights Act of 1866 and 1877, 42 U.S.C. Sections 1981 and 1983, and 2000e, et seq..

2. The jurisdiction of this Court is invoked pursuant to Title 28, U.S.C. Section 1343, which allows a plaintiff to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, and pursuant to Title 28, U.S.C. Section 1331.

3. Venue in this district is appropriate under 28 U.S.C. Section 1391, this being the judicial district in which the cause of action arose.

## PARTIES

4. Plaintiff, Daisy Chavez, is a citizen of the United States and a resident of Bloomfield, Connecticut.

5. Defendant, The Metropolitan District Commission, is a public instrumentality created pursuant to Special Acts of the State of Connecticut by Section 511 of the 1929 Special Acts (hereinafter referred to as "MDC"), has its offices located at 555 Main Street, Hartford, Connecticut. At all times hereto, defendant MDC was acting under color of state law.

## PRIOR PROCEEDINGS

6. Plaintiff filed a formal charge of complaint with the Connecticut Commission on Human Rights and Opportunities on or about August 9, 2001, alleging discrimination by defendant MDC based upon its application of gender, national origin (Cuban) and being of Hispanic/Latino ancestry/race, and retaliation as a factor in evaluations, compensation positions criteria, and decisions, and further, that Defendant, acting through its managers, retaliated against Plaintiff for complaining about gender and national origin (Cuban) discrimination.

7. A formal charge of complaint was simultaneously filed with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC"), alleging discrimination by defendant MDC on the basis of gender, national origin (Cuban) and being of Hispanic/Latino ancestry/race and retaliation.

2

8. No legal action is being undertaken at present by the state or federal agencies on the legal issues which are the subject of this complaint.

## STATEMENT OF THE CASE

9.      Plaintiff is Daisy Chavez and she resides at 547 Simsbury Road, Bloomfield, Connecticut 06002.

10.      The Respondent is The Metropolitan District, (otherwise known as The District, or MDC, or The Metropolitan District Commission), located at 555 Main Street, Hartford, Connecticut.

11.      The Respondent employs more than 15 persons, and is a special chartered municipal entity in the State of Connecticut.

12.      Plaintiff is a female Hispanic who started working at the MDC on July 12, 1976 as a Junior Technician.

13.      Since that time, Plaintiff has been promoted to an Engineering Technician; a Drafter; a supervisor and an Administrator Grade 10, upgraded to an 11, reclassified to a 13 and upgraded in 1994 to a 14 (the highest grade for an Administrator).

14.      In the summer of 1994, District Manager Anthony Milano had several conversations with Plaintiff regarding her opportunities to advance and the importance to her career at the MDC of having a Master's degree and he strongly encouraged Plaintiff to obtain one. These conversations told Plaintiff that Mr. Milano was going to promote her to upper management if she was to obtain a graduate degree.

4

15.    In the summer of 1996, Plaintiff graduated from the University of Hartford with a Master's Degree in Public Administration. This took a great deal of personal and financial sacrifice to obtain while working full time.

16.    In the spring of 1997, Mr. Milano initiated a conversation with Plaintiff where he offered to transfer Plaintiff to Operations to be trained by the Director of Operations for an Assistant Director of Operations position, which was going to take 3 to 6 months to create. Mr. Milano asked Plaintiff to think it over over the weekend and let him know on the following Monday morning.

17.    On that Monday morning, Plaintiff briefly met with Mr. Milano and thanked him for the opportunity and agreed to the transfer as proposed by him. Mr. Milano then asked Plaintiff to work out a transfer date with Peg Roughan, Director of Personnel.

18.    At the end of May Plaintiff met with Peg Roughan, to discuss Mr. Milano's request to work out a transfer date to Operations. Ms. Roughan at first, acted as if she did not know what Plaintiff was talking about. So Plaintiff said "perhaps I should not be speaking with you until Mr. Milano makes you aware of his request." Then, Ms. Roughan admitted to having a brief conversation with Mr. Milano. Ms. Roughan then stated that she was going on vacation in a week or so and would meet again with Plaintiff when she returned. Plaintiff then proposed a transfer date of July 1 - that would give everyone enough time - and the discussion ended with Ms. Roughan telling Plaintiff that she would call upon her return to work after her vacation.

