**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| | : | |
| DAISY CHAVEZ | : | |
| | : | No. 3:02CV458(MRK) |
| VS. | : | |
| | : | |
| METROPOLITAN DISTRICT | : | March \_\_\_\_ , 2005 |
| COMMISSION | : | |
| | : | |

**POST HEARING BRIEF ON ADMISSIBILITY OF**
**LEVY AND DRONEY REPORT**

**I.     INTRODUCTORY**

A hearing, having been held on March 7, 2005, preliminary to the trial on the issue of the

admissibility of the Levy & Droney Report, Plaintiff's Exhibit 1, entitled "Compliance Audit of

Employment Practices of the Metropolitan District Commission Undertaken by Legal Counsel",

dated March 15, 2005, this brief is submitted as a summary of the factual evidence and the legal

issues pertinent to this question.

The prior testimony of Attorney John Rose, Jr., taken on November 3, 2004, in the case of

Lebert Thomas vs. The Metropolitan District Commission, Docket 3:02CV457, was admitted by

stipulation.  Testimony at the hearing was given by Attorney Bourke Spellacy, Counsel to the

Metropolitan District Commission ("MDC"), and by Rev. Paul M. Ritter, a longtime and newly

retired Commissioner of the MDC.  The Report and various minutes of meetings of the Commission

and the Personnel, Pension and Insurance Committee thereof, were placed into evidence.

## II.    FACTS

The Commission commissioned the compliance audit in the autumn of 2001 and the law firm of Levy and Droney was engaged to conduct an independent investigation and render a compliance audit.  That report was dated March 15, 2002 and delivered to the MDC then or soon thereafter.  On April 1, 2002, the Commissioners, acting in executive session, waived attorney-client privilege.  Pl. Ex. 2, Minutes of Metropolitan District Commission, April 1, 2002, page 181.  This made the document immediately a public record, as evidenced by the Hartford Courant article dated April 2, 2002, Pl. Ex. 5.  Attorney Spellacy also indicated that this action by the Commissioners made the document publicly available.  The document was also posted on the MDC website, though the testimony whether it was available for public viewing outside of the MDC was unclear.  Testimony of Attorney Spellacy and Rev. Ritter.

As early as April 15, 2002, Personnel, Pension and Insurance Committee was engaged in assessing a "Preliminary Management Implementation Plan for Recommendations in the March 15, 2002 Compliance Audit of Employment Practices", involving a chart showing the recommendation contained in the Levy & Droney Report and Implementation status on each point.  Pl. Ex. 3, Minutes of Personnel, Pension and Insurance Committee, April 15, 2002, pp. 99 to 105.  From the cover letter, Pl. Ex. 3, Minutes, p. 99, it would appear that the three column chart came to the PPI Committee through Anthony Milano, then the Chief Executive Officer of the MDC.  A comparison of "Recommendation" to "Implementation" columns shows that, for the most part, Mr. Milano accepted the need for changes recommended in the Levy & Droney Report.  Indeed, looking at the first recommendation and finding it already implemented implies the likelihood that the CEO had prior input and was acting to implement the report before it was filed with the MDC.

The Recommendations most relevant to Plaintiff Daisy Chavez would include the following: No. 6, create an affirmative action plan; No. 7, adopt a non-retaliatory complaint mechanism; No. 8, empowerment of affirmative action officer; No. 9, creation of an Affirmative Action Advisory Committee; No. 12, revise hiring and promotional practices.  As to the Affirmative Action Plan, intention to implement is stated and the ("newly hired" - L&D Rpt., p. 33) Affirmative Action Officer was assigned to prepare the same.  As to No. 7, intention to comply is stated.  As to No. 8, a general implementation of "intent to define and refine role [of AAO]" is stated, but the specific recommendations are not overtly endorsed.  Recommendation No. 9 is only partially to be implemented with the committee being essentially powerless.  No. 12 is given a vague nod.

