# Loislaw Federal District Court Opinions

PHIPPS v. COMPREHENSIVE COMMUNITY DEVELOPMENT CORP., (S.D.N.Y. 2005)

CLAUDETTE PHIPPS, Plaintiff, v. COMPREHENSIVE COMMUNITY DEVELOPMENT CORP.,

et al., Defendants.

No. 00 Civ. 6063 (RJH) (KNF).

United States District Court, S.D. New York.

February 2, 2005

### MEMORANDUM OPINION AND ORDER

RICHARD HOLWELL, District Judge

Plaintiff Claudette Phipps brought this action against Comprehensive Community Development Corporation d/b/a Soundview Health Center ("CCDC"), Pedro Espada, Sandra Love, Maria Cruz, Melba Conley and Esther Hill (collectively "defendants"), asserting employment discrimination, retaliation and hostile workplace claims based on race and national origin pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), **42 U.S.C. § 2000e** *et seq.*; **42 U.S.C. § 1981** ("Section 1981"); and New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 291 *et seq.* Specifically, Phipps, a black woman of Jamaican national origin, alleges that defendants made racially derogatory comments, forced her to hire Hispanic individuals, retaliated against her when she filed a charge with the Equal Employment Opportunity Commission ("EEOC") and terminated her from her position at CCDC based on unlawful discrimination. Phipps has separately asserted a breach of contract claim against defendants based on their alleged failure to protect her from defamation.

Defendants now move for summary judgment on all of plaintiff's claims of employment discrimination. For the reasons set forth below, the Court grants summary
**Page 2**
judgment on Phipps' claims of employment discrimination, retaliation and hostile work environment. The remaining state law claims for breach of contract are **dismissed** without prejudice for lack of pendent subject matter jurisdiction.

### BACKGROUND

Unless otherwise indicated, the following facts are undisputed.**[fn1]** CCDC is a not-for-profit corporation authorized under New York laws that operates Soundview Health Center ("Soundview"), an outpatient community health center. (Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) Pursuant to a license issued under Article 28 of New York's Public Health Law, CCDC provides medical services including diagnostic and treatment services. (Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) Pedro Espada Jr., a Hispanic, founded CCDC and served as President of CCDC at all relevant times. (Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 10.)
**Page 3**

I. <u>Phipps' Employment at CCDC from 1995-1997</u>

A. *Phipps' Hiring by CCDC*

Phipps sent a letter dated July 20, 1990 to Maria Cruz seeking to apply for the position of Program Director of CCDC's Women, Infants and Child Program ("WIC Program") advertised in *The New York Times.* (Defs.' 56.1 ¶ 34.) In support of this letter, Phipps attached her resume which included experiences such as her employment as "Teacher of Home Economics, Vere Technical High

School, Jamaica W.I." from September of 1977 until June of 1980. (Defs.' Ex. L at 3.) The resume also listed Phipps' "Honors Diploma — Technical Education Nutrition" received in June of 1977 at "College of Art, Science and Technology, Kingston, Jamaica, West Indies." (*Id.*)

At this time, Espada, a Hispanic male, was serving as President of CCDC, Sandra Love, a black female,**[fn2]** was Vice President, and Cruz, a Hispanic female, was Espada's executive assistant. (Defs.' 56.1 ¶ 38; Pl.'s 56.1 ¶ 10.) In response to Phipps' application, Cruz set up an appointment for the interview, and Espada and Jim Knox, then Vice President at CCDC, interviewed Phipps. (Phipps Dep. Tr. at 9.) Based on his meeting with Phipps and her application, Espada knew that Phipps was black and from Jamaica. (Espada Decl. ¶ 2.) Espada decided to hire Phipps as Director of the WIC Program, commencing on or about August 10, 1990, and contends that her race and national origin had no effect on his decision to hire her. (Defs.' 56.1 ¶ 37; Espada Decl. ¶ 7.) Love met Phipps around this time and learned soon after her hiring that she was from Jamaica. (Love Decl. ¶ 12.)
**Page 4**

Phipps was not given a job description at the time of her hiring. (Pl.'s 56.1 ¶ 37.) Her starting salary was approximately $31,000 a year. (Phipps Aff. ¶ 3.) Through several salary increases during the course of her employment, Phipps' annual salary at the end of her employment rose to $80,000. (Defs.' 56.1 ¶ 42.)

*B. Phipps' Management of the 731 White Plains Road Clinic*

In or about 1995, Phipps received added clinic management responsibilities regarding the Managed Care and Credentialing Program, HMO contracting, the Children's Medical Center and CCDC's main medical clinic at 731 White Plains Road ("731 WPR Clinic"). (Defs.' 56.1 ¶ 43; Pl.'s 56.1 ¶ 43.) Around this time, CCDC also promoted Phipps to the position of Assistant Vice President. (Defs.' 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.) The parties sharply contest how Phipps received those added responsibilities. Defendants simply claim that Phipps requested them. (Def.'s 56.1 ¶ 43.) According to Phipps, Dr. Azimah Ehr, then Vice President of Clinical Affairs, had a private conversation in which she told Phipps that she did not want to work with Cruz. (Phipps Dep. Tr. at 140; Phipps Aff. ¶ 10.) As such, Dr. Ehr had suggested to Espada that Phipps take on those responsibilities, and Espada had **agreed**. (Phipps Dep. Tr. at 140-41.) In any event, Phipps was given clinic management duties at the 731 WPR Clinic that had belonged to Cruz. (Espada Dep. Tr. at 152.)

Plaintiff asserts that Dr. Ehr informed her that Cruz would be subsequently transferred to the Burnside Clinic against her own wishes. (*Id.* at 141.) Phipps further contends that Cruz became angry that she had been displaced.**[fn3]** (Phipps Aff. ¶ 11.) According to plaintiff, Cruz "set about to sabotage" her by having meetings in the early
**Page 5**
mornings with staff prior to going to the Burnside Clinic even though Cruz no longer supervised the staff at the 731 WPR Clinic. (Phipps Aff. ¶ 12.) In a cabinet meeting held because the computers at the 731 WPR Clinic suffered a breakdown, Cruz suggested to Phipps that she consult her on a more frequent basis regarding the operations of the 731 WPR Clinic to avoid such problems in the future. (Phipps Dep. Tr. at 133.) Although Phipps considered the suggestion "hypocritical," she acquiesced and followed up with Cruz. (*Id.* at 134.) Phipps maintains that she told Cruz that "I wanted to work just like anybody else and I was not about displacing anybody or taking their job and that I got the impression that ever since I was given this responsibility, that that was the vibe that I was getting and one of the reasons why I did not, you know, sit down in any meetings with [you]." (Phipps Dep. Tr. at 137.)

By her own admission, Phipps was not successful in managing the

731 WPR Clinic. (*Id.* at 142.) Phipps felt that the administrative staff did not support or assist her and that to her detriment, Dr. Ehr had been terminated, leaving Love as her new supervisor. (*Id.* at 137.) Soon after she assumed the position, Espada, Love and Cruz began receiving numerous complaints from staff employees who were not part of the WIC Program regarding Phipps' failure to manage the 731 WPR Clinic.**[fn4]** (Defs.' 56.1 ¶ 151.) At a meeting held with medical assistants and HIV workers initiated by Espada at CCDC's office at Trumbull Avenue, numerous staff members voiced their criticisms regarding Phipps' performance as a manager in the presence of Phipps, Espada, Cruz and Love. (Phipps Dep. Tr. at 144; Espada Decl. ¶¶ 15-16; Cruz Decl. ¶¶ 18-19; Love Decl.
**Page 6**
¶ 28.) Phipps was completely shocked by the comments and could not respond because she felt "railroaded" by the overwhelming criticism. (Phipps Dep. Tr. at 145-46.) However, Phipps does not claim that the staff complaints were animated by racial or national origin discrimination. Following the meeting, Phipps spoke with Love who was surprised by the number and intensity of the comments articulated by the staff members. (Conley Decl. ¶¶ 28-29; Phipps Dep. Tr. at 146.)

Because Phipps did not believe that there were any issues to be resolved, she did not take any steps following the meeting. (Pl.'s 56.1 ¶ 155.) Subsequently, Phipps was relieved of supervising the front desk as well as some of her clinic manager duties at 731 WPR although she remained responsible for the Prenatal Care Assistance Program and HIV Programs. (Phipps Aff. ¶ 19.) Phipps remained WIC Program Director despite the reductions in her responsibilities at the 731 WPR Clinic. (Defs.' 56.1 ¶ 156.)

*C. Love's Evaluation of Phipps' Managerial Skills*

In April of 1997, Love completed an annual performance appraisal sheet in which she rated Phipps as mostly "very good" in each of the behavioral ratings including quality of work, punctuality on the job, cooperation and ability to accept criticism. (Phipps Aff., Ex. A.) Moreover, Love specifically described Phipps as possessing "very good management and organizational skills," as well as "keen at recognizing problems." (*Id.*) The one area of weakness that Love listed was Phipps' "interaction with some team players." (*Id.*) Love did not score Phipps in any respect as "below expected level" or "unsatisfactory." In Phipps' employee remarks appended at the end of the evaluation sheet, Phipps responded that she "appreciate[d] the honesty of this evaluation." (*Id.*)
**Page 7**

According to Love, she overrated Phipps because she did not want to put anything on Phipps' record that could be perceived as "damaging." (Love Dep. Tr. at 93.) However, she maintains that she talked to Phipps about her attitude towards coworkers because Phipps "had difficulties in dealing with some of the cabinet members. Either she didn't like them or she felt that they didn't like her." (*Id.*) Love further contends that she told Phipps to get counseling for her "persecution complex" and to "try to be more of a team player." (*Id.* at 96-97.)

