## U.S. 2nd Circuit Court of Appeals Reports

FAULKNER v. MINDSCAPE, INC., 04-0263 (2nd Cir. 2005)

DOUGLAS FAULKNER, LOUIS PSIHOYOS, MATRIX INTERNATIONAL, INC., as agent for Roger Hutchings, Sarah Leen and Rick Rickman, SALLY FAULKNER, DAVID HISER, DAVID G. ALLEN, as successor and interest to Arthur Allen, RICHARD CONNIFF, JON KRAKAUER, JOHN KNOEBBER, ELIZABETH ROYTE, JOE BARABAN, PAMELA WILSON SARTORELLI, DORANNE JACOBSON, JEROME JACOBSON, DAVID ROBERT AUSTIN, and FRED WARD, Plaintiffs-Appellants, v. MINDSCAPE INC., NATIONAL GEOGRAPHIC ENTERPRISES INC., DATAWARE TECHNOLOGIES INC., NATIONAL GEOGRAPHIC SOCIETY, NATIONAL GEOGRAPHIC INTERACTIVE, EASTMAN KODAK CO., and NATIONAL GEOGRAPHIC HOLDINGS, INC., doing business as National Geographic Interactive, doing business as National Geographic Enterprises Inc., Defendants-Appellees.

Nos. 04-0263-cv(L), 04-0388-cv(CON), 04-0265-cv(CON), 04-0475-cv(CON), 04-0318-cv(CON), 04-0481-cv(CON).

United States Court of Appeals, Second Circuit.

Argued: October 27, 2004.

Decided: March 4, 2005.

Appeal from grant of summary judgment by the Southern District of New York (Lewis A. Kaplan, Judge) dismissing claims of copyright infringement involving CD-ROM collections of National Geographic Magazine. We hold the CD-ROM versions to be privileged "revisions" of the original collected works within the meaning of Section 201(c) of the Copyright Act. We affirm except for a small number of contributions to the original works as to which we reverse because of express contractual provisions.

DANIAL A. NELSON, Schaden, Katzman, Lampert & McClune (John D. McClune, Troy, Michigan, on the brief), Broomfield, Colorado, for Psihoyos Plaintiffs-Appellants.

ANDREW BERGER, Tannenbaum, Helpern, Syracuse & Hirschtritt LLP, New York, New York, for Plaintiff-Appellant Ward.

STEPHEN A. WEINGRAD, Weingrad & Weingrad, LLP (William D. Gardner, on the brief), New York, New York, for Faulkner and Hiser Plaintiffs-Appellants.

ROBERT B. SUGARMAN, Weil, Gotshal & Manges LLP (Pierre M. Davis, Denise Alvarez, on the brief) (Terrence B. Adamson, Angelo M. Grima, Karen Kerley-Shwartz, National Geographic Society, Washington, D.C., of counsel) (Kenneth W. Starr, Christopher Landau, Kirkland & Ellis, LLP, Washington, D.C., of counsel), New York, New York, for Defendants-Appellees.

Victor S. Perlman, American Society of Media Photographers, Inc., Philadelphia, Pennsylvania, for Amici Curiae American Society of Media Photographers, Inc., et al. Surjit P. Soni, The Soni Law Firm, Pasadena, California, for Amici Curiae Plaintiffs in Auscape.

Joseph M. Beck, Kilpatrick Stockton LLP (Alex S. Fonoroff, on the brief) (Nancy A. Kopans, JSTOR, New York, New York, on the brief), Atlanta, Georgia, for Amici Curiae JSTOR, et al.

Arnold P. Lutzker, Lutzker, Lutzker & Settlemyer LLP (Carl H. Settlemyer, III, Allison L. Rapp, on the brief), Washington, D.C., for Amici Curiae American Library Association, et al.

Charles S. Sims, Proskauer Rose LLP (Meredith R. Miller, on the brief), New York, New York, for Amici Curiae Advance Publications, Inc., et al.

Before: WINTER, KATZMANN, AND RAGGI, Circuit Judges.

WINTER, Circuit Judge:

Appellants are freelance photographers and authors whose photographs and/or written works were originally published in various issues of the National Geographic Magazine. These photographs and writings have now been published in "The Complete National Geographic" ("CNG"), a digital collection of the past issues of the Magazine that offers users various means of searching, viewing, and displaying pages of these issues. Appellants and their representatives brought copyright infringement actions under the Copyright Act of 1976, as amended, **17 U.S.C. § 101** et seq. ("Act"), and the Copyright Act of 1909 ("1909 Act"), against various defendants listed in the margin.**[fn1]** The district court granted summary judgment in favor of defendants.

Although a number of issues are raised and resolved on this appeal, the principal questions are whether the district court erred in not applying the doctrine of collateral estoppel to give Greenberg v. National Geographic Society, **244 F.3d 1267** (11th Cir. 2001), preclusive effect, and in finding the CNG to be a privileged revision under Section 201(c) of the Copyright Act. We agree with the district court. The decision in New York Times Co. v. Tasini, **533 U.S. 483**, **488** (2001), represented an intervening (post-Greenberg) change in law precluding the application of collateral estoppel, and the CNG is a revision for Section 201(c) purposes. We also resolve the other issues against appellants, and therefore affirm, except for issues relating to seven photographs that were subject to express contractual provisions preserving electronic rights in the copyright owners. As to those, we reverse and remand.