5

19.    In June, after Ms. Roughan's return from vacation, Plaintiff called her on several occasions to confirm their discussions with regard to the July 1 transfer date. They finally sat down to discuss what Plaintiff thought was going to be the transfer date when Ms. Roughan informed Plaintiff that Mr. Milano wanted to offer Plaintiff a different position as the Administrator of Real Estate position (a lateral job with the same grade of pay). Plaintiff informed Ms. Roughan that she was interested in Mr. Milano's original offer of the Assistant Director of Operations which represented an opportunity for growth and advancement, not a lateral position. Plaintiff then asked about the upper management promotional opportunities for the position Ms. Roughan offered. Ms. Roughan did not know.

20.    A little time passed, and Plaintiff heard nothing about either position. In the fall, Plaintiff met with Mr. Milano and Peg Roughan again, at their request. At this meeting, Mr. Milano wanted to know if Plaintiff would be interested in the Review Officer's position. Plaintiff asked again about the promotional opportunities for an upper management position. Plaintiff made great personal and financial sacrifices to obtain an M.P.A., at his request, with the understanding that he was going to assist in achieving Plaintiff's career goals of advancement to upper management within the MDC.

21.    On September 23, 1998, Mr. Milano called Plaintiff to his office where Peg Roughan was also present and directed that Plaintiff be assigned to a non-existent special assignment in Engineering and Planning (E&P). Plaintiff reported on Monday morning, September 28, 1998, to

6

the Manager of Engineering Services. Plaintiff was directed to sit at the very end of the Department with a table and chair, not even a desk, right out in the open. Plaintiff was extremely humiliated and embarrassed at being treated in this manner for no just cause, and with no explanation. Plaintiff sat there doing menial and demeaning tasks, after spending 16+ years as the Administrator of a department which Plaintiff had established; automating the MDC's service location records into a computerized system; forms and operational work orders, including attaching a cost accounting tracking process; plus hired and trained its staff of 19.

22.    Plaintiff cannot fully describe how humiliated she felt each day she had to report to this department and a non-existing job. Plaintiff continues to feel this way to this day. Plaintiff tried to make the best of the situation by learning as much as allowed in that Department, offering to help on any tasks or assignments, and enrolling in college courses to keep her mind occupied.

23.    During her special assignment in E&P, even after the humiliation on the day she arrived, Plaintiff was denied a proper work area. When the Manager of Engineering Services made a used cubicle available for Plaintiff, she was moved into it. Within two hours, thereafter, Plaintiff was ordered to move back to the open area by Mr. Geldoff, to her further embarrassment. Plaintiff was made to believe that Mr. Milano had chosen to place her in this demeaning situation, an employment purgatory, so that she would suffer the ongoing degradation of being without a real position, duties or responsibilities.

24.    Mr. Milano, on several occasions, discussed positions in the organization that he thought Plaintiff might be interested in. The very first being the transfer and then creation of the Assistant Director of Operations position to which Plaintiff expressed an interest and accepted, however, it was never fulfilled. This position has been renamed Assistant Manager of Operations, Grade EE18, and has been budgeted for (2001) although it has not been posted or offered since being created. A proposed re-organization was started which changed the name of the Director of Operations position to Manager of Operations, and creating the Assistant Director position which Mr. Milano had offered, to be renamed Assistant Manager.

25.    On May 25, 1999, Plaintiff had a scheduled meeting with Mr. Milano to follow up on a conversation Plaintiff had with him in December of 1998 regarding the retirement of the Manager of Water Supply and her interest in the position. At a prior meeting, Mr. Milano had stated he (Milano) would think about it and get back to Plaintiff.