The Recommendations section of the Levy & Droney Report occupies pages 42 to 50 of that document, and are far more detailed than the summary contained in the first column of Pl. Ex. 3. The first sentence of that section ties the recommendations to the previous section on findings: "In this section of the report, we make recommendations consistent with our findings from the Compliance Audit."  Again, those sections of the Findings and of the Recommendations central to Plaintiff's case may be seen most easily from the Table of Contents to the Report, pp. 4-5 of Pl. Ex. 1.  In particular, Plaintiff claims the relevance of the following sections:

> III.  Findings:          A C, E.2 and 3, F.1
> IV.   Recommendations    B, C, D, E and H

> Part A of the Findings - "An Overview" - notes a factual finding of importance, viz.:

>> Our investigation revealed, however, that qualified minorities did not achieve supervisor status for many years.  There is only one Black male in what the MDC describes as its "administrative/management positions".  He replaced a "Director" There are no , but is only a Manager.  Of the two White females at that level, one is in an "Acting" position and the other, who replaced a "Director" is also only a "Manager".  There are no Hispanics or Asians

represented in MDC's administrative/management level positions. Several of the Operations departments include no women at all.

Pl. Ex. 1, p. 12 of Levy & Droney Report.

Part C contains specific factual findings about management and the lack of minorities and women in management. It notes the pattern of "hiring by word-of-mouth" as a long time practice of the MDC. Pl. Ex. 1, p. 29 of Levy & Droney Report. The E and F parts of the Findings section provide the basis for the recommendations in Parts B, C, D, E, and H of the Recommendations section and provide a necessary context for the recommendation.

The Preliminary Management Implementation Plan appeared again - but with changes - before the PPI Committee on June 17, 2002 as a "Final Management Implementation Plan". See Pl. Ex. 4, Minutes PPI Mtg., June 17, 2002, pp. 169-175. This new document was forwarded by Memo of George Sparks, now the Interim CEO of the MDC. See Pl. Ex. 4, Minutes, p. 168. Few changes, if any, were made to the items specified above.

This Management Implementation Plan next appears at the July 8, 2002 meeting of the MDC Commissioners. See Pl. Ex. 2, Minutes of Metropolitan District Commission, July 8, 2002, pp. 283 to 288. At this stage, it is necessary to pause and note that the PPI Committee never took any formal action with respect to the implementation plan. This is critical to an understanding of the operation of the MDC, as it appears that the PPI was able to pass on this document for consideration by the full Commission without taking formal action, unlike the operation of legislative committees of the state or federal governments. It is also critical to note that the full Commission is able to take executive action, adopt plans and give direction without formal action reflected in the minutes. Testimony of Rev. Ritter. But this is not just a matter of testimony. The documentary record, especially Pl. Ex. 2, 3, and 4 herein, viewed as a whole, show a pronounced tendency to run the

company by informal action, rarely, if ever, taking a formal vote on an issue.  No changes appear in the Implementations section from the form of document shown in Pl. Ex. 4.  Finally, a status report of the implementation actions appears in Pl. Ex. 2, Minutes, Mtg. of MDC Commissioners, November 6, 2002, pp. 425-441.  Of particular note is the definition of the role of the Affirmative Action Officer, pp. 440-441 of the Minutes.  Despite the customary and statutory interconnectedness of the concept of affirmative action with hiring and promotion, the MDC Affirmative Action Officer is assigned no role whatsoever in those areas, other than (p. 440) to "work in conjunction with Human Resources to develop additional methods for recruiting and retaining minorities and women," no mention being made of promoting minorities or women.  This gap was emphasized in the Findings section of the Levy & Droney Report.  See Report, p. 35: "Internally at the MDC the perception, again, became that qualified majority [sic - minority] persons need not apply."  Note further on that very page, the Report notes that the then Acting Director of Human Resources, a woman, was told to her face that she was not qualified for her position, thus undermining her authority.

Also important in assessing the relevancy of the Report to the issues in the case is that fact that three of the positions about which Ms. Chavez makes complaint in this action were posted after the Management Implementation Plan was being crafted.  They are Manager of Operations, May 2002; Assistant Manager of Operations, June 2002, and Manager of Environment, Health and Safety, June 2002.

Defendant MDC chose to put on no evidence about the relevance or prejudicial value of the Levy & Droney Report.