II. <u>Phipps' Subsequent Employment Problems</u>

*A. Phipps' Relationship With Other Employees*

*1. Employee Complaints Against Phipps*

From at least December of 1998 until the date of her termination on May 7, 1999, Phipps' supervisors, including Love, Espada, and Melba Conley, the Human Resources Director, received numerous complaints from WIC Program employees regarding Phipps.**[fn5]** (Defs. 56.1 ¶ 61.) Conley stated that she received complaints as early as 1997. (Conley Decl. ¶ 75.) For instance, Conley claims that Liliana Martin, an assistant

nutritionist, stated that she would not return to work in August of 1997 because she was "afraid" of Phipps who allegedly "disrespected and taunted her."**[fn6]** (*Id.* ¶ 76.) Conley also received a complaint from Rita Krever, another employee, regarding her difficulties in communicating with Phipps. (Defs.' 56.1 ¶ 94.) Although Phipps admits that Conley

**Page 8**

relayed this information to her, Phipps asserts that when she confronted Krever, she denied making any complaints. (Pl.'s 56.1 ¶ 97; Defs.' 56.1 ¶ 94.)

Other employees such as Sasha Stewart, Delores Montemurro, Joan Lewis, Margarita Soto and Sherrill McDermott voiced criticisms of Phipps' unfair treatment, ineffective communications and retaliatory attacks. (Defs.' 56.1 ¶¶ 95-100.) Phipps does not contest that these employees made complaints, but rather disputes the truth asserted therein. (Pl.'s 56.1 ¶¶ 92, 95-100.) Phipps admitted that at least four employees complained to her that she favored Cheryl Boston over other employees because of their personal relationship prior to working at CCDC. (Phipps Dep. Tr. at 227; Pl.'s 56.1 ¶ 144.) Phipps further admitted that in late 1998 or early 1999, Stewart complained about Phipps' management to their pastor, Reverend Cole, and other members of the congregation at the church they both attended. (Defs. 56.1 ¶ 139; Pl.'s 56.1 ¶ 139.) When Stewart was terminated, she blamed the determination on Phipps. (Defs.' 56.1 ¶ 139; Pl.'s 56.1 ¶ 139; Phipps Dep. Tr. at 233.) However, Phipps disputes that numerous employees felt that she created a "hostile work environment" and protests that she did not "make improper statements or threatening remarks in the workplace." (Defs.' 56.1 ¶ 102; Pl.'s 56.1 ¶ 102.).)

In response to these complaints, Conley organized a staff meeting with Phipps present. (Defs.' 56.1 ¶ 72.) According to defendants, the "purpose of the meeting was to have an airing of employee grievances and to foster a productive dialogue between and among Phipps and her staff." (*Id.*) Phipps acknowledges that "there was a meeting where Conley tried to get people to offer negative criticism of me." (Pl.'s 56.1 ¶ 62.) However, she asserts that the complaints made were "refuted, because none of them were

**Page 9**

true." (*Id.*) Moreover, Phipps vaguely claims that she "responded to these supposed criticisms and showed them to be untrue," (Pl.'s 56.1 ¶ 62), although defendants maintain that at the staff meeting, she did not answer the criticisms or engage in dialogue with her staff members. (Defs.' 56.1 ¶ 74.)

*2. Noel Haughton*

Phipps acted as Haughton's main supervisor. (Defs.' 56.1 ¶ 118; Pl.'s 56.1 ¶ 118.) Haughton's "principal" job was to perform custodial services for the WIC Program although he had other minor duties. (Phipps Dep. Tr. at 266.) On occasions when Haughton was supposed to clean the sidewalk outside the Allerton Avenue Center, he was frequently late. (Phipps Dep. Tr. at 242.) As a result, the WIC Program received tickets for the sidewalk violations. (*Id.*) It is disputed whether Haughton was "chronically late" in cleaning up the sidewalk and opening up the WIC Program center site. (Defs,' 5.1 ¶ 126; Pl.'s ¶ 126.)

After CCDC hired Haughton, Haughton moved into a part of Phipps' residence. (Pl.'s 56.1 ¶ 122.) Although Phipps initially charged Haughton rent, Phipps reduced that rent in exchange for Haughton's services in driving her daughter, Melissa, to school by 7:30 a.m. (*Id.*; Phipps Dep. Tr. at 395.) In the school year of 1998-1999, Haughton "drove Melissa to school most days" of the week. (Phipps Dep. Tr. at 264.) Moreover, Phipps admits that Haughton may have arrived late to work when he was driving Melissa to and from school. (*Id.*)

It is undisputed that Phipps did not discipline Haughton or deduct any of his pay for these latenesses because she felt that it was not her responsibility even though she was his supervisor.

(Defs.' 56.1 ¶ 129; Pl.'s 56.1 ¶ 129.) Eventually, another employee,

**Page 10**

Sandria Robertson, received the responsibility of unlocking the Allerton Avenue Center on time. (Defs.' 56.1 ¶ 128; Pl.'s 56.1 ¶ 128.)

In or about February of 1999, Love, then Senior Vice President, and Conley attended a WIC Program staff meeting to present the staff with an award for its excellence. (Defs.' 56.1 ¶¶ 130-31; Pl.'s 56.1 ¶¶ 130-31.) When Love was speaking to the staff, Haughton made what Conley and other staff members perceived to be rude, sarcastic and disrespectful comments. (Defs.' 56.1 ¶ 132.) Phipps did not consider the remarks to be rude and therefore did nothing to stop him. (Phipps Dep. Tr. at 353-55.) Conley confronted Phipps and told her that she was "shocked that as WIC Program Director, [Phipps] did not intervene at her staff meeting and stop Mr. Haughton from his public showing of disrespect to CCDC and to its Senior Vice President." (Conley Decl. ¶ 105.) Although Phipps told Haughton that his behavior was perceived as "rude," she did not tell him to apologize. (Phipps Dep. Tr. at 354.)

   B. *Phipps' Difficulties with Love, Cruz and Conley*

   1. *Love*

Following Dr. Ehr's termination from CCDC, Phipps directly reported to Love, who was her supervisor. (Phipps Dep. Tr. at 38; Defs.' 56.1 ¶ 105.) At one point, Love informed Phipps that Dr. Israel Praiss, the Medical Director and/or Vice President of Clinical Affairs, would become her new supervisor. (Love Decl. ¶ 14; Pl.'s 56.1 ¶ 105.) However, Phipps objected to Dr. Praiss becoming her supervisor because she wanted Love to continue supervising her. (Phipps Dep. Tr. at 388.)

Despite wanting Love as her direct supervisor (*id.*), Phipps claims that Love "enforced the atmosphere of discrimination and racism" at CCDC. (*Id.* at 29.) Phipps

**Page 11**

interpreted Love's behavior as discriminatory whenever she "was called to do anything that was not in line with the policies of the program." (*Id.*) For instance, Phipps considered Love's questions regarding her meeting with another employee about starting a labor union as "constant harassment." (*Id.*) Phipps defined "discrimination" as "anything going against ethics . . . and based on . . . race, nationality, sex, religion. . . ." (*Id.* at 30.)

Phipps further claims that Espada, Love and Conley applied pressure on her to hire more Hispanics. (Pl.'s 56.1 ¶ 109; Phipps Dep. Tr. at 54-55.) After Phipps hired Cheryl Boston, Espada "expressed displeasure to [Phipps] over hiring her and noted that [she] should hire more Hispanics." (Phipps Aff. ¶ 34.) Defendants have not directly contested this issue.**[fn7]** Yet Phipps admitted that in light of the client population being served, the WIC Program needed employees who were familiar with Hispanic culture and could speak Spanish (Phipps Dep. Tr. at 361-63, 497.) Neither party has offered statistical evidence comparing the relative number of Hispanic clients to the number of Hispanic staff members.

Moreover, Love took Phipps out to lunch on two occasions to tell her who to hire at the WIC Program. (Phipps Dep. Tr. at 28.) Specifically, Love instructed her to hire Haughton, who was black and Jamaican, as well as Robertson, who was African American. (Phipps Dep. Tr. at 27-28, 235.) Phipps admits that she selected Cheryl

**Page 12**

Boston, a black Guyanese woman, and Sasha Stuart, a black Jamaican woman, to be hired into the program without any objections to their employment. (*Id.* at 27, 221, 229.)

   2. *Cruz*

Phipps asserts that in 1999, Maria Sanchez, Phipps' administrative assistant, informed her that Cruz, then acting as Vice President of Operations, had referred to Phipps as a "f___ n___" and "f___ Jamaican." (Phipps Dep. Tr. at 94, 231.) That same year, Phipps contends that Israel Acosta, another employee, informed her that Cruz called her a "n___." (*Id.* at 96.) Phipps also claims that she heard Cruz refer to Henry as "f___ n___" and "f___ Jamaican" in her presence. (*Id.*) On another occasion, Cruz allegedly told Phipps that she needed to "stop weeping like a f'ing baby" when Phipps' request for financial assistance for her school fees was denied and she began crying. (*Id.* at 93.)