BACKGROUND

National Geographic Magazine ("the Magazine") is the monthly publication of the National Geographic Society ("NGS"). In addition to being sold in single bound paper copies, it has been sold in microform format for decades. At different times, NGS has also sold compiled, bound, paper volumes containing multiple issues of the Magazine. Since 1962, NGS has granted rights to the Library of Congress to publish a Braille edition of the Magazine. In 1996, NGS undertook a project to reproduce in CD-ROM format all issues of the Magazine published from its founding in 1888 to 1996. In 1997, NGS produced and began to sell the product, "The Complete National Geographic: 108 Years of National Geographic Magazine on CD-ROM." It was the first of many iterations of the CNG sold.**[fn2]**

The CNG was produced through digital scanning. Each issue of the magazine was scanned two pages at a time into a computer system. As a result, the CNG user sees exactly what he or she would see if viewing an open page of the paper version, including the fold of the magazine. Because of some contractual arrangements excluding electronic reproduction, approximately 60 out of 180,000 images have been blacked out in some iterations of the CNG. None of these images are at issue in this case. Except for the blacked-out images, there are no changes in the content, format, or appearance of the issues of the magazine.**[fn3]** The pages appear as they do in the print version, including all text, photographs, graphics, advertising, credits and attributions. Issues of the Magazine appear chronologically with the first issue published appearing at the beginning of the first disk and the last appearing at the end of the last disk. The individual images and texts are therefore viewed in a context almost identical — but for the use of a computer screen and the power to move from one issue to another and find various items quickly — to that in which they were originally published.

Because the scanning process does not replicate the high resolution found in the paper magazines, the digital images may appear slightly

fuzzy when compared to the high resolution of the original. PicTools Development Kit ("PicTools"), an image compression and decompression tool, compresses the scanned images onto the disc for increased storage and expands them back to their original size when the images are accessed on the CDs. PicTools is a copyrighted storage mechanism. It does not add any creative elements to the Magazines.

Stories can be retrieved through the table of contents of each magazine or by using an electronic search engine. The search engine allows a user to find stories containing certain words or phrases within the texts of articles; descriptions of articles, including title, contributors, date, and major related subjects; advertisements; cover and page images; and page maps. To view a particular story, a user must insert the disk containing the issue in which the story appeared.

Each iteration of the CNG contains introductory and conclusory material. At the beginning of each disk of the first iteration of the CNG, CD-ROM 108, a series of multimedia sequences appears. It begins with a moving display of the NGS logo followed by a Kodak advertisement, and then a sequence depicting the digital transition of ten Magazine covers into each other (the "Moving Cover Sequence"). These multimedia sequences play the first time a user boots up the CNG and at the beginning of each subsequent session. During subsequent sessions, however, the user can skip the introductory sequence by clicking on it with the mouse. A graphic display depicting moving spines of the issues of the magazines (the "Moving Spines Sequence") followed by credits is displayed when the CNG program is exited. The subsequent iterations contain similar or identical multimedia sequences. Additional multimedia tools such as the capability to bookmark and rotate pages and darken text have been added to some subsequent iterations.

NGS is a nonprofit organization that produces the Magazine. The other defendants, see Note 1, supra, are sued as a result of their relation both to NGS and the CNG. In 1995, NGS placed its television division, and subsequently its interactive and a portion of its cartography divisions, in taxable for-profit wholly owned subsidiaries. Holdings, NGV, NGE, and Interactive were such wholly-owned taxable subsidiaries. NGV, before its dissolution, wholly owned NGE. Interactive was a division of NGE.**[fn4]** By a license agreement, NGS gave NGV non-exclusive rights to its copyrights in the Magazine for the development and use in "multimedia" products. The rights granted were for reproduction only in archival form and without alteration. Other parties and their relationship to the CNG are described in the margin.**[fn5]**

Eastman Kodak, a manufacturer and developer of film and camera equipment, entered into an agreement to pay a fee to Interactive. In return, Eastman Kodak obtained the right to place a promotional message at the beginning of the CD-ROM Disks as well as on the outside of the CNG product packaging. It also received 5,000 complimentary units of CD-ROM 108.

In 1997, the CNG project was presented to and approved by the Society's Board of Trustees. One trustee was former United States Court of Appeals Judge Leon Higginbotham, now deceased. He had at one time been a partner with Judge Kaplan in the New York law firm of Paul, Weiss, Rifkin, and Garrison.

After gaining Board approval, NGS registered the CNG with the Copyright office. Its registration form states that the CNG is a "compilation of pre-existing material primarily pictorial" and that additional material added to it is a "brief introductory audiovisual montage."

The CNG was originally distributed and marketed as an "unprecedented" collection. Some of the marketing materials urge consumers to print "any article or photograph." In addition, in some copies of the CNG marketed by Encore Software, an End User License Agreement is included which states that, "[a]s a user of this product, you are free to use, modify and publish the Images as you wish" and "incorporate any Image(s) into your own original work and publish, display and distribute your work in any media."

In response to the production and marketing of the CNG, various contributors to the magazine or their representatives filed actions against some or all of the following defendants: NGS, NGE, Interactive,

Mindscape, Kodak, and Dataware for copyright infringement. Greenberg v. National Geographic Society was filed on December 5, 1997 in the Southern District of Florida. Faulkner v. National Geographic Society was filed on December 19, 1997 in the Southern District of New York. Ward v. National Geographic Society, was filed on December 27, 1999 in the Southern District of New York. Hiser v. National Geographic Society was filed on December 29, 1999 in the Southern District of New York. Auscape v. National Geographic Society was filed on January 31, 2002 in the Central District of California. It was transferred to the Southern District of New York on August 2, 2002. Psihoyos v. National Geographic Society was filed on March 7, 2002 in the District of Colorado. It was transferred to the Southern District of New York on August 9, 2002. All cases filed in or transferred to the Southern District of New York were assigned to Judge Kaplan.