26.    At this meeting on May 25, 1999, Mr. Milano had Lebert Thomas, now the Manager of Engineering Services and my new supervisor, attend. At the beginning of the discussion, Mr. Milano rebuked Plaintiff in an angry manner by saying that she should not come to see him any more. Any personnel issues should go directly to Peg Roughan, Director of Human Resources. Mr. Milano also stated that Plaintiff was a letdown and disappointment to him. His monologue continued on for about 8+ minutes. During which time, he gave no explanation nor accepted any comments from Plaintiff.

8

27.    Plaintiff was very shocked, bewildered, embarrassed, and humiliated. At which time, Plaintiff became emotional (crying). Milano offered Plaintiff a Kleenex which was conveniently placed near where they were sitting. Mr. Milano never asked or provided Plaintiff the opportunity to discuss the subject which was the purpose of the meeting.

28.    To remove herself from this, Plaintiff started to apply for Management positions that were posted. For each and every position, Plaintiff was either informed that she was not qualified or just was not sent notifications at all, even though Plaintiff would call Personnel and request notifications.

29.    In June of 2000, Robert Moore was hired for the newly-created position of Chief Administrative Officer. Soon after, he called Plaintiff and scheduled a luncheon meeting to discuss what positions Plaintiff was interested in. However, as soon as those discussions started, Mr. Moore offered Plaintiff positions which did not exist in the table of organization, but were things he was apparently looking to create. Plaintiff tried to impress upon Mr. Moore that she would be a valuable addition to his immediate staff, that she had 25 years experience with the MDC and was a loyal and hard working employee. Plaintiff inquired of Mr. Moore during their discussions if he was to have an assistant to which he responded that he would, but it would be an administrative level position, a much lower grade than the Grade 14 Plaintiff currently had. However, around the first week in June of 2001, Mr. Moore named a white male grade 16 as his assistant. Plaintiff was very skeptical of Mr. Moore's approach. Plaintiff asked Mr. Moore for the Utility Services Manager's position

9

(Grade 15) that had been vacant for about 1 ½ years in an area where Plaintiff originally had worked for 7± years. Mr. Moore, at first, said there was no such vacant position, but he would check with personnel. Plaintiff continued to inquire every week or so, and finally, Mr. Moore said he was going to give Plaintiff the position, but she might have to also perform the duties of Company Review Officer, which Plaintiff agreed to do. The following day, Plaintiff sent Mr. Moore an e-mail message to confirm his offer, and was shocked to receive a response contrary to our discussions (see copies).

30.    Mr. Milano removed Plaintiff from her position in Treasury to clear the way for his long-time friend (who Mr. Milano had at the MDC as a consultant for quite some time) to obtain Plaintiff's ex-manager's position (Manager of Treasury) when he retired in May of 2000. This was 1± year after Plaintiff's transfer to a non-existing special assignment. Mr. Milano's acts denied Plaintiff the opportunity to be in a position to become the Manager of Treasury. However, since removing Plaintiff from the Administrator of Customer Service in the Treasury Department into the non-existent special assignment, employees in Customer Service were hand picked to be upgraded on an acting capacity to the next level. This created turmoil among the employees and the Union. In order to get rid of the problem they created, Plaintiff was involuntarily placed in a lateral, vacant, permanent position. Plaintiff's position of Customer Service Administrator was never posted, but rather, outright given to a white, non-Hispanic individual.

10

31.    On April 2, 2001, the Manager of Utility Service position was posted and Plaintiff was encouraged by Robert Moore to apply for it. However, Plaintiff later found out that Mr. Moore had no intention of giving this position to Plaintiff. The interviews were completed on Tuesday, June 26, 2001, and by Thursday, an email was sent out announcing the successful candidate. Normally, this process takes several weeks. At the interview Plaintiff was informed the position would not be awarded until sometime in the middle of July. A non-Hispanic white male was awarded the position.