III.    ARGUMENT

A.    **THE LEVY & DRONEY REPORT, OR PARTS OF IT RELEVANT TO PLAINTIFF'S CLAIM, ARE NOT HEARSAY UNDER FRE RULE 801(d)(2)(B)**

Fed. R. Evid. Rule 801(d)(2)(B) makes a statement not a hearsay declaration if it is "a statement of which the party has manifested an adoption or belief in its truth." Under this item, a statement made by a third person is admissible if the party to the case has *manifested* a belief in its truth. Thus, the Levy & Droney Report or portions of it would be admissible if the MDC - by words or actions - manifests its belief in the truth of the statements contained therein or contained in the relevant parts of it. The admissibility of a statement under Rule 801(d)(2) does not hinge on whether or not the statement is against the party-declarant's interest. See United States v. Turner, 995 F.2d 1357, 1363 (6th Cir.), cert. denied, 510 U.S. 904 (1993); United States v. Reed, 227 F.3d 763, 770 (7th Cir. 2000). A liberal attitude in favor of admissibility is favored by the Rules.

> When silence is relied upon, the theory is that "the person would, under the circumstances, protest the statement made in his presence, if untrue." Id., advisory comm. notes. Moreover, Rule 801(d)(2) generally calls for "generous treatment" in determining the admissibility of such putative admissions. Fed. R. Evid. 801(d)(2), advisory comm. notes.

Phipps v. Comprehensive Community Development Corp., No. 00Civ.6063 (RJH) (KNF) (S.D.N.Y. 2005), February 2, 2005, p. 26, copy attached.

That same case summarizes the current position in the Second Circuit on silent manifestations.

> The Second Circuit has stated that "[s]ilence is not evidence of an admission, unless there are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not." U.S. v. Flecha, 539 F.2d 874, 877 (2d Cir. 1976) (internal citations omitted). Phipps, as the proponent of the admission, "has the burden of proving [through a preponderance of the evidence] that the party's conduct manifested an intent to adopt the statement." J. McLaughlin & J. Weinstein, WEINSTEIN'S FEDERAL EVIDENCE, § 801.31[2] at 801-57 (2d ed. 2004)

6

> ("Weinstein"). Following an "initial evidentiary determination" to be made by the trial court, any "ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess." Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., 262 F. Supp. 2d 251, 260 (S.D.N.Y. 2003) (citing U.S. v. Tocco, 135 F.3d 116, 129 (2d Cir. 1998), cert. denied, 523 U.S. 1096, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998)).

Id. at 26-27.

In the Phipps case, the silence of the person to whom a statement was made was deemed sufficient for the statement to go to the jury on the basis that a reasonable person would have denied it if it were not true. The court stated:

> The accusation directed at Espada — that he allegedly claimed that the WIC Program's difficulties arising out of the investigation stemmed from the presence of Jamaicans — is sufficiently placed in context such that a juror could reasonably conclude that Espada heard, understood and acceded to the statement at issue. Weinstein, § 801.31[2] at 801-58. As such, Espada's failure to directly deny the statement is deemed an adoptive admission for the purpose of this summary judgment motion.

Id. at 27.

And again, this time the Second Circuit speaking in the recent case of Patterson v. County of Oneida, 375 F.3d 206 (2nd Cir. 2004) at page 229, citing not only the Rule but Wigmore:

> (Brown-v-Middaugh Hearing Transcript, July 23, 1998, at 210 (emphases added).) Patterson, having proffered this third-party testimony to the district court, cannot complain of its use against him. See generally Fed.R.Evid. 801(d)(2)(B) ("a statement of which the party has manifested an adoption or belief in its truth" is not, when offered against that party, hearsay); 4 WIGMORE ON EVIDENCE § 1075, at 150 (Chadbourn rev. 1972) ("some depositions or testimonies may be so used as to become admissions" (emphasis omitted)); id. § 1073, at 129 ("written statements of a third person may be so dealt with by the party that his assent to the correctness of the statements may be inferred, and they would thus by adoption become his own statements" (emphasis in original)); id. at 138 ("The party's use of a document made by a third person will frequently amount to an approval of its statements as correct, and thus it may be received against him as an admission by adoption." (emphasis in original)).