### 3. Conley

At the end of 1998 until her termination, Conley became "very involved in . . . WIC['s] employee operations." (Phipps Dep. Tr. at 326-27.) Phipps admits that there were "several times that [Conley] was talking to WIC employees and bringing [her] into the picture. . . . It was just about almost every week that [Conley] had something to discuss [with Phipps] about the employees." (*Id.* at 327.) Subsequently, Conley told Phipps that "she did not think that from a human resources vantage point, that [Phipps] communicated adequately with the employees." (*Id.*) Conley further told Phipps that she had received complaints from Phipps' entire staff. (*Id.*)

Phipps asserts that Conley told her to change or behave differently several times based on the fact that she "was being looked upon as an oddball." (*Id.* at 45.) According to Phipps, Conley "inferred that I was an oddball because I was a Jamaican, and

**Page 13**

Jamaicans did things differently." (*Id.*) Phipps states that Conley told her to participate in more events rather than simply going home. (Phipps Dep. Tr. at 54-55.) Phipps responded by telling her that making those changes "was not my style. Some of the things I did not like. I thought I was being hired to do a particular job and that's what I wanted to do." (*Id.* at 55.) Moreover, Phipps claims that Conley told her that they were looking to replace her with another woman who was an "American." (*Id.* at 47.)

### C. The WIC Investigation

In December 1998, the New York State Department of Health ("NY DOH") initiated an investigation of certain enrollments in CCDC's WIC Program. (Espada Aff. ¶ 28; Phipps Decl. ¶ 22.) According to Phipps, defendants attempted to force her to sign documents preventing the NY DOH investigator, Fred Fogel, from obtaining documents from CCDC. (Phipps Aff. ¶ 27.) Espada admits that while the NY DOH investigation created a stressful situation for the entire organization, and particularly, for the WIC Program, Phipps' poor managerial performance "seemed to be making the program increasingly dysfunctional." (Espada Aff. ¶ 28.)

In 1999, Phipps claims that Acosta told her that he was called into a meeting with Espada to discuss the pending WIC investigation. (Phipps Dep. Tr. at 34-35.) Phipps alleges that Acosta told her that Espada said at a meeting that the problems were occurring because "they were all Jamaicans." (*Id.* at 34.) When Phipps became enraged and approached Love regarding Espada's comments, Love called him to come over to her office. (Phipps Dep. Tr. at 34-35.) According to Phipps, Espada did not admit or deny making the statement and simply told her not to worry. (*Id.* at 35.) Phipps herself never heard Espada refer negatively to Jamaicans at this meeting. (*Id.* at 36.) However, at

**Page 14**

some point she heard him refer to "these people," which she interpreted as an implicit reference to Jamaicans. (*Id.* at 39.)

### D. Phipps' Relationship with Dorrell Henry

Sometime before 1999, Phipps interviewed Dorrell Henry, a black

woman of Jamaican national origin, for a position on the WIC Program staff. (Defs,' 56.1 ¶ 75; Phipps Dep. Tr. at 300.) Phipps selected Henry as the best applicant for the position and considered her to be a good worker. (Phipps Dep. Tr. at 300.) Phipps further promoted Henry at some point to the title of Assistant WIC Coordinator. (*Id.* at 304.) On several occasions, Phipps designated Henry as the person to oversee the WIC Program while she was absent or on **vacation**. (Pl.'s 56.1 ¶ 77.)

At some point, Henry began voicing complaints to Conley claiming that she had to shoulder responsibilities that Phipps should have handled. (Conley Decl. ¶ 63.) Phipps apparently responded to Henry's criticisms by taking away some of her responsibilities. (*Id.*) On February 12, 1999, Henry wrote a letter to Conley in which she detailed numerous problems growing in her relationship to Phipps. (Defs.' Ex. T.) Henry first acknowledged Conley's remark that "there was obviously a problem with the WIC Director and myself," as well as Conley's recommendation that Henry and Phipps be temporarily separated. (*Id.*) Henry alleged that Phipps made comments in staff meeting such as "there are a million and one ways to hang a dog without putting a rope around its neck"; "my office is an open office for you to come in and resign"; and "if you should complain when the Regional staff conducts the management evaluation you will be terminated." (*Id.*) In that letter, Henry further complained about her purported demotion and reassignment as nutritionist immediately following a discussion with

**Page 15**

Conley, in which Henry disclosed that she had been interviewed by Fogel in his WIC investigation. (*Id.*) In a letter dated February 17, 1999, Conley responded by **rejecting** Henry's suggestion that defendants were attempting to retaliate against her for cooperating with the WIC investigation. (Defs.' Ex. V.)

Henry began directly voicing her criticisms to Phipps regarding her administration of the WIC Program at least a month before Phipps was terminated. (Phipps Dep. Tr. at 308-9.) Conley showed Phipps some of the letters in which Henry had criticized Phipps. (*Id.* at 309.) Phipps was "displeased" by Henry's personal criticisms, which she perceived to be false. (Phipps Aff. ¶ 31; Pl.'s 56.1 ¶ 81.) Additionally, Phipps was concerned that defendants would use her as a "scapegoat" in the WIC investigation "if possible and necessary." (Pl.'s 56.1 ¶ 31.)

*E. Defendants' Decision to Terminate Phipps*

In March of 1999, Phipps met with Cruz, Love and Espada. (Phipps Dep. Tr. at 245.) According to Phipps, she was called to the meeting regarding the WIC investigation. (*Id.*) Phipps admits that she was "distressed" about the WIC investigation and "was basically just throwing my arms up in the air, saying, at this point, I don't know what to do." (*Id.*) In response, Espada told her not to worry, that "we're going to be here for you — just do what you are supposed to do within the context of our policies and you should be fine." (*Id.* at 245-46.)

Following the meeting, Espada, Love and Cruz concluded that Phipps did not have "a plan to resolve the problems nor the skills, determination, and energy to turn the program around" and decided to look for Phipps' replacement. (Defs.' 56.1 ¶¶ 50, 51.) Defendants understood Phipps' comments at the meeting to express an intention to

**Page 16**

resign. (Defs.' 56.1 ¶ 55.) Plaintiff denies making any such statements. (Pl.'s 56.1 ¶ 53.) In any event, Cruz ordered an advertisement for the WIC Program Director position to be published on March 14, 1999 in the *Daily News*. (Defs.' Ex. CC.) Phipps admits that she saw an advertisement for the WIC Program Director position in *The New York Times* four to six weeks before her termination on May 7, 1999. (Pl.'s 56.1 ¶ 52.) She also saw a resume in her mailbox for her position shortly thereafter. (Phipps Dep. Tr. at 49.)

In April of 1999, Phipps felt "very fearful about being

terminated," particularly since Love had asked her to perform tasks that were usually done later in the year. (Phipps Dep. Tr. at 50-51.) She asked Conley whether she was being fired, to which Conley responded "speak no evil, hear no evil." (*Id.* at 51.) She also asked Esther Hill, another employee at CCDC, several times whether she was going to be fired. (*Id.* at 52.)

Around the same time, Phipps retained a lawyer, Daniel Cherner, who sent a letter dated April 3, 1999 on her behalf to CCDC's attorneys to respond to Henry's complaints. (Defs.' Ex. O.) That letter asked defendants to address Henry's allegedly defamatory statements regarding Phipps and warned them not to use Phipps as a scapegoat in the WIC investigation or to take any adverse employment action. (*Id.*) Cherner met with CCDC's attorneys at their request and informed them of Phipps' concern that "CCDC was trying to make it look like Ms. Phipps was directing the attempt to withhold documents from the DOH, and that CCDC was not addressing the statements made by Henry about Ms. Phipps." (Cherner Decl. ¶ 10.) At no point did Cherner mention racial or national origin discrimination to CCDC's attorneys.
**Page 17**

When Phipps did not resign, defendants decided that they "could not wait any longer to **remove** Phipps" from her position and therefore terminated her on May 7, 1999. (Defs.' 56.1 ¶ 54.) It is undisputed that only Espada, Love and Cruz were involved in the decision to terminate Phipps.**[fn8]** (Pl.'s 56.1 ¶¶ 159-161.) CCDC conducted an exit interview with Phipps on that same day. (*Id.* ¶ 172.) The stated reason for separation on the exit interview form was "deficient management performance." (Defs.' Ex. Q.) Phipps wrote at the end of the document: "I don['t] accept the above reason for my termination." (*Id.*) Yet Phipps did not answer the question on the form which asked "[w]ere you discriminated against because of race, color, creed, sex, handicap, national origin or religion?" (*Id.*)

Following Phipps' termination, defendants promoted Hill, a black woman who had already been working for CCDC since 1992, to the position of WIC Program Director. (Defs.' 56.1 ¶¶ 8, 163.)

III. Phipps' Claims of Discrimination

Phipps filed her EEOC charge on April 9, 1999, in which she referred to the advertisement placed in *The New York Times* and stated that she had "reason to believe that there is a plan to terminate me from my employment at [CCDC]." (Pl.'s 56.1 ¶ 192.) According to defendants, they had no knowledge that Phipps intended to file or had filed a discrimination complaint with the EEOC. (Defs.' 56.1 ¶ 194.) Phipps claims that the
**Page 18**
April 3, 1999 letter from her counsel, as well as her counsel's meeting with CCDC's attorneys, provided implicit notice of her intent to file an EEOC charge.

On April 19, 1999, the EEOC issued a Notice of Charge of Discrimination, which defendants received on or about April 23, 1999. (Defs.' 56.1 ¶¶ 16-17.) Phipps filed an employment discrimination action in the Southern District of New York on July 15, 1999 against CCDC, Espada, Love, Conley, Hill and Henry as defendants, without naming Cruz. (*Id.* ¶ 17.) However, the Court signed an unpublished Stipulation and Order of Voluntary Discontinuance on February 25, 2000. (*Id.* ¶ 21.)