Greenberg was the only case not filed in, or transferred to, the Southern District of New York. On June 8, 1999, the Florida district court granted summary judgment for defendants with regard to the copyright claims. On March 22, 2001, the Eleventh Circuit reversed. Greenberg v. Nat'l Geographic Soc'y, **244 F.3d 1267**, **1268** (11th Cir. 2001). The Supreme Court denied certiorari on October 12, 2001. Nat'l Geographic Soc'y v. Greenberg, **534 U.S. 951** (2001).

In the Southern District of New York, defendants filed motions to dismiss and for summary judgment in Faulkner, Ward, and Hiser in March, 2001. Ward cross-moved for summary judgment. Judge Kaplan issued two opinions ("the 1909 Act Opinions") on July 13, 2002. Ward v. Nat'l Geographic Soc'y, **208 F. Supp. 2d 429** (S.D.N.Y. 2002); Faulkner v. Nat'l Geographic Soc'y, **211 F. Supp. 2d 450** (S.D.N.Y. 2002). The court held that issues of fact precluded entry of summary judgment for defendants with regard to some of the infringement claims. It also dismissed the claim brought by some plaintiffs against Kodak for contributory infringement. Id. at 473-75.

On April 11, 2002, defendants again filed motions to dismiss and for summary judgment in Ward, Faulkner and Hiser; the plaintiffs in those actions also moved for summary judgment. Defendants filed a motion to dismiss and for summary judgment in Psihoyos on May 20, 2003. The district court granted defendants' motions for summary judgment in Ward, Faulkner, Hiser, and Psihoyos on December 11, 2003 under Rule 54(b). Faulkner v. Nat'l Geographic Soc'y, **294 F. Supp. 2d 523** (S.D.N.Y. 2003). It held that the CNG was a privileged revision under Section 201(c), and, therefore, defendants did not infringe plaintiffs' copyright in publishing their underlying works in the CNG. Id. at 543.

The Faulkner and Hiser plaintiffs moved for reconsideration on the grounds that the Court erred as a matter of law and should have recused itself. The recusal motion was based on: (i) Judge Kaplan's disclosure to the litigants, in a letter dated November 24, 2003, that he had just discovered Judge Higginbotham's role in NGS; and (ii) the subsequent discovery that while in private practice, Judge Kaplan had represented a subsidiary of defendant Eastman Kodak. The motion was denied on December 23, 2003, Faulkner v. Nat'l Geographic Soc'y, **296 F. Supp. 2d 488** (S.D.N.Y. 2003) ("Recusal Order"), and a final judgment entered. The Auscape suit remains pending.

At issue on this appeal are the judgments entered against the Faulkner, Ward, Hiser, and Psihoyos plaintiffs. Plaintiffs from Faulkner and Hiser, ("Faulkner appellants") appeal the final orders in: (i) Faulkner v. National Geographic Society, **211 F. Supp. 2d 450** (S.D.N.Y. July 13, 2002); (ii) Faulkner v. National Geographic Society, **220 F. Supp. 2d 237** (S.D.N.Y. September 4, 2002); (iii) Faulkner v. National Geographic Society, **294 F. Supp. 2d 523** (S.D.N.Y. December 11, 2003); and (iv) Faulkner v. National Geographic Society, **296 F. Supp. 2d 488** (S.D.N.Y. December 23, 2003). Fred Ward appeals only the December 11, 2004 order's grant of summary judgment to defendants dismissing all of his copyright claims. Plaintiffs from Psihoyos ("Psihoyos appellants") also appeal only the December 11, 2004 order's grant of summary judgment to defendants dismissing all of their copyright claims.

DISCUSSION

We review a district court's grant or denial of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. United States v. Collado, **348 F.3d 323**, **326-27** (2d Cir. 2003). Summary judgment is only appropriate if, based on the pleadings and evidentiary submissions, there is no genuine material issue of fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, **477 U.S. 317**, **322-23** (1986). We review a district court's decision regarding offensive non-mutual collateral estoppel de novo. S.E.C. v. Monarch Funding Corp., **192 F.3d 295**, **303** (2d Cir. 1999). We review the denial of a motion to recuse under **28 U.S.C. § 455** for abuse of discretion. In re Aguinda, **241 F.3d 194**, **200** (2d Cir. 2001).

a) Legal Background

Copyright subsists in "original works of authorship." **17 U.S.C. § 102**(a). Copyright in a work vests initially in the author or authors of the work. Id. § 201(a). A compilation is an original work formed by selecting, coordinating, and arranging preexisting materials. Id. § 101. A compilation includes collective works, which are defined as "work[s], such as a periodical issue, anthology, or encyclopedia in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." Id. The copyright in a compilation or derivative work extends only to materials contributed by the compiling author. Id. § 103(b). A copyright in a compilation or derivative work does not include an exclusive right in the preexisting material. Id. § 103(b). Section 201(c) of Title 17 provides:

> Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

Id. § 201(c). With regard to Section 201(c), the pertinent House Report noted:

> Under the language of this clause a publishing company could reprint a contribution from one issue in a later issue of its magazine, and could reprint an article from a 1980 edition of an encyclopedia in a 1990 revision of it; the . . . publisher could not revise the contribution itself or include it in a new anthology or an entirely different . . . magazine or other collective work.