32.    Although Plaintiff followed postings and diligently looked for opportunities, job postings for management positions were inconsistent. When Mr. Milano wants to award a position to an employee, he picks which jobs to post. Other positions are never posted, such as the position of Manager of Special Engineering Projects, where a white, non-Hispanic male received this job, which was recently awarded without being posted. When a management job is awarded without posting, qualified candidates like Plaintiff are denied the opportunity to compete for the position, and is another means to carry out a glass ceiling against minority promotion.

33.    The inconsistent manner in which employees are promoted has long been a problem at MDC. Plaintiff has become angry and frustrated by the manipulations. It is the "Good Old Boys" network at its best. No matter how hard you work and whatever your personal and professional credentials and accomplishments are, they do not matter. Credentials and accomplishments do not matter when it comes to achieving your career goals at the MDC. When people such as Mr. Milano,

11

Moore, Geldoff and others, continually strip you of your dignity and self-respect; take advantage of your knowledge and abilities while counting on your ignorance of the law and human rights; they play on your fear of retaliation and possible job loss to hold you down.

34.    During the recent few years, as Plaintiff has attempted to gain a promotion, she have seen a pattern of the MDC not qualifying Plaintiff and other minority employees for positions while qualifying white candidates who clearly failed to have minimum qualifications in education and experience.

35.    The MDC has a long-standing record of being under-represented with female and minority employees in upper management and has failed to resolve this under-representation despite this being a stated goal on the MDC Affirmative Action Plan.  The actions of the MDC are a violation of the Affirmative Action obligations of the MDC as a municipal entity.

36.    Plaintiff has tried to address her personal and professional concerns at the MDC directly in a professional way, but to no avail.  Plaintiff has currently been ordered into the existing vacant position of Administrator of Special Services, however, the Cross Connection duties and staff were removed from her responsibilities by Mr. Milano, Mr. Moore and Mr. Geldoff through the Director of Personnel, Peg Roughan, leaving just the clerical, non-managerial responsibilities.  As a result, these actions changed an established position's duties and responsibilities as stated in the Board-approved job description, without the required prior Board approval.  These tactics are

12

constantly used against minority employees and creates a glass ceiling to stop their advancement in management.

37.    On July 9, 2001 Plaintiff was given her performance review, which was discussed with Richard Newton.  Mr. Newton stated that Plaintiff needed to get back to doing management work to receive above average rating at my job grade.  Prior to this review, Plaintiff had received above average/average performance reviews including her many years as an Administrator. Plaintiff feels she is denied the opportunity to be productive and contributing to the MDC organization after so many years of hard work, dedication and loyalty.  This situation is very difficult for Plaintiff. Richard Newton stated that Plaintiff does not belong in Engineering & Planning but he had no problem with Plaintiff working for him.  This is a hell of a thing to say to Plaintiff after 25 years of service.  He also went on to say that the individual awarded the Utility Manager position deserved it, he had put the time in.  Plaintiff replied that only applies to white men.  Plaintiff also put in her time and waited for her supervisor's job, but she was abruptly pulled out of the treasury position and then not even _qualified_ for the interview.  The job was awarded to a white non-Hispanic, who was Mr. Milano's past friend.  Her qualifications may be appropriate, but the manner in which she was given the job was not appropriate.

38.    Plaintiff has never in her life felt so embarrassed and humiliated, and Management continues to assign Plaintiff demeaning tasks, below her level of responsibilities.  They have shoved

13

Plaintiff in a corner to forget about her perhaps hoping she would leave. Plaintiff is no longer invited to attend staff meetings, and in other ways embarrassed and demeaned.

39.  One particular time, Neal's (Geldoff) secretary came around to inform everyone of a staff meeting. So Plaintiff asked if that meant Plaintiff and she said I guess so. As Plaintiff was walking in the conference room, Neal turned around and said "You are not needed, you can leave now." It's embarrassing to say that to an Administrator in front of staff.