In the instant case, we have so much more than silence upon presentation of a document that demanded a response.  First, the MDC solicited the statement - not only solicited it, but paid for it. Testimony of Mark Rose.  Second, upon receiving the document, the MDC Commissioners virtually immediately - April 1, 2002 - waived attorney-client privilege and made it public.  Third, also upon receiving the document, senior management of the MDC, including the Chief Executive Officer and his staff, set about implementing the recommendations and produced an implementation plan in short order by April 15, 2002.  Pl. Ex. 3.  (How else does one interpret a document entitled "Preliminary Management Implementation Plan for Recommendations in the March 15, 2002 Compliance Audit of Employment Practices", where the Levy & Droney Report is the only document dated March 15, 2002, entitled "Compliance Audit of Employment Practices of the Metropolitan District Commission Undertaken by Legal Counsel"?)  Fourth, though there is the occasional exception to the Levy & Droney Recommendations, the Preliminary Implementation Plan, Pl. Ex. 3, manifests an overwhelming intention to adopt the Recommendations and implement them as MDC policy.  So strong is this manifestation that Plaintiff suggests that the entire Levy & Droney Report should be ruled admissible and the Defendant left to present evidence of specific items with which it disagrees.  Fourth, the Preliminary Management Implementation Plan is not only received by the PPI Committee of the Commissioners, a Final Management Implementation Plan is received by them on June 17, 2002, and passed on to the full body of the Commissioners on July 8, 2002.  Some changes are noted as the document progresses showing that implementation is occurring while the Plan is making its way to the full body of the Commissioners.  Finally, Rev. Ritter testified that the Commissioners did not need to make a formal resolution in order to act, to accept a report, to advise management.  They did so by their discussions, asking questions,

suggesting direction and change.  What is absolutely clear is that the Commissioners did not reject

the Levy & Droney Report or reject its recommendations.  Indeed, it is more than clear that the

Commissioners and the highest levels of management of the MDC were pushing for an expedited

implementation of the recommendations.

Can these recommendations be implemented, almost holus-bolus, without there being an

implicit acceptance of the findings?  We suggest that the Levy & Droney Report itself so closely

knits the Findings to the Recommendations, with constant reference back from Recommendations

to Findings, that the notion that the recommendations could be adopted while the findings rejected

is simply ludicrous.  The action of the MDC in unhesitatingly implementing the Recommendations

has to imply an acceptance of the major Findings of the Report.  Defendant is free to argue at trial

which specific items it did not accept, if it can do so without inconsistency with the Management

Implementation Plan.


**B.     THE LEVY & DRONEY REPORT IS A STATEMENT BY THE MDC'S AGENT CONCERNING A MATTER WITHIN THE SCOPE OF THE AGENCY MADE WITHIN THE EXISTENCE OF THE AGENCY UNDER FRE RULE 801(d)(2)(D)**

The MDC commissioned Levy & Droney to make a report on the matters that this Report

considers.  Levy & Droney did so within the scope of their agency and within the existence of the

agency to do so.  Levy & Droney were paid for making this statement.  Testimony of Mark Rose;

testimony of Burke Spellacy.

If the MDC had not waived attorney-client privilege on April 1, 2002, this report would have

remained privileged, even though otherwise within the scope of Fed. R. Evid. Rule 801(d)(2)(D).

But the waiver of attorney-client privilege and the consequent publication of the Report clearly

shows that the MDC not only ratified the agency and the statement, but sought to gain favor with public opinion by making this statement. See Pl. Ex. 5, and the headline, taken from the Report itself, which is clearly intended to counter the testimony of Rev. Ritter at the Harper vs. Metropolitan District trial.

### C.    THE LEVY & DRONEY REPORT IS RELEVANT TO THE CLAIMS OF PLAINTIFF REGARDING DISCRIMINATION UP TO MARCH 2002 AND TO CLAIMS OF DISCRIMINATION AFTER MARCH 2002