On or about February 28, 2000, Phipps filed an Amended Charge of Discrimination with the EEOC. (*Id.* ¶ 22.) The EEOC **dismissed** the charge. (Defs.' Ex. H.) On August 15, 2000, Phipps commenced this employment discrimination action against CCDC, Espada, Love, Cruz, Conley, Hill and Henry in the Southern District of New York. (Defs.' Ex. I.) However, Phipps voluntarily discontinued any claims against Henry and amended her complaint by, *inter alia,* dropping Henry as a defendant. (Defs.' Ex. J.)

As amended, Phipps' complaint asserts claims of employment

discrimination, retaliation and hostile work environment based on
race or national origin against defendants. In addition, she
brings a separate breach of contract claim, alleging that
defendants failed to protect her from alleged defamatory
statements made by Henry. The Court now turns to the merits of
these issues.
**Page 19**

DISCUSSION

I. <u>Summary Judgment Standard</u>

   Summary judgment is appropriate "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane,*
**112 F.3d 54**, **57** (2d Cir. 1997) (quoting Fed.R.Civ.P. **56**(c)).
Summary judgment may also be granted when the opposing party
fails to establish an element essential to that party's case and
on which that party would bear the burden of proof at trial. See
*Celotex Corp. v. Catrett,* **477 U.S. 317**, **321** (1986); *Distasio
v. Perkin Elmer Corp.,* **157 F.3d 55**, **61** (2d Cir. 1998) (summary
judgment is "mandated" when "the evidence is insufficient to
support the non-moving party's case.")

   In order to defeat a defendant's properly supported motion for
summary judgment, a plaintiff in an employment discrimination
action must show that there is a material issue of fact as to
whether the employee's protected status was a motivating factor
in the adverse employment action. *See Cronin v. Aetna Life Ins.
Co.,* **46 F.3d 196**, **203** (2d Cir. 1995) (plaintiff is not required
to show that the employer's proffered reasons were false or
played no role in the employment decision, but only that they
were not the only reasons and that the prohibited factor was at
least one of the "motivating" factors). Because employment
discrimination actions often present factual issues as to the
presence or absence of discriminatory intent that are not
appropriately resolved at the summary judgment, courts must
exercise caution in such cases and grant this remedy only when
the employer has proffered evidence of a legitimate,
nondiscriminatory reason
**Page 20**
for its action which raises "no genuine issue and which no
rational trier of fact could **reject**." *Id.* at 203.

   In reviewing the record, the district court must assess the
evidence in "the light most favorable to the non-moving party,"
resolve all ambiguities, and "draw all reasonable inferences" in
its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* **42 F.3d 725**,
**728** (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.,*
**477 U.S. 242**, **255**, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).
Nevertheless, an alleged factual dispute between the parties will
not by itself defeat a motion for summary judgment, since "the
requirement is that there be no *genuine* issue of *material*
fact." *Anderson,* 477 U.S. at 247-48 (emphasis in original). "A
fact issue is `genuine' if `the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.'"
*Mitchell v. Shane,* **350 F.3d 39**, **47** (2d Cir. 2003) (quoting
*Anderson,* 477 U.S. at 248). "A fact is `material' if it might
affect the outcome of the suit under governing law." *Id.*
(quoting *Anderson,* 477 U.S. at 248).

   To survive summary judgment, the non-moving party cannot rely
on mere allegations, denials, conjectures or conclusory
statements, but must present **affirmative** and specific evidence
showing that there is a genuine issue for trial. *See Anderson,*
477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.,*
**232 F. Supp. 2d 58**, **67** (S.D.N.Y. 2002). Where, as here, the party primarily
relies on her own affidavit as well as the affidavit of her
attorney in opposing summary judgment, such affidavits must "be
made on personal knowledge, shall set forth such facts as would

be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed.R.Civ.P. 56(e)). Moreover, hearsay statements that would be inadmissible at trial, conclusory

Page 21

assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact. *Id.* (internal citations omitted); *Quinn v. Syracuse Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123-24 (2d Cir. 2001).

In addition, the purpose of Local Rule 56.1 "is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). At the outset, the Court expresses some misgivings as to certain allegations contained in plaintiff's 56.1 statement that fail to cite any specific part of the record. Where those assertions are unsubstantiated, they shall "be disregarded and the record reviewed independently." *Id.*

II. Employment Discrimination and Retaliation Claims Pursuant to Title VII, Section 1981 and NYSHRL

A. The Framework for Analyzing Employment Discrimination and Retaliation Claims

Phipps has asserted claims pursuant to Title VII, NYSHRL and Section 1981, alleging that defendants intentionally discriminated and retaliated against her because of her race or national origin. Title VII prohibits an employer from discharging any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce

Page 22

contracts . . . as is enjoyed by white citizens . . .", has been construed to prohibit unlawful discrimination with respect to the benefits, privileges, terms and conditions of employment. *Patterson*, 375 F.3d at 224. Similarly, the relevant employment provision of NYHRL states that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or to employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

The burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), sets forth the order and allocation of proof in evaluating employment discrimination and retaliation claims asserted under Title VII, Section 1981 and NYSHRL in the absence of direct evidence. See *McDonnell Douglas*, 411 U.S. at 800-802 (Title VII); *Jetter v. Knothe Corp.*, 324 F.3d 73, 75 (2d Cir. 2003) (analyzing discrimination and retaliation claims together under *McDonnell Douglas* framework); *Hudson v. International Business Machines Corp.*, 620 F.2d 351, 354 (2d Cir. 1980) (Section 1981); *Jones v. Yonkers Public Schools*, 326 F. Supp. 2d 536, 542 (S.D.N.Y. 2004) (Title VII, Section 1981 and NYSHRL). Generally, these claims are subject to the standards of proof applied to Title VII claims. See *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 2001); *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir. 1999); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).

**Page 23**

To establish a *prima facie* case of employment discrimination or retaliation, the plaintiff must show that "(1) she belongs to a protected class; (2) she suffered adverse employment action; (3) she was performing her duties satisfactorily; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination." *McDonnell Douglas,* 411 U.S. at 802; *Sanders v. New York City Human Resources Admin.,* 361 F.3d 749, 754 (2d Cir. 2004). Assuming that the plaintiff has presented a *prima facie* case, a presumption of discriminatory animus arises, and the burden shifts to the defendant to proffer a legitimate, nondiscriminatory business rationale justifying its adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. Assuming the defendant is able to meet that burden, the plaintiff must "demonstrate by competent evidence that `the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson,* 375 F.3d at 221 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

*B. Phipps'* Prima Facie *Case Regarding Race and/or National Origin*

Defendants concede, for the purposes of this motion, that Phipps has adduced sufficient evidence establishing the first three elements of her *prima facie* case — namely, that she is a member of a protected class of black and Jamaican persons; qualified for her position; and was terminated from her position as WIC Program Director. (Defs.' Mem. in Supp. of Mot. for Summary J. at 4.) The parties primarily differ as to whether Phipps has met her *de minimis* burden showing "circumstances that would permit a rational finder of fact to infer invidious discrimination" with respect to either claim. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 38 (2d Cir. 1994).

**Page 24**

Phipps attempts to support her claims by identifying alleged derogatory comments made by Cruz and Espada. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at iii.)**[fn9]** Defendants contend that Phipps failed to show, through admissible evidence, that Cruz or Espada made derogatory comments. (Defs.' Mem. in Supp. of Mot. for Summary J. at 8-9.) The Court shall now analyze each set of comments independently.

*1. Cruz*

Phipps testified at her deposition that her administrative assistant, Maria Sanchez, informed her that Cruz had referred to Phipps as a "f___ n___" and "f___ Jamaican." (Phipps Dep. Tr. at 94, 231.) Moreover, Phipps claims that Israel Acosta, another employee at CCDC, told her that Cruz referred to her as a "n___". (*Id.* at 96.) These statements implicate hearsay concerns in that "[e]ach link in the chain must be admissible, either because it is an admission and thus not hearsay or under some other hearsay exception." *Vazquez v. Lopez-Rosario,* 134 F.3d 28, 34 (1st Cir. 1998) (internal citations and quotations omitted); see Fed.R. Evid. 801, 802. While neither of Cruz's original statements are hearsay to the extent that they are not offered for the truth of the

**Page 25**

matter asserted, Phipps claims that she "was told" by Sanchez and Acosta that Cruz made those statements. (*Id.* at 94, 96.) As such, the out-of-court declarations of Sanchez and Acosta are offered for the truth of the matter asserted — namely, that Cruz made those derogatory remarks based on race or national origin — and can only be admissible as nonhearsay under Rule 801 or as a hearsay exception. See Fed.R. Evid. 801.