H.R. Rep. No. 94-1476, at 122-123 (1976), reprinted in 1976 U.S.C.A.A.N. 5659, 5738.

"The unauthorized reproduction and distribution of a copyrighted work generally infringes the copyright unless such use is specifically protected by the Act." Tasini v. New York Times Co., **206 F.3d 161**, **165** (2d Cir. 2000). In the instant matter, appellants created individual works that they submitted to NGS for use in the Magazine, a collected work. In their view, CNG's inclusion of their individual contributions infringes their copyright. Appellees believe that such use was specifically protected by the Act as a revision of the Magazine under **17 U.S.C. § 201**(c).

Three decisions interpreting Section 201(c) are of paramount importance to the resolution of the issue. They are Tasini v. New York Times Co., **206 F.3d 161** (2d Cir. 2000); its affirmance in New York Times Co. v. Tasini, **533 U.S. 483** (2001); and, of course, Greenberg v. National Geographic Society, **244 F.3d 1267** (11th Cir. 2001), a decision involving the CNG itself. We now address those decisions in some detail.

In Tasini, we held that electronic and CD-ROM databases containing individual articles from multiple editions of various periodicals did not

constitute "revisions" of individual periodical issues within the meaning of Section 201(c). 206 F.3d at 168. Crucial to our decision was the fact that each article had to be retrieved individually from the particular database and made "available without any material from the rest of the periodical in which it first appeared." Id. at 164. We also noted that "[t]he aspects of a collective work that make it `an original work of authorship' are the selection, coordination, and arrangement of the preexisting materials," and that the means of retrieval employed by the databases did "almost nothing to preserve the copyrightable aspects of the Publishers' collective works, `as distinguished from the preexisting material employed in the work.'" Id. at 168 (quoting **17 U.S.C. § 101** and **17 U.S.C. § 103**(b)).

  The Supreme Court affirmed Tasini, holding,

  [i]n agreement with the Second Circuit, . . . that §
  201(c) does not authorize the copying at issue here.
  The publishers are not sheltered by § 201(c), we
  conclude, because the databases reproduce and
  distribute articles standing alone and not in
  context, not "as part of that particular collective
  work" to which the author contributed, "as part of . . .
  any revision" thereof, or "as part of . . . any
  later collective work in the same series."

New York Times Co. v. Tasini, **533 U.S. at 488** (alterations in original). The Supreme Court stressed that in enacting the 1976 revision, Congress "rejected the doctrine of indivisibility, recasting the copyright as a bundle of discrete `exclusive rights,' **17 U.S.C. § 106** (1994 ed. and Supp. V), each of which `may be transferred . . . and owned separately,' § 201(d)(2)." Id. at 495-96 (footnotes omitted). It explained:

  Copyright in the separate contribution "vests
  initially in the author of the contribution" (here,
  the freelancer). Copyright in the collective work
  vests in the collective author (here, the newspaper
  or magazine publisher) and extends only to the
  creative material contributed by that author, not to
  "the preexisting material employed in the work."

Id. at 494 (quoting **17 U.S.C. §§ 201**(c), 103(b)). Accordingly, the Court held that just as the author's copyright as contemplated by Congress would not be preserved by allowing a publisher "to reproduce or distribute copies of the author's contribution in isolation or within new collective works," it would not be preserved by allowing publishers to do so in electronic databases. Id. at 497.

  Importantly, the Court gave tacit approval to microfilm and microfiche as permissible Section 201(c) revisions, by contrasting that method of reproduction with the databases. It stated that "unlike microforms, the Databases do not perceptibly reproduce articles as part of the collective work to which the author contributed or as part of any `revision' thereof." Id. at 501-02. It pointed out that microforms "represent a mere conversion of intact periodicals (or revisions of periodicals) from one medium to another," whereas the Databases offered users articles in isolation absent their context in intact collective works. Id. at 502.

  The Supreme Court failed to adopt only one of the conclusions we reached in Tasini. It declined to pass on whether NEXIS, one of the databases at issue, "was infringing partly because [it] did `almost nothing to preserve the copyrightable aspects of the [Print] Publishers' collective works,' i.e., their original `selection, coordination, and arrangement.'" Id. at 502 n. 10 (quoting Tasini, 206 F.3d at 168). Instead the Court stated that "[i]t suffices to hold that the Databases do not contain `revisions' of the Print Publishers' works `as part of' which the Articles are reproduced and distributed." Id.

  After our opinion in Tasini, but before the Supreme Court's affirmance, the Eleventh Circuit decided Greenberg. That decision addressed the application of Section 201(c) to a case virtually identical on the facts and law to the instant matter. Jerry Greenberg, a freelance photographer who had completed four assignments for NGS over 30 years, sued NGS, NGE, and Mindscape for copyright infringement. Greenberg,

244 F.3d at 1269-70. His suit was based on the use of his photos in the CNG as well as the use of one in the Moving Cover Sequence. Id. at 1269. The copyrights in the pictures, once held by NGS, had been returned to Greenberg in 1985 and 1990. Id.