40.  This whole matter has gotten Plaintiff sick to the point of which she required surgery for diverticulitis this fall. As Plaintiff has stood up for her rights and raised her concerns about discriminatory conduct, Plaintiff have faced a series of retaliatory actions, such as the lateral moves, the placement without a desk or real job, and the embarrassment by Mr. Milano, Neil Geldoff and others.

41.  The actions of the Respondent represent a pattern and practice of discrimination and retaliation against Plaintiff as a Hispanic female and is part of an overall pattern and practice of MDC Management to discriminate against minority employees and to create a glass ceiling to prevent management level minority employees' advancement and to retaliate against them from achieving their full potential and career goals. Plaintiff is the only Hispanic Administrator who has, through 25 years of hard work and dedication at the MDC, worked her way up the ranks to this level. However, Plaintiff has not received a promotion since 1984 and has not had an upgrade since 1994. After obtaining the requested MPA, all doors to upper management positions have been closed.

14

Opportunities for training and eventual promotions to management positions are only provided to the chosen.

42. Further, by so discriminating against Plaintiff, and, given the pattern of Defendant's conduct as exhibited by its repeated treatment of Plaintiff, Defendants did not adhere to the Affirmative Action requirements set forth as guidelines to govern its employment decisions and practices.

43. As a result of Defendant's systematic conduct and actions, carried out under color of state law, Plaintiff has been deprived of and denied her rights, privileges, and immunities guaranteed by the laws of the United States, specifically Title 42, U.S.C. Section 1983, and by the Constitution of the United States, to wit: the failure to be promoted to a position for which she is qualified as a result of defendants' discrimination against her based upon general and national origin (Cuban), and being of Hispanic/Latino ancestry/race.

COUNT TWO

1. Paragraphs 1 through 42 of Count One are incorporated herein as paragraphs 1 through 42 of this Count Two as fully set forth.

43. As a result of Defendants' systematic conduct and actions, carried out under color of state law, Plaintiff has been deprived of and denied her rights, privileges, and immunities guaranteed by the laws of the United States, specifically Title 42, U.S.C. Section 1981, and by the Constitution of the United States, to wit: the failure to be promoted in grade for which she is qualified as a result

15

of Defendant's discrimination against her based upon gender, national origin (Cuban) and being of Hispanic/Latino ancestry/race, denying Plaintiff the right to contract for employment as is enjoyed by other citizens.

COUNT THREE

1. Paragraphs 1 through 42 of Count One are incorporated herein as paragraphs 1 through 42 of this Count Three as fully set forth.

43. As a result of defendants' systematic conduct and actions, plaintiff has been deprived of and denied her rights, privileges, and immunities guaranteed by the laws of the United States, specifically Title 42, U.S.C. Section 2000(e) et seq., to wit: the failure to be promoted in grade, being subjected to a hostile work environment and suffering in the terms and conditions of her employment as a result of defendants' discrimination against her based upon gender, national origin (Cuban) and being of Hispanic/Latino ancestry/race.

COUNT FOUR

1. Paragraphs 1 through 42 of Count One are incorporated herein as paragraphs 1 through 42 of this Count Four as fully set forth.

43. As a result of defendants' systematic conduct and actions, plaintiff has been deprived of and denied her rights, privileges, and immunities guaranteed by the laws of the United States, specifically Title 42, U.S.C. Section 2000(e) et seq., to wit: the retaliation as a result of defendants'

16

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAISY CHAVEZ | ) | Case No. 302CV458(SRU) |
|     Plaintiff | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| THE METROPOLITAN DISTRICT | ) | |
| COMMISSION | ) | |
|     Defendant | ) | SEPTEMBER 2, 2003 |

## DEMAND FOR A JURY TRIAL

The plaintiff demands a jury trial on all counts above.

Respectfully submitted,

THE PLAINTIFF, DAISY CHAVEZ


By_____

    Robert W. Heagney
    GILMAN & MARKS
    Two Riverview Square
    East Hartford, CT 06108
    Tel: (860)282-0301
    Federal Bar No: ct05658

18