The "Findings" of the Levy & Droney Report are relevant to the claims predating the issuance of the Report. The "Recommendations" of the Levy & Droney Report are relevant to the claims postdating the issuance of the Report. Findings, such as the lack of Hispanic or female employees in Administrative/Management positions (Report, p 19), the pattern of hiring by word of mouth, thus avoiding competition from people who do not look the same (Id., p. 19), the failure to maintain an affirmative action plan (Id. p. 28), the absence of a policy prohibiting discriminatory treatment (Id. , p. 29), the lack of a consistent job posting and job selection process (Id., p. 31) are of significant consequence to the determination that discrimination in promotions was more probable than it would be without the evidence. Fed. Rule Evid. Rule 401. Likewise, as Plaintiff will be contending at trial that in the post-Report period, while senior management made a show of implementing the Report, middle management, and perhaps senior management,  ignored it in practice or manipulated its recommendations to avoid promoting Plaintiff to positions for which she was the best suitable candidate. Therefore, both the Recommendations of the Report and the implementation of them are in issue for the three positions post-dating the report, viz:  Manager of Operations, posted May 2002; Assistant Manager of Operations, posted June 2002, and Manager of Environment, Health and Safety, posted June 2002.

Plaintiff wishes to emphasize that this brief cannot capture each and every sentence in the Levy & Droney Report that is relevant to the proof of the Plaintiff's case. The most important issues have been highlighted, but findings such as those related to the performance review process may have either lesser or indirect effects on the proof of the case. Therefore, the court should deem the entire Report relevant and admit it without redaction of any part.

### D.    RULE 403 SHOULD NOT EXCLUDE ADMISSION OF THE LEVY & DRONEY REPORT

The Preliminary and Final Management Implementation Plans cannot be explained without reference to "the March 15, 2002 Compliance Audit of Employment Practices" mentioned in its title or without explanation for the Recommendations column of the implementation plan. The Recommendations column cannot be discussed without reference not only to the Levy & Droney Report generally, but without reference to the Findings that relate to the Recommendations. The probative value of the Report, both as it relates to Plaintiff's application for prior and subsequent job positions is high, very high indeed.

Plaintiff grants that the Report contains a number of anonymous hearsay statements. There are several ways to handle this issue.

1.    The court could instruct the jury to ignore anonymous allegations mentioned in the report. In this regard, Plaintiff submits that the Court must not underestimate the ability of a jury to weigh evidence, especially with guidance from the court.

2.    The court could redact - either by black out or cutting out - any such portions of the Report without losing the coherency of the Report. Again, the ability of the jury to understand the meaning of what does go before it should not be underestimated. An

instruction that deleted material does not relate to claims in the case is a standard

instruction in such cases.

3.      The court could admit only those sections that Plaintiff has identified as directly and

closely relating to the claims in the case, and give a suitable instruction, as indicated

above.  For instance, it is of no consequence (at this point, at least, unless something

unforeseen should occur at trial) that the jury consider the section of the Report

relating to workplace violence.

Plaintiff submits that there are also other ways to handle it.  To the extent that a statement

in the Report relates to the claims in the case, Defendant will have the opportunity to explain

whether it intended to adopt that particular statement or not, and then show how it fits into the

implementation plan.

In short, Defendant, having commissioned the report, having waived attorney-client privilege

on the report, having made it public, and having acted to implement its recommendations, cannot

complain that this public document be considered to be a statement by it.

## IV.    CONCLUSION

For the reasons set forth herein, Plaintiff requests that this court rule that the Levy & Droney Report be admitted as an exhibit in the trial of this case.  Plaintiff further requests that it bee admitted intact and that if the court determines that any portions of the document should be prejudicial to Defendant, that that prejudice be handled with a minimum of interference to the Plaintiff's right to have the remainder of the document placed before the jury.


PLAINTIFF
DAISY CHAVEZ

By_____
        Francis A. Miniter
        Miniter and Associates
        100 Wells Street, Suite 1D
        Hartford, CT 06103
        phone 860-560-2590
        fax    860-560-3238
        email: miniter@attglobal.net
        Fed. ID No. CT09566


## CERTIFICATION OF SERVICE

The undersigned does hereby certify that a true copy of the foregoing together with all attachments thereto was delivered to the following counsel of record by placing the same in the U.S. Postal Service, regular mail, postage prepaid, on March 11, 2005:

Holly Quackenbush Darin, Esq.
David Ryan, Esq.
Ryan & Ryan
900 Chapel Street, Suite 621
New Haven, CT  06510


_____
        Francis A. Miniter