The only conceivable ground for considering either Sanchez's statement or Acosta's statement on this summary judgment motion is as a party admission. Rule 801(d)(2)(D) provides that a

statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement by a party's agent or servant concerning a matter within the scope of employment, made during the existence of the relationship." Fed.R. Evid. **801**(d)(2)(D). However, the declarant must be "`an advisor or other significant participant in the decision-making process that is the subject matter of the statement.'" *Evans v. Port Authority of New York and New Jersey,* **192 F. Supp. 2d 247**, **263** (S.D.N.Y. 2002) (quoting *United States v. Rioux*, **97 F.3d 648**, **661** (2d Cir. 1996)).**[fn10]** It is undisputed that Sanchez served as Phipps' administrative assistant. (Phipps Dep. Tr. at 231.) Although Acosta's employment relationship to Phipps is unclear, only Cruz, Espada and Love were involved in the decision to terminate Phipps. (Pl.'s 56.1 ¶¶ 159-161.) Accordingly, the Court deems both of these statements hearsay to the extent that neither will be considered on this motion. See *Patterson,* 375 F.3d at 219.
**Page 26**

    *2. Espada*

   Phipps testified that in 1999, Acosta informed her that Espada said in a meeting not attended by Phipps that all of the problems arising out of the WIC investigation were occurring because "they were all Jamaicans." (Phipps Dep. Tr. at 34.) According to Phipps, she became outraged and confronted Love, who called Espada into her office. (*Id.* at 35.) Espada entered Love's office, at which point Love "reported that [Phipps] had heard that he had made this reference, that all the turmoil was happening because there were Jamaicans over there." (*Id.*) According to Phipps, Espada did not admit or deny making the statement and simply told her not to worry. (*Id.* at 35.)

   For the reasons discussed earlier in this Opinion, Acosta's statement regarding Espada's alleged comment is inadmissible as hearsay since Acosta was a coworker and not involved in the decision to terminate Phipps. *Evans,* **192 F. Supp. 2d at 263**. However, the second encounter in which Love told Espada about his alleged remark and in response, Espada did not directly deny making it, may be separately analyzed under the rubric of Rule 801(d)(2)(B), which provides that a statement is not hearsay if it is offered against a party and is a "statement of which the party has manifested an adoption or belief in its truth." Fed.R.Evid. **801**(d)(2)(B). When silence is relied upon, the theory is that "the person would, under the circumstances, protest the statement made in his presence, if untrue." *Id.,* advisory comm. notes. Moreover, Rule 801(d)(2) generally calls for "generous treatment" in determining the admissibility of such putative admissions. Fed.R. Evid. **801**(d)(2), advisory comm. notes.

   The Second Circuit has stated that "[s]ilence is not evidence of an admission, unless there are circumstances which render it more reasonably probable that a man
**Page 27**
would answer the charge made against him than that he would not." *U.S. v. Flecha,* **539 F.2d 874**, **877** (2d Cir. 1976) (internal citations omitted). Phipps, as the proponent of the admission, "has the burden of proving [through a preponderance of the evidence] that the party's conduct manifested an intent to adopt the statement." J. McLaughlin & J. Weinstein's *Weinstein's Federal Evidence,* § 801.31[2] at 801-57 (2d ed. 2004) ("Weinstein"). Following an "initial evidentiary determination" to be made by the trial court, any "ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,* **262 F. Supp. 2d 251**, **260** (S.D.N.Y. 2003) (citing *U.S. v. Tocco,* **135 F.3d 116**, **129** (2d Cir. 1998), *cert. denied,* 523 U.S. 1096, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998)).

   The accusation directed at Espada — that he allegedly claimed that the WIC Program's difficulties arising out of the investigation stemmed from the presence of Jamaicans — is

sufficiently placed in context so that a juror could reasonably conclude that Espada heard, understood and acceded to the statement at issue. Weinstein, § 801.31[2] at 801-58. As such, Espada's failure to directly deny the statement is deemed an adoptive admission for the purpose of this summary judgment motion.

Even assuming that Espada admitted that he blamed the WIC investigation on Jamaicans, the Court expresses some doubts as to whether this statement alone suffices to meet Phipps' admittedly low burden in raising an inference of national origin discrimination at the *prima facie* stage. See *Soliman v. Deutsche Bank AG,* No. 03 Civ. 104 (CBM), 2004 WL 1124689, at *9 (S.D.N.Y. May 20, 2004) (isolated remarks such as "sand nigger" and "all blacks are good for is dancing" were insufficient to raise an

**Page 28**

inference of racial discrimination at *prima facie* stage). Nevertheless, the fact that Phipps was replaced by Hill, a black woman of *American* origin who was outside the protected class, raises the "required inference of discrimination at the *prima facie* stage of the Title VII analysis" with respect to her national origin discrimination claim. *de la Cruz v. New York City Human Resources Admin. Dep't of Social Servcs.,* **82 F.3d 16**, **20** (2d Cir. 1996) (Puerto Rican plaintiff replaced by black female established inference of discrimination based on national origin). Accordingly, Phipps has satisfied her *prima facie* burden for her discrimination claim based on national origin.

With respect to her racial discrimination claim, the only evidence Phipps has presented is the allegation that Espada "referred to the fact that we were having all of these problems because of these people," (Phipps Dep. Tr. at 39), which she later understood, according to her deposition testimony, to be a reference to Jamaicans. (*Id.* at 38-39.) In her affidavit submitted in opposition to summary judgment, Phipps now claims that the reference to "these people" was a discriminatory remark about *black* Jamaicans. (Phipps Aff. ¶ 29.) While Phipps' added inference that Espada meant *black* Jamaicans in her affidavit does not necessarily contradict her earlier deposition testimony, this belated insertion casts severe doubts as to whether Phipps has merely attempted to create a sham issue of material fact through self-serving allegations contained in her affidavit. *Brown v. Henderson,* **257 F.3d 246**, **252** (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony") (internal citations and quotations omitted). Thus it appears that plaintiff has

**Page 29**

failed to meet her burden of establishing a prima facie case of racial discrimination. See *Soliman,* 2004 WL 1124689, at *9. However, whether she has met this burden is of little moment since, as the Court finds below, plaintiff has failed to meet her ultimate burden as well. Accordingly, the Court proceeds with the *McDonnell Douglas* analysis.

*B. Defendants' Proffered Reasons for Terminating Phipps*

Under the *McDonnell Douglas* framework, the burden now shifts to defendants to present a legitimate, nondiscriminatory reason for terminating Phipps. Defendants' articulated reason for terminating Phipps is that her "management performance was deficient and seriously undermined the capacity of the WIC Program to provide quality services to its clients." (Defs.' Mem. in Supp. of Mot. for Summary J. at 19.) Specifically, defendants identify several episodes from December 1998 until May of 1999 in which they determined that Phipps was an ineffective manager, such as: (1) Phipps' feud with Henry; (2) numerous and sustained complaints voiced to CCDC's management regarding Phipps; and (3) Phipps' inability to respond to complaints at a staff meeting organized by Conley to resolve staff grievances. (Defs.' 56.1 ¶

56.) Additionally, CCDC perceived that Phipps had "given up" on trying to solve problems at the WIC Program and was physically unavailable during work hours. (*Id.*) Ultimately, defendants concluded that "too much management time and organizational resources were being diverted to reacting to complaints about Phipps and problems at the WIC Program and that this was impairing CCDC's ability to support and develop other projects and services." (*Id.*)

   The undisputed facts show that Phipps and Henry suffered tremendous personal difficulties in working together. (Conley Decl. ¶¶ 53, 54, 63, 64; Defs.' Exs. T, V; Phipps
**Page 30**
Dep. Tr. at 308-9; Pl.'s 56.1 ¶¶ 81, 83.) While Phipps disputes the substance of employee complaints voiced against her, she fails to present evidence beyond her mere denials that they did not make such complaints. (Pl.'s 56.1 ¶¶ 95-100); see *U.S. Private Sanitation Industry Ass'n v. Nassau/Suffolk, Inc.,* **44 F.3d 1082**, **1084** (2d Cir. 1995) (conclusory allegations stated in affidavit did not create genuine issue of material fact). Moreover, she admitted that at least four employees directly complained about her purported favoritism towards Boston over other employees. (*Id.* ¶ 144; Phipps Dep. Tr. at 227.) Similarly, Phipps admits that Conley organized a meeting to discuss employee grievances against her, but does not show, through specific evidence, how she responded to the criticisms at the meeting. (Phipps Aff. ¶¶ 62-63); *Weinstock v. Columbia University,* **224 F.3d 33**, **41** (2d Cir. 2000) (unsupported allegations "do not create a material issue of fact"); *Smith v. American Express, Co.,* **853 F.2d 151**, **154** (2d Cir. 1988) (**affirming** summary judgment where plaintiff failed to rebut employer's justifications through specific facts contained in affidavits, deposition testimony or other admissible evidence).