Greenberg did not utilize the Tasini analysis in determining whether the CNG was a "revision" under Section 201(c). It did not discuss whether the articles were presented in the context of the previous collected works or mention our discussion in Tasini. Rather, Greenberg focused on a description of the CNG as consisting of three components, the moving cover sequence (the "Sequence"); the digitally reproduced issues of the Magazine (the "Replica"); and the computer program that stored and retrieved the images (the "Program"). Id. For the Greenberg court, the key issue was what had been added to the digital reproductions of the Magazine. In that regard, it stated:

> Assuming arguendo, but expressly not deciding, that 201(c)'s revision privilege embraces the entirety of the Replica portion of the CNG (the 1,200 issues, as opposed to each separate issue of the Magazine), we are unable to stretch the phrase "that particular collective work" to encompass the Sequence and Program elements as well.
>
> . . . .
>
> . . . [T]he CNG is an "other collective work" composed of the Sequence, the Replica, and the Program. . . . [T]he Society, in collaboration with Mindscape, has created a new product ("an original work of authorship"), in a new medium, for a new market that far transcends any privilege of revision or other mere reproduction envisioned in § 201(c).

Id. at 1272-73 (footnote omitted). Because each of the three components identified by the Greenberg court as comprising the CNG — the Sequence, the Replica, and the Program — were themselves copyrightable, that court concluded that NGS had created a new work in the CNG. Id. at 1273-74. Accordingly it reversed the district court's entry of summary judgment in favor of defendants. Id. at 1275-76. While declining to address whether adding only the Program would result in the creation of a new collective work, Greenberg noted that the existence of the Program differentiated the CNG from microfilm. Id. at 1273 n. 12.

Three weeks after the Greenberg decision, the Supreme Court affirmed our Tasini ruling. It subsequently denied the petition for a writ of certiorari filed by the defendants in Greenberg. Nat'l Geographic Soc'y v. Greenberg, **534 U.S. 951** (2001).

b) Greenberg and Collateral Estoppel

In the district court, appellants claimed that offensive collateral estoppel precluded appellees from litigating their Section 201(c) argument. The district court held that, because the Supreme Court's decision in Tasini determined that the key to whether a collective work is a revision is how the articles are "presented to, and perceptible by, the user of the Databases," that decision so altered the legal environment that a fresh look at the Section 201(c) revision issue was appropriate in the instant matter. Faulkner, **294 F. Supp. 2d at 534**, **538** (quoting Tasini, **533 U.S. at 499**). We agree.

Under the doctrine of offensive collateral estoppel, a plaintiff may preclude a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff. Parklane Hosiery Co. v. Shore, **439 U.S. 322**, **329** (1979). In order for a plaintiff to bar a defendant from litigating an issue on collateral estoppel grounds: "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." Gelb v. Royal Globe Ins. Co., **798 F.2d 38**, **44** (2d Cir. 1986). Use of collateral estoppel "must be confined to situations where the matter

raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." Commissioner v. Sunnen, **333 U.S. 591**, **599-600** (1948).

Therefore, even where the specified elements of collateral estoppel are present, reexamination of a legal issue is appropriate where there has been a change in the legal landscape after the decision claimed to have preclusive effect. Restatement (Second) of Judgments § 28 (cmt. c). This is particularly so "when the application of the rule of issue preclusion would impose on one of the parties a significant disadvantage, or confer on him a significant benefit, with respect to his competitors. . . . because the essential problem is that there has been change in the law but not the facts." Id. Accordingly, in some situations, "a judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable." Sunnen, **333 U.S. at 600** (footnote omitted).

As noted, Greenberg held that if a subsequent work contains independently copyrightable elements not present in the original collected work, it cannot be a revision privileged by Section 201(c). Several months later, however, the Supreme Court held in Tasini that the critical analysis focused on whether the underlying works were presented by the particular database in the context of the original works. For example, in a straightforward application of that analysis, it also strongly implied, by contrasting the database to microfilm, that microfilm would constitute a privileged revision. **533 U.S. at 501**. In our view, the Tasini approach so substantially departs from the Greenberg analysis that it represents an intervening change in law rendering application of collateral estoppel inappropriate. Our analysis is, of course, not affected by the Supreme Court's declination of certiorari in Greenberg. See United States v. Carver, **260 U.S. 482**, **490** (1923) (denial of certiorari "imports no expression of opinion upon the merits" of any given case).

c) Section 201(c) and Tasini

Turning to the merits, we hold that, because the original context of the Magazines is omnipresent in the CNG and because it is a new version of the Magazine, the CNG is a privileged revision.

"`Revision' denotes a new `version,' and a version is, in this setting, a "`distinct form of something regarded by its creator or others as one work.'" Tasini, **533 U.S. at 500** (quoting Webster's Third New International Dictionary 1944, 2545 (1976)). "In determining whether the [underlying works] have been reproduced and distributed `as part of' a `revision' of the collective works in issue, we focus on the [underlying works] as presented to, and perceptible by, the user of the [CNG]." Id. at 499 (citations omitted). The CNG presents the underlying works to users in the same context as they were presented to the users in the original versions of the Magazine. The CNG uses the almost identical "selection, coordination, and arrangement" of the underlying works as used in the original collective works. Tasini, 206 F.3d at 168. The CNG presents an electronic replica of the pages of the Magazine. Pages are presented two at a time, with the gutter (that is, the Magazine fold) in the middle, and with the page numbers in the lower outside corners, just as they are presented in the written format. In addition, the contents of the CNG, including the authors' contributions, are in the same positions relative to the other contributions in the Magazine. To be sure, a CNG user can focus on particular pages or parts of pages. However, a user of a microfilm of a collective work can do the same thing, see Tasini, **533 U.S. at 501**, as, indeed can a reader of an original magazine by opening to a particular page. In contrast, the databases at issue in Tasini precluded readers from viewing the underlying works in their original context. Id. at 501-02.