   In addition, it is undisputed that Conley, Love, and Espada received complaints from several WIC Program employees regarding Phipps. (Defs.' 56.1 ¶ 61.) At the end of 1998 until her termination, Conley subsequently became "very involved" in acting as an intermediary in attempting to resolve employee grievances against Phipps. (Phipps Dep. Tr. at 326-27.) Phipps admits that Conley discussed those grievances with her on a weekly basis, and that Conley told her that she was not communicating well with her staff members. (*Id.* at 327.) Phipps was aware that Conley had received complaints from Phipps' entire staff. (*Id.*)
**Page 31**

   Phipps further admitted that she had several meetings with Love, Cruz and Conley in which she expressed her frustrations regarding the management of the WIC Program. (Phipps Dep. Tr. at 356.) At the meeting held in March of 1999, Espada, Love and Cruz perceived Phipps' attitude as negative and defeated, to the extent that she did not appear to have a plan to turn the WIC program around. (Defs.' 56.1 ¶¶ 50, 53.) Phipps admits that she was "distressed" about the WIC investigation, and that she "was basically just throwing [her] arms up in the air, saying, at this point, I don't know what to do." (*Id.*)**[fn11]**

   In light of all the evidence in the record concerning plaintiff's job performance, it is not surprising that plaintiff concedes, albeit begrudgingly, that defendants have met their burden at this stage of the analysis. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at iv.) Keeping in mind that the burden on defendants to articulate a nondiscriminatory rationale is one of production, not persuasion, *Taylor v. Potter,* No. 99 Civ. 4941 (AJP), 2004 WL 1811423, at *12 (S.D.N.Y. Aug, 16, 2004) (internal citations omitted), the Court also concludes that defendants have presented legitimate, nondiscriminatory reasons for terminating Phipps. Accordingly, defendants have satisfied their burden of proof at this stage and the presumption of discrimination with respect to Phipps' claims drops out. *Mario v. P & C Food Markets, Inc.,* **313 F.3d 758**, **767** (2d Cir. 2002).
**Page 32**

*C. Phipps' Ultimate Burden in Proving Discrimination Based on Race or National Origin*

Given that defendants have carried their burden in presenting legitimate, nondiscriminatory reasons for terminating Phipps, the burden shifts back to Phipps to "demonstrate by competent evidence that `the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Burdine*, **450 U.S. at 253**). Indeed, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," to the extent that "if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment **dismissing** the claim is appropriate." *Id.* (internal citations and quotations omitted). In making this determination, the Second Circuit has espoused a "case-by-case" approach evaluating the entire record for a reasonable inference that an employer's adverse employment action was motivated wholly or in part by invidious discrimination. *Schnabel*, 232 F.3d at 90; see also *Slattery*, 248 F.3d at 93-94. A reviewing court should "consider a number of factors including `the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.'" *Zimmerman v. Associates First Capital Corp.*, **251 F.3d 376**, **381** (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods.*, **530 U.S. 133**, **148-49** (2000)).

**Page 33**

*I. Pretext*

Phipps has attempted to show that defendants' reasons served as a pretext for discrimination based on race or national origin. To show pretext, the plaintiff must introduce evidence "sufficient to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false." *Weinstock*, 224 F.3d at 42.**[fn12]** Here, Phipps argues that (1) defendants' inability to produce a written record detailing her purported failures or employee complaints undermines their claim that her managerial performance was deficient in any respect; and (2) Espada and Cruz harbored discriminatory animus against black Jamaicans. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at vi.)

*a. Phipps' Deficient Managerial Skills*

In the absence of presenting **affirmative** evidence, plaintiff points to defendants' failure to provide documentary evidence concerning her performance as well as employee complaints against her. (*Id.*) While this omission is somewhat suspect, it is "plaintiff's burden to establish pretext, not the defendants' burden to disprove it." *Evans*, **192 F. Supp. 2d at 275**. As the record stands before the Court, Phipps has failed to dispute that at least seven employees complained about her managerial and communicative problems to Conley, Love and Espada. (Defs.' 56.1 ¶¶ 61, 94-100, 102, 139; Conley Decl. ¶ 75.) Indeed, Phipps also admitted that at least four employees directly voiced their criticisms of her purported favoritism of employees and threatening remarks. (Phipps Dep. Tr. at 227; Pl.'s 56.1 ¶¶ 102, 144.) At a meeting organized by

**Page 34**

Conley, staff members openly voiced their criticisms to Phipps. (Pl.'s 56.1 ¶ 62; Defs.' 56.1 ¶ 72.) Phipps further acknowledged that Stewart complained about her management to Reverend Cole, the pastor of the church they both attended. (Defs.' 56.1 ¶ 139; Pl.'s 56.1 ¶ 139.)**[fn13]**

Phipps was aware that by the end of 1998, Conley became heavily involved in helping Phipps resolve employee complaints that were mounting against her, to the extent that they discussed the

situation on a weekly basis. (Phipps Dep. Tr. at 326-27.) Phipps admits that Conley told her that she was not communicating well with her staff members. (*Id.* at 327.) Phipps also attested to the fact that she repeatedly approached Love about what was occurring in the WIC Program, and that she expressed her frustration during several meetings with Love, Cruz and Conley at what she perceived to be "difficult" behavior" by the administration. (*Id.* at 356.) By March of 1999, Phipps became "distressed" about the WIC investigation and ultimately felt that she was "just throwing [her] arms up in the air, saying, at this point, I don't know what to do." (*Id.*)

**Page 35**

   Despite the benefit of discovery, plaintiff has failed to introduce meaningful evidence controverting the facts that numerous employees in the WIC Program voiced complaints against her and that CCDC's management became increasingly frustrated with her performance. *Evans,* 192 F. Supp. 2d at 275. Significantly, plaintiff has failed to present any **affirmative** and specific evidence that she "did an excellent job" other than her own self-serving, conclusory allegations. *Weinstock,* 224 F.3d at 41; *Smith,* 853 F.2d at 154. Accordingly, the Court finds that Phipps has failed to show that defendants' proffered reason regarding her deficient managerial and communicative skills was pretextual.

   *b. Discriminatory Animus*

   Phipps also claims that Espada and Cruz harbored discriminatory animus against black Jamaicans as evidenced by their pressure on her to hire more Hispanics and allegedly racist comments. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at vi.) As an initial matter, the Court disregards the hearsay remarks made by Cruz as discussed earlier in this Opinion. With respect to Phipps' claim that she personally heard Cruz call *Henry* a "f___ n___" and "f ___ Jamaican," Phipps has failed to show how these remarks were causally connected to the ultimate decision to fire *her* and therefore cannot support an argument of pretext. *Pace v. Paris Maintenance Co.,* 107 F. Supp. 2d 251, 263 (S.D.N.Y. 2000 (stray racist remarks on one occasion insufficient to satisfy plaintiff's burden of showing pretext where remarks were unrelated to termination decision) (collecting cases). Therefore, the remaining considerations are whether (1) the pressure applied by Espada and Cruz to force Phipps to hire more Hispanics; (2) Espada's alleged failure to explicitly deny making a derogatory reference to Jamaicans; and (3) Espada's

**Page 36**

remark that "we were having all these problems because of these people" suffice to demonstrate pretext.

   Defendants contest Phipps' "uncorroborated allegations about so-called `historical pressure' to hire Hispanic staff members" but admit that the WIC Program needed a reasonable number of Spanish-speaking employees. (Love Reply Decl. ¶ 15.) Phipps also acknowledged that the WIC Program needed employees who were familiar with Hispanic culture and who could speak Spanish. (Phipps Dep. Tr. at 361-63; 497.) Moreover, she admitted that she stated on her resume that she had Spanish-speaking capabilities. (*Id.* at 363.)

   Even assuming that defendants expressed a desire to hire more Hispanic staff members, Phipps has failed to argue or present evidence that such "pressure" somehow related to the decision to terminate her. Moreover, it is well settled that courts should not second-guess the good-faith business determinations and criteria that employers adopt in running their organizations. *Faldetta,* 2000 WL 1682759, at *9 (S.D.N.Y. Nov. 9, 2000) (internal citations and quotations omitted); *Dodson,* 2004 WL 1336231, at *21 (collecting cases). With these considerations in mind, the Court deems such purported pressure nonprobative in establishing that defendants' proffered reasons were pretextual.

   With respect to Espada's adopted admission — i.e., that he

stated that the WIC Program's difficulties arising out of the WIC investigation stemmed from the presence of Jamaicans — that vague remark falls within the ambit of cases holding that "stray remarks" generally directed towards a minority group may not, without more, defeat summary judgment. *Woroski v. Nashua Corp.,* **31 F.3d 105**, **109-10** (2d Cir. 1994), *abrogated on other grounds* (while a stray remark made by a supervisor constitutes

**Page 37**

"some evidence" of discrimination, it is not sufficient to withstand a properly supported motion for summary judgment); *Norris v. New York City Housing Authority,* No. 02 Civ. 6933 (RJH), 2004 WL 1087600, at *13 n. 12 (S.D.N.Y. May 14, 2004) (assuming that supervisor made explicitly racist remark, such remark were inadequate to defeat summary judgment); *Danzer v. Norden Systems, Inc.,* **151 F.3d 50**, **56** (2d Cir. 1998). Indeed, if a supervisor's racially derogatory comments were enough to force a discrimination suit to a jury, "disparaged workers who had the `fortuity' of being in the class encompassed by the stray remark would have an instantaneous jury case on discrimination, regardless of the ground for their **dismissal**." *Danzer,* 151 F.3d at 56.

   Such is the case here. At face value, Espada's purported remarks that "they were all Jamaicans" and "we are having all these problems because of these people" are too vague to be considered explicitly discriminatory epithets. Significantly, Phipps has not presented evidence showing that Espada directed his comment at her, or that this comment had any bearing on the decision to terminate her. *Schreiber v. WorldCo., LLC,* 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) (requiring "nexus" between "the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff" in order to find discriminatory animus). Therefore, Espada's comments are too isolated, ambiguous and attenuated to the ultimate decision to terminate Phipps so as to establish pretext for discrimination based on race or national origin. *Lee v. New York State Dep't of Health,* No. 98 Civ. 5712 (RMB), 2001 WL 34031217, at *19 (S.D.N.Y. April 23, 2001) (remark made by former supervisor suggesting that plaintiff return to Korea was too attenuated to the termination decision); *Campbell v. Daytop Village, Inc.,* No. 97 Civ. 4362 (JMM), 1999 WL 292576, at *3 (S.D.N.Y. May 7, 1999) (supervisor's racist

**Page 38**

remarks about black people generally did not have a "nexus" to the reduction in force); *Balut v. Loral Electronic Systems,* **988 F. Supp. 339**, **348-49** (S.D.N.Y. 1998) (supervisor's comment that plaintiff was an "older engineer with health problems" was too ambiguous and isolated to attribute age discrimination as motivating factor in termination decision); *O'Connor v. Viacom Inc./Viacom Intern. Inc.,* No. 03 Civ. 2399, 1996 WL 194299, at *5 (S.D.N.Y. April 23, 1996) (one isolated, ambiguous remark and two racial epithets by plaintiff's superior "without a demonstrated nexus to the complained of personnel actions" were insufficient to defeat summary judgment).