Moreover, because the Section 201(c) privilege of reproduction and distribution extends to that collective work and any revision of that collective work, a permissible revision may contain elements not found in the original — for example, a collection of bound volumes of past issues with a copyrightable index to the entire collection. See Tasini, 206 F.3d at 167 (Section 201(c) "protects the use of an individual contribution in a collective work that is somewhat altered."). Tasini is

in that regard contrary to Greenberg. In the case of the CNG, some images found in the original version of the Magazines are blacked out, and it contains additional elements such as, among other things, the Moving Cover Sequence. However, these changes do not substantially alter the original context which, unlike that of the works at issue in Tasini, is immediately recognizable. The presentation does not, therefore, affect the CNG's status as a revision.

d) Transferability of the Section 201(c) Privilege

Appellants argue that the revision privilege is available only to NGS, as owner of the copyright in the original collective work, and that NGS cannot transfer its privilege. We disagree.**[fn6]**

Prior to the Copyright Act of 1976, authors risked losing all rights in their underlying works when they allowed such works to be used in a collective work. Tasini, 206 F.3d at 168. To address this concern, the 1976 Act contained Section 201(c) and, in other provisions, "expressly permitted the transfer of less than the entire copyright, see **17 U.S.C. § 201**(d), in effect replacing the notion of a single `copyright' with that of `exclusive rights' under a copyright." Id. To that end, Section 201(d) provides:

> (1) The ownership of a copyright may be transferred
> in whole or in part by any means of conveyance or by
> operation of law, and may be bequeathed by will or
> pass as personal property by the applicable laws of
> intestate succession.
>
> (2) Any of the exclusive rights comprised in a
> copyright, including any subdivision of any of the
> rights specified by section 106, may be transferred
> as provided by clause (1) and owned separately. The
> owner of any particular exclusive right is entitled,
> to the extent of that right, to all of the protection
> and remedies accorded to the copyright owner by this
> title.

**17 U.S.C. § 201**(d). The drafters intended that the Copyright Act of 1976 do "nothing to change the rights of the owner of copyright in a collective work" but that it merely clarify and improve an unfair legal situation by preserving an author's copyright in a contribution. H.R. Rep. No. 94-1476, at 122 (1976), reprinted in 1976 U.S.C.A.A.N. 5659, 5738. Given that intention, it is more than reasonable to read Section 201(c) and 201(d) together to render the publisher's limited privilege under Section 201(c) to be transferrable under Section 201(d).

Section 201(c) transfers some of the copyright in a contribution to publishers in the form of a limited privilege. Section 201(d)(1) by its terms allows for a transfer of a copyright "in whole or in part." Section 201(d)(2) authorizes owners of "[a]ny of the . . . rights . . . in a copyright" to transfer such rights. Therefore, publishers may transfer any subdivision of a copyright that they acquire. See Tasini, **972 F. Supp. 804**, **815-16** (S.D.N.Y. 1997) (holding subdivisions of copyrights transferable), rev'd on other grounds, **206 F.3d 161** (2d Cir. 2000). This result in no way undermines Section 201(c)'s goal of remedying the unfairness of indivisibility. It simply recognizes the quite natural implications of divisibility.

e) Section 201(c) and the Pre-1978 Works

The applicability of the revision privilege to the reproduction of works in the CNG must be addressed with regard to all the underlying works, including those originally published before 1978, when Section 201(c) went into effect. After some early wrestling with the issue of who owned the underlying copyrights in the pre-1978 works, the district court finally concluded that such ownership was irrelevant. In the final summary judgment order, it held that, because "at all relevant times [NGS] owned the copyrights in issues of the Magazine published before and after January 1, 1978. . . . the privileges conferred upon it by Section 201(c) as the holder of those copyrights govern regardless of when they were published." Faulkner, **294 F. Supp. 2d at 543**. The district court pointed out that the parties agreed that the extent of protection provided

by Section 201(c) to publication of the CNG was the same whether NGS or the plaintiffs owned the underlying copyrights. Id. Accordingly, Section 201(c) privileged NGS to publish the CNG regardless of when or who owned the copyrights in the underlying works. Id. We agree and affirm.

f) The Effect of Contractual Agreements Between the Parties

The district court determined that in all but a few circumstances none of the contractual agreements between the parties overrode application of Section 201(c)'s default provisions. The Faulkner appellants argue that their contracts were "intended to grant NGS limited publication rights in paper format only," and accordingly the Section 201(c) privilege is not applicable. We again disagree.

The Faulkner appellants' first argument in this regard is based on the language of Section 201(c). That provision extends to publishers the privilege of reproducing and distributing underlying works as part of certain collective works "[i]n the absence of an express transfer of the copyright or of any rights under it" in the underlying work itself. **17 U.S.C. § 201**(c). Most of the plaintiffs have written contracts with NGS, and the Faulkner appellants make the odd argument that, under the quoted language, the very existence of such contracts renders Section 201(c) inapplicable. However, the plain effect of the quoted language is only to establish the minimum rights acquired by publishers absent contractual provisions expressly overriding Section 201(c). In short, in the absence of a contract stating otherwise, publishers acquire "only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series." Id. (emphasis added). The mere existence of contracts does not, therefore, render Section 201(c) inapplicable.