   To the extent that plaintiff suggests that Conley made discriminatory comments about her Jamaican national origin (Pl.'s Mem. in Opp'n to Mot. for Summary J. at iii), it is undisputed that Conley was not involved in the decision to terminate her. (Pl.'s 56.1 ¶¶ 200, 205.) However, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight." *Ezold v. Wolf, Block, Schorr and Solis-Cohen,* **983 F.2d 509**, **545** (3d Cir. 1992). For that reason, Conley's statements are hardly probative of any discrimination against Phipps based on national origin.

   Phipps' discrimination claims are further undercut by the fact that she charged that defendants' actions reflected not discriminatory animus but rather an effort to make her a scapegoat for the problems arising out of the WIC investigation. Indeed, it was her own counsel who wrote to CCDC's attorneys on April 3, 1999, claiming that Phipps was being made a scapegoat and warning defendants not take any adverse employment action on this account. (Defs.' Ex. O.) Any reference to race or national

origin discrimination is conspicuously absent from counsel's
letter. (*Id.*) In a similar vein, Leroy Richards,

**Page 39**

Phipps' friend, testified that she told him that "the reason she
thought she was fired was that [CCDC] was trying to protect
itself, because the State Health Department that oversees her
program was, I think, investigating." (Richards Dep. Tr. at 70.)

   This scenario bears a strong resemblance to the facts in *Brown
v. Henderson,* in which the plaintiff repeatedly suggested that
her coworkers' hostility arose out of their dispute over a union
election, rather than being rooted in sexual discrimination.
*Brown,* 257 F.3d at 256. In *Brown,* the Second Circuit **affirmed**
the district court's decision to grant summary judgment in light
of plaintiff's failure to carry "her burden of showing — even for
purposes of avoiding summary judgment — that the harassment she
faced was rooted in her sex." *Id.* Similarly, here, the specter
of Phipps' previous story casts a foreboding shadow over her new
account of why she felt she was treated unfairly by her
employers.

   Even if this Court were to find plaintiff's assertions
"sufficient to raise a fact question as to pretext, such a
determination would not end [the] inquiry." *Slattery,*
248 F.3d at 93. Indeed, the Court must engage in a "case-by-case" approach
evaluating the record in its entirety in discerning whether a
reasonable inference that an employer's adverse employment action
was motivated wholly or in part by invidious discrimination
exists. *Schnabel,* 232 F.3d at 90; *see also Slattery,*
248 F.3d at 93-94. The record overwhelmingly shows that Phipps had
difficulties getting along with her subordinates and her
superiors. Regardless of whether Phipps **agreed** with these
evaluations, she has failed to show that they were pretextual.
*Faldetta,* 2000 WL 1682759, at *9. While Phipps has attempted to
weave the sparse threads of Espada's stray remarks into a blanket
of invidious discrimination, a plaintiff must "produce not simply
*some* evidence, but

**Page 40**

*sufficient* evidence to support a rational finding that the
legitimate, non-discriminatory reasons proffered by the
[defendant] were false, and that more likely than not
[discrimination] was the real reason for the [employment
action]." *Weinstock,* 224 F.3d at 42 (internal citations and
quotations omitted) (emphasis added); *Woroski,*
31 F.3d at 109-10. While it may well be that Phipps perceived the treatment
she received as discriminatory, she has failed to support her
claim with any competent evidence. Accordingly, the Court grants
summary judgment to defendants on plaintiff's claim of
discrimination based on race or national origin. Since the
decision to terminate is the same action underlying plaintiff's
claims of discrimination and retaliation, the Court also grants
defendants' motion for summary judgment on plaintiff's
retaliation claim because she has failed to "demonstrate that
there is sufficient potential proof for a reasonable jury to find
the proffered legitimate reason merely a pretext for
impermissible retaliation." *Richardson v. New York State of
Corrections,* **180 F.3d 426**, **443** (2d Cir. 1999).

   II. <u>Hostile Work Environment Claims Pursuant to Title VII,
Section 1981 and NYSHRL</u>

   Plaintiff has also asserted hostile work environment claims
pursuant to Title VII, Section 1981 and NYSHRL alleging, *inter
alia,* that defendants pressured her to hire Hispanics, engage in
political activity on behalf of Espada, give benefits to Espada's
relatives and other employees' relatives, and to engage in
wrongful activities because of her race and national origin.
(Pl.'s Mem. in Opp'n to Mot. for Summary J. at xii.) Defendants
argue that plaintiff has failed to demonstrate any evidence —
either objective

**Page 41**

or subjective — showing that she was subjected to a
discriminatory hostile work environment. (Defs.' Mem. in Opp'n to

Mot. for Summary J. at 30.)

   Hostile work environment claims brought pursuant to Section
1981 and NYSHRL may be analyzed under the rubric of Title VII.
*Whidbee*, 223 F.3d at 69; *Van Zant v. KLM Royal Dutch
Airlines*, **80 F.3d 708**, **715** (2d Cir. 1996). To establish a
hostile work environment claim, a plaintiff must show that "the
workplace is permeated with discriminatory intimidation,
ridicule, and insult . . . sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an
abusive working environment," *Harris v. Forklift Sys., Inc.*,
**510 U.S. 17**, **21** (1993) (internal quotations omitted), and "must
demonstrate either that a single incident was extraordinarily
severe, or that a series of incidents were `sufficiently
continuous and concerted' to have altered the conditions of her
working environment." *Cruz v. Coach Stores*, **202 F.3d 560**, **570**
(2d Cir. 2000) (quoting *Perry v. Ethan Allen, Inc.*,
**115 F.3d 143**, **149** (2d Cir. 1997)).

   As a general rule, incidents must be "more than episodic; they
must be sufficiently continuous and concerted in order to be
deemed pervasive." *Terry v. Ashcroft*, **336 F.3d 128**, **148** (2d
Cir. 2003) (quoting *Alfano v. Costello*, **294 F.3d 365**, **374** (2d.
Cir. 2002)); see also *Faragher v. City of Boca Raton*,
**524 U.S. 775**, **788** (1998) ("[C]onduct must be extreme to amount to a change
in the terms and conditions of employment, and the Courts of
Appeals have heeded this view.") Although "there is neither a
threshold `magic number' of harassing incidents that gives rise,
without more, to liability as a matter of law, nor a number of
incidents below which a plaintiff fails as a matter of law to
state a claim," *Richardson*, 180 F.3d at 439 (citing *Harris,
510 U.S. at 22*), isolated instances of racially hostile
name-calling and offensive remarks alone are
**Page 42**
ordinarily not severe enough to alter the conditions of
employment. In engaging in a "totality of the circumstances"
inquiry to determine whether a hostile work environment exists,
courts must consider factors such as "the frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance." *Harris*, **510 U.S. at 23**.

   In addition, the Second Circuit has unambiguously stated that
only conduct prompted by plaintiff's race or national origin
contributes to a hostile work environment claim. See
*Richardson*, 180 F.3d at 440; see also *Alfano*, 294 F.3d at 374
(cautioning that it is "important in hostile work environment
cases to exclude from consideration personnel decisions that lack
a linkage or correlation to the claimed ground of
discrimination"). As such, a plaintiff must "demonstrate that she
was subjected to the hostility *because of her membership in a
protected class.*" *Brennan v. Metropolitan Opera Ass'n Inc.*,
**192 F.3d 310**, **318** (2d Cir. 1999) (emphasis added).