Moreover, the contracts of the Faulkner appellants do not purport to alter the effect of Section 201(c). Nevertheless, these appellants argue that the contracts were intended to limit publication rights to a non-digital format. The argument is unpersuasive. The transfer of a work from one media to another generally does not alter its character for copyright purposes. See **17 U.S.C. § 102**(a) (copyright protection subsists in original works "fixed in any tangible medium of expression"); Tasini, **533 U.S. at 502** (describing "concept of `media neutrality'"). Therefore, even if the Faulkner appellants harbored an intent to limit publication rights to a non-digital format, their failure to negotiate for pertinent contractual provisions or even to communicate these intentions to NGS is fatal to their claim. Accordingly, the contracts in question do not bar defendants from exercising their Section 201(c) privilege.

g) Contributory Infringement Claims

In one of its 1909 Act Opinions, the district court granted summary judgment to Kodak and dismissed the contributory infringement claim brought against it by some of the plaintiffs. Faulkner, **211 F. Supp. 2d at 475**. On appeal, the Faulkner appellants argue that this was error.

"[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a `contributory' infringer." Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., **443 F.2d 1159**, **1162** (2d Cir. 1971) (footnote omitted); see also Matthew Bender & Co. v. West Publ'g Co., **158 F.3d 693**, **706** (2d Cir. 1998). Because Section 201(c) precludes a finding of copyright infringement, and because there can be no contributory infringement absent actual infringement, id., dismissal of the claim against Kodak is affirmed.

h) Individual Works by Ward and Psihoyos

Appellants make some additional arguments about specific works. Ward argues that he owns the underlying copyrights for certain articles — "Jade," "Computer Graphics," "Emeralds," "Coral Reefs," and "Rubies" — and for certain photographs or sets of photographs — "Fiber Optics," the "Pearls Stock Photo," the "Emeralds stock photo," and the "Kennedy photograph."**[fn7]**

Because appellees were privileged under Section 201(c) to include contributions to which individuals owned underlying copyrights in the CNG, we affirm the district court's holding with respect to the specific works for which Ward argues he holds the underlying copyright.

Two photographs taken by plaintiff Psihoyos, the "Paul Sereno" and "Ford Styrofoam" images, were excepted from the district court's ruling due to contractual language expressly denying NGS any electronic rights and defendants' withdrawal of their motion to dismiss regarding those photographs. Faulkner, **294 F. Supp. 2d at 531** n. 30, 549. In their brief, the Psihoyos appellants contend that factually there were a total of seven such photographs, four more taken by plaintiff Psihoyos — "Michael Novacek," "Information Technology," "T-Rex," and a photo appearing in the Geographica section of the magazine — and one by plaintiff Rickman — "Belly Flop". They request that we correct what must have been an inadvertent error by the district court.

Defendants respond that they do not object to excluding from the grant of summary judgment two of the five additional photographs, "Michael Novacek" and "Information Technology," both of which were identified in the papers submitted below. They oppose the exception of plaintiff Rickman's "Belly Flop" photograph because it was not previously identified to the district court. Presumably they also oppose exception of plaintiff Psihoyos's T-Rex photograph and his photograph that appeared in the Geographica section of the Magazine.**[fn8]** Because, in the declarations of Louis Psihoyos and Rick Rickman in support of plaintiffs' memorandum of law in opposition to defendants' motion to dismiss and for summary judgment, all of the above discussed photographs were identified as granting only limited use licenses to NGS, we find that they were properly identified. Accordingly, with respect to the "Michael Novacek," "Information Technology," "T-Rex," and "Belly Flop" photographs, as well as the photograph that appeared in the Geographica section of the Magazine,**[fn9]** we reverse.

h) Recusal

The Faulkner plaintiffs made a recusal motion based on Judge Kaplan's having practiced law with Judge Higginbotham, his hostility toward the Faulkner plaintiffs and their attorneys, and his past representation of a subsidiary of defendant Kodak. Judge Kaplan held that because movants raised the recusal issue only after he had ruled against them, they failed to raise the first two issues in a timely fashion and therefore waived any objection. Faulkner, **296 F. Supp. 2d at 490**. Nevertheless, Judge Kaplan addressed the merits of each basis for the motion and found recusal inappropriate because: (i) there was no suggestion that Judge Higginbotham served as a lawyer for the NGS while he and Judge Kaplan were in practice, but only served as a trustee; (ii) Judge Higginbotham could not have acted "concerning the matter" during the period when he and Judge Kaplan were in practice together because Judge Kaplan left the firm in August 1994, "well before the 1996 genesis of the [CNG]"; (iii) no affidavit, declaration, or deposition testimony given by Judge Higginbotham was part of the case, he never testified before Judge Kaplan, and his death precludes the possibility of any such occurrence in the future; and (iv) because he stopped practicing with Judge Higginbotham before the latter could have witnessed anything regarding the CNG, no knowledge he might have obtained could be imputed to Judge Kaplan. Id. at 490-91. Moreover, Judge Kaplan reasoned, even assuming that his representation of Sterling Drug, a Kodak subsidiary, was equivalent to representing Kodak, his representation of them in trademark litigation did not concern the matters at issue in this case. Id. at 491. Judge Kaplan also rejected plaintiffs' claim of hostility and bias because it was based only on his denial of their motion for class certification based on the Judge's view that they and their counsel could not adequately represent the class. Id. at 492-94. These Faulkner appellants appeal Judge Kaplan's denial of their recusal motion. We affirm.**[fn10]**

**28 U.S.C. § 455**(b)(2) provides that a judge shall disqualify himself "[w]here in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it." Judge Higginbotham did not serve as a lawyer or a material witness concerning

the matter in issue. Judge Kaplan's representation of the Kodak subsidiary did not concern the matter in issue.