   Plaintiff has alleged in a conclusory fashion that Cruz
harassed and "discriminated" against her without setting forth
specific facts as to how Cruz's actions altered the conditions of
her working environment or whether these actions were motivated
by racial or national origin discrimination. It is clear that
Cruz and Phipps had several disagreements in which each was
jockeying to secure her position at the organization. (Phipps
Aff. ¶¶ 11, 12; Phipps Dep. Tr. at 137.) At best, the record
demonstrates that Cruz and Phipps intensely disliked each other
and engaged in power plays against each other. Nevertheless,
there is simply no competent evidence showing that Cruz was
motivated by an unlawful discriminatory animus against Phipps.
**Page 43**

   Similarly, plaintiff's allegations that defendants placed
pressure on her to engage in Espada's political campaign and to
give benefits to family members of employees lack a cognizable

nexus to racial or national origin discrimination. While it may be true that Phipps was forced to participate in such activities, Phipps has not demonstrated that defendants compelled her to participate in these activities *because* of her race or national origin. See *Brennan*, 192 F.3d at 318. Indeed, Phipps resisted those activities because she felt she had been "hired to do a particular job and that's what [she] wanted to do," (Phipps Dep. Tr. at 55), and not because she felt discriminated against for her race or national origin.**[fn14]**

    Finally, any purported comment made by Conley that Phipps was considered an "oddball" is too isolated and weak to give rise to a cause of action for hostile work environment. Even assuming that such remark was a racial epithet, plaintiff has cited no precedent, and the Court can find none, for the proposition that a single or even a few racial epithets uttered in a context like the one presented here would suffice to create a hostile work environment. See *Schwapp*, 118 F.3d at 110 ("[f]or racist comments, slurs, and jokes to constitute a hostile work environment . . . there must be a steady barrage of opprobrious racial comments"). Ultimately, there is nothing to set these allegations apart from the cases finding that "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to give rise to a hostile work environment. *Harris*, **510 U.S. at 21** (citations and internal punctuation omitted); *Lopez*, 831 F.2d at 1189 (finding no hostile work environment

**Page 44**

when the main incident alleged involved plaintiff's supervisor "burst[ing] into degrading and lewd obscenities directed toward him"); *Stembridge v. City of New York*, **88 F.Supp.2d 276**, **286** (S.D.N.Y. 2000) (seven incidents, including two instances of racial epithets uttered by supervisors toward plaintiffs, over three years do not establish hostile work environment); *Carter v. Cornell Univ.*, **976 F.Supp. 224**, **232** (S.D.N.Y. 1997) (six race-related disparaging comments over three years do not create a hostile work environment); *Williams v. Port Authority of New York. & New Jersey*, **880 F.Supp. 980**, **991-92** (E.D.N.Y. 1995) (five racial slurs uttered by supervisors in plaintiff's presence over the course of two years did not establish hostile work environment); *Pagan v. New York State Div. of Parole*, No. 98 Civ. 5840 (FM), 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding that four instances of racially derogatory remarks by supervisor in the span of several months did not amount to a hostile work environment). Accordingly, the Court grants summary judgment on Phipps' hostile work environment claims.

    IV. Conclusion

    The Court grants defendants' motion for summary judgment [56] with respect to plaintiff's employment discrimination, retaliation and hostile work environment claims. All remaining state claims are **dismissed** without prejudice.**[fn15]** The Clerk of the Court shall close this case.

**Page 45**

    SO ORDERED

[fn1] The facts as herein recited are drawn from defendants' Rule 56.1 Statement of Material Facts ("Defs.' 56.1 ¶ ____") and attached exhibits; plaintiff's Rule 56.1 Statement of Material Facts in Dispute ("Pl.'s 56.1 ¶ ____"); Declaration of Daniel Cherner ("Cherner Decl. ¶ ____"); Deposition Transcript of Claudette Phipps annexed as Exhibit G to the Declaration of Daniel Cherner (Phipps Dep. Tr. at ___"); Deposition Transcript of Pedro Espada annexed as Exhibit I to the Declaration of Daniel Cherner (Espada Dep. Tr. at ___"); Deposition Transcript of Sandra Love annexed as Exhibit K to the Declaration of Daniel Cherner ("Love Dep. Tr. at ___"); Deposition Transcript of Melba Conley annexed as Exhibit L to Declaration of Daniel Cherner ("Conley Dep. Tr. at ___"); Deposition Transcript of Leroy Richards annexed as Exhibit EE to defendants' Rule 56.1 Statement (Richards Dep. Tr. at ___"); Declaration of Sandra Love (Love

Decl. ¶ _____"); Declaration of Melba Conley ("Conley Decl. ¶ _____"); Declaration of Pedro Espada ("Espada Decl. ¶ _____"); Declaration of Maria Cruz ("Cruz Decl. ¶ _____"); Declaration of Esther Hill ("Hill Decl. ¶ _____"); Reply Declaration of Sandra Love ("Love Reply Decl. ¶ _____"); Reply Declaration of Melba Conley ("Conley Reply Decl. ¶ _____"); Reply Declaration of Maria Cruz (Cruz Reply Decl. ¶ _____"); Reply Declaration of Esther Hill ("Hill Reply Decl. ¶ _____").

[fn2] Sandra Love, hired by CCDC in or about January 1982, held the position of Vice President at the time of Phipps' hiring and later became Senior Vice President. (Defs.' 56.1 ¶ 5.)

[fn3] Phipps has not asserted her basis of personal knowledge for this allegation.

[fn4] Plaintiff does not dispute the fact that complaints were made but asserts without supporting evidence that those complaints "were not real, but . . . [rather] orchestrated by Cruz." (Pl.'s 56.1 ¶ 151.)

[fn5] Plaintiff again does not dispute that complaints were made but asserts again without any supporting evidence that "[a]ny so-called `complaints' that were received about Ms. Phipps were false, and were made out of malicious intent or orchestrated by Cruz and/or Espada." (Pl.'s 56.1 ¶ 48.)

[fn6] Plaintiff states that "[n]o one would have been afraid of Ms. Phipps because she was fair with the WIC employees and treated them well." (Pl.'s 56.1 ¶ 93.)

[fn7] Espada does not respond to this allegation. In her declaration, Love simply says that Phipps "ignores the needs of the WIC Program to have a reasonable number of Spanish speaking receptionists and service providers (irregardless of the race or national origin of the Spanish speaking persons. . . . I would estimate that about 50% of the Hispanic clients (i.e., 30% of the total clients) either cannot communicate effectively in English or else they have a strong preference to communicate in Spanish when they are discussing medical, family, and personal matters." (Love Reply Decl. ¶ 15.)

[fn8] Phipps admits that neither Conley nor Hill had any authority to make decisions regarding the hiring, firing or terms and conditions of her employment. (Pl.'s 56.1 ¶¶ 200, 205.)

[fn9] The Court notes that Rule 56(e) explicitly states that a party opposing summary judgment "must set forth *specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. **56**(e) (emphasis added). Here, plaintiff has merely pointed generally to her affidavit in support of her contention that Cruz, Conley and Espada made derogatory remarks. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at iii.) Despite plaintiff's blatant failure to set forth specific facts in opposing defendants' motion for summary judgment, the Court is mindful that the *prima facie* case method established in *McDonnell Douglas* "is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination" and seeks to avoid "rigid, mechanized, or ritualistic" application. *U.S. Postal Service Bd. of Governors,* **460 U.S. 711**, **716** (1983) (internal citations and quotations omitted). If the defendant has "done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant." *Id.* The Court will therefore proceed with the analysis despite the woeful inadequacies of plaintiff's proffered showing. *Id.*

[fn10] In *Evans,* Judge Kaplan laboriously addressed the issue of "whether a statement by a co-worker relating the alleged statement of a supervisor with decision-making authority concerns a matter within the scope of the co-worker's employment." *Evans,* **192 F. Supp. 2d at 263.** The Court adopts Judge Kaplan's

thorough analysis.

[fn11] Phipps later claims in her affidavit that the meeting never took place. (Pl.'s 56.1 ¶¶ 51, 53.) However, a nonmoving party cannot create genuine issues of material fact by submitting an affidavit that contradicts earlier sworn testimony. *Rule v. Brine, Inc.,* **85 F.3d 1002**, **1011** (2d Cir. 1996).

[fn12] In *Weinstock,* the Second Circuit expressly declined to address how much evidence is necessary to find pretext because the plaintiff had failed to introduce any evidence raising a triable issue of fact with regard to defendants' decision to deny her tenure. *Weinstock,* 224 F.3d at 42 n. 2.

[fn13] Phipps does not dispute that this episode occurred, or that other circumstances — such as Haughton's practice of driving her daughter to school — happened. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at viii.) Instead, Phipps asserts that defendants' focus on these instances in which they perceived her to have faulty judgment reveal that defendants "are looking for anything that they can find, misstate, or fabricate, to use as an excuse for their actions." (*Id.* at viii.) First, Phipps has failed to present any evidence rebutting that Stewart, as well as other employees, complained to management, or that Haughton drove her daughter to school most mornings and could have consequently been chronically late to work. (Phipps Dep. Tr. at 264.) Second, to the extent that these reasons appear unwise or overly sensitive, it is not the "province of the Court to sit as a super-personnel department that reexamines an entity's business decisions" absent evidence of discrimination. *Faldetta v. Lockheed Martin Corp.,* No. 98 Civ. 2614 (RCC), 2000 WL 1682759, at *9 (S.D.N.Y. Nov. 9, 2000) (internal citations and quotations omitted); *Dodson v. CBS Broadcasting Inc.,* No. 02 Civ. 9270 (AJP), 2004 WL 1336231, at *21 (S.D.N.Y. June 15, 2004) (collecting cases).

[fn14] Phipps' very definition of unlawful harassment further renders her claim suspect. At her deposition, Phipps testified that she considered general questions from Love regarding her involvement in a potential union "constant harassment" based on unlawful discrimination. (Phipps Dep. Tr. at 29.)

[fn15] Given that the Court has **dismissed** all federal claims with prejudice, Phipps' only remaining claims are pendent state law claims of breach of contract. Since all parties are citizens of New York, there is no diversity jurisdiction and therefore, jurisdiction over these claims was premised solely on supplemental jurisdiction. See **28 U.S.C. § 1367** (1991) ("district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form the same case or controversy . . .."). Where all federal claims have been **dismissed** before trial, a district court may exercise its discretion in declining to adjudicate the remaining pendent state law claims. See 13 U.S.C. § 1967(a)(3) ("district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has **dismissed** all claims over which it has original jurisdiction"); *Travelers Ins. Co. v. Keeling,* **996 F.2d 1485**, **1490** (2d Cir. 1993).

**Page 1**

Copyright © 2005 Loislaw.com, Inc. All Rights Reserved