**28 U.S.C. § 455**(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." With the exception of the written order denying class certification because Faulkner's counsel did not satisfy Federal Rule of Civil Procedure **23**(a)'s requirement of adequate representation, plaintiffs have not offered specific allegations of hostility, let alone bias. This ruling alone does not mandate recusal. See Liteky v. United States, **510 U.S. 540**, **555** (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion" under Section 455(a).).

## CONCLUSION

With the exception of the specifically discussed works made by Psihoyos and Rickman, we affirm.

[fn1] These defendants are: the National Geographic Society ("NGS"); National Geographic Holdings, Inc. ("Holdings"); National Geographic Ventures ("NGV"), National Geographic Interactive ("Interactive"); National Geographic Enterprises, Inc. ("NGE"); Mindscape, Inc. ("Mindscape"); Dataware Technologies, Inc. ("Dataware"); and Eastman Kodak Company ("Kodak").

[fn2] The Society has published the following additional CNG products: "The Complete National Geographic: 109 Years of National Geographic Magazine on CD-ROM"; "The Complete National Geographic: 109 Years of National Geographic Magazine on DVD"; "The Complete National Geographic: 110 Years of National Geographic Magazine on CD-ROM"; "The Complete National Geographic: 110 Years of National Geographic Magazine on DVD"; "The Complete National Geographic: 111 Years of National Geographic Magazine on CD-ROM"; "The Complete National Geographic: 112 Years of National Geographic Magazine on CD-ROM"; decade sets of the CNG containing issues of the Magazine from various decades in its history in CD-ROM format; a 30 year set containing 30 years of Magazine issues; a Curriculum Supplement including a CNG CD-ROM disk for 1997, a teacher's guide, and instructional materials; and individual CD-ROM discs sold with the intent of allowing users of earlier iterations of the CNG to add subsequently published issues of the Magazine as they became available.

[fn3] It should be noted that during some time periods of its publication, for each issue of the Magazine, regional issues were published containing somewhat different advertising. The CNG contains only one of each issue, not all of the regional issues.

[fn4] Holdings, Interactive, and NGE are now the same wholly-owned subsidiary of NGS, incorporated as NGHT, Inc.

[fn5] Mindscape was a computer software publisher and distributor that entered into an agreement with NGE to manufacture, market, and distribute the CNG. NGE's division, Interactive, authorized Mindscape to manufacture, market and distribute the CNG, subject to Interactive's approval, in return for the receipt of royalties from the sale of the CNG. The agreement did not grant Mindscape any rights in the individual works of photographers and authors. It did, however, authorize Mindscape to sub-license the CNG to multiple tiers of sublicensees. Mindscape mass-marketed the CNG through retail outlets and internet websites. It has also contracted with original equipment manufacturers to bundle the CNG with their computer hardware and sell the products as a single unit. Mindscape has been dissolved and no longer exists. In 2001, Encore Software succeeded Mindscape as the distributer of the CNG.

Dataware was a developer of interactive software designed for information retrieval and electronic publishing applications. Dataware entered into an agreement with Interactive to participate in the design and to manage development of the CNG. Dataware is in bankruptcy and accordingly this action is stayed as against it. See Faulkner v. Nat'l Geographic Soc'y, **294 F. Supp. 2d 523**, **526** n. 9 (S.D.N.Y. 2003).

[fn6] Because Tasini held that the publishers had no Section 201(c) privilege, the transferability issue was not addressed.

[fn7] The court previously granted Ward summary judgment as to the "Kennedy" photograph in one of the 1909 Act Opinions. Ward, **208 F. Supp. 2d at 448-49**. It later withdrew summary judgment after holding that defendants were privileged to include the photograph in the CNG under Section 201(c). Faulkner, **294 F. Supp. 2d at 543** n. 97.

[fn8] Appellants do not specifically identify the contributions that they believe should be excepted. We infer that they want us to except these two photographs because they were identified in the declarations submitted to the district court as having contractual language limiting reproduction to paper use only.

[fn9] The license for the Geographica photograph conferred "onetime reproduction rights" rather than denying electronic rights, but appellees have not argued that this distinction is legally relevant.

[fn10] Given our disposition of the Faulkner appellants' claims, Judge Kaplan's denial of the recusal motion was at most harmless error as to them. See Liljeberg v. Health Servs. Acquisition Corp., **486 U.S. 847**, **862**, **864** (1988) (harmless error review applies to **28 U.S.C. § 455**(a) violations; in determining whether judgment should be vacated on failure to recuse grounds, appellate court should consider (1) risk of injustice to parties in the particular case; (2) risk that denial of relief will produce injustice in other cases; and (3) risk of undermining public's confidence in the judicial process); Parker v. Connors Steel Co., **855 F.2d 1510**, **1526-27** (11th Cir. 1988) (Liljeberg test applies on direct appeal to alleged Section 455(a) and (b) violations; failure to recuse harmless error where appellate court exercising plenary review concludes that district court's dismissal of case based on grant of summary judgment was proper); Camacho v. Autoridad de Telefonos de Puerto Rico, **868 F.2d 482**, **490** (1st Cir. 1989) (where appellate court independently confirmed correctness of lower court's decision, judge's refusal to recuse himself was harmless and moot, if error, but recusal addressed in order to explain that there was no error at all). We address the issue of recusal on the merits because we are remanding the case for further proceedings. Although the plaintiffs who are beneficiaries of the remand have not raised recusal as an issue, we believe it appropriate to erase all doubt as to the propriety of Judge Kaplan's continuing to preside over this matter. See Liljeberg, **486 U.S. at 864** (public confidence in the judicial process a factor in review of a failure to recuse).

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved