UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAISY CHAVEZ

VS.                                      No. 3:02CV458(MRK)

METROPOLITAN DISTRICT
COMMISSION                               May 2, 2005

**PLAINTIFF'S OBJECTIONS TO DEFENDANT'S PROPOSED JURY INSTRUCTIONS**

1.  **Instruction No. 1 re Sec. 1983**

    The instruction fails to explain the phrase "under color of law", which is an essential element of the statutory right.

2.  **Instruction No. 2 re Elements of Proof**

    Defendant has misstated the law regarding intention. It has been held that lack of intention is not a defense if defendant should have reasonably known that their acts would have a discriminatory effect. Hemmings v. Grafton, 523 F.2d 861 (7th Cir. 1975). Very recently, in the context of an ADEA case, the U. S. Supreme Court announced an important modification relating to "intent to discriminate". Smith v. City of Jackson, 03-1160 (U.S. March 30, 2005) [see attached slip opinion], where the Court held:

    > Accepting the Court of Appeals' conclusion that the employer had adopted the diploma and test requirements without any intent to discriminate, we held that

1

> good faith "does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Id., at 432.
>
> We explained that Congress had "directed the thrust of the Act to the consequences of employment practices, not simply the motivation." Ibid. We relied on the fact that history is "filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas and tests are useful servants, but Congress has mandated the common-sense proposition that they are not to become masters of reality." Id., at 433. And we noted that the Equal Employment Opportunity Commission (EEOC), which had enforcement responsibility, had issued guidelines that accorded with our view. Id., at 433-434. We thus squarely held that § 703(a)(2) of Title VII did not require a showing of discriminatory intent.[fn5]

Slip Opinion, p. 4

The Second Circuit, in an opinion directly relating to Section 1983 cases, <u>Back v. Hastings on Hudson Union Free S.D.</u>, 365 F.3d 107 (2nd Cir. 2004), stated at 130, that the test was wether a reasonable person would understand that his actions violated the law:

> Defendants might have believed their stereotypes not to be gender discriminatory, but rather, to be true — that is, they may have believed that women with young children in fact should not or would not work long hours. But such a belief can not serve as a refuge in the discrimination context, for it cannot be considered "objectively reasonable."

Discriminatory effect, then, is the proper test.

**3.    Instruction No. 4 State of Mind**

The state of mind of the Defendant's employees is irrelevant. See the discussion in Item No. 2 above. The Second Circuit clearly does not require a specific state of mind. In <u>Back</u>, the act of stereotyping, absent a belief that they were discriminating, was sufficient to support a violation of Section 1983.

4. **Instruction No. 5 Intent**

   See Items 2 and 3 above.

5. **Instruction No. 6 "Under Color of State Law"**

   Defendant requires too much from "under color of law". Even a private doctor treating a state prisoner can be deemed to be acting under color of law: Abney v. Mcginnis, 380 F.3d 663 (2nd Cir. 2004), because the state has a duty to provide medical care to prisoners. Likewise, in the instant case, the state/municipality has a duty to treat its employees non-discriminatorily under Section 1983 and under the 1964 Civil Rights Act. So, any manager charged with the making of employment related decisions can violate Section 1983 in his (or her - except that MDC had no decision-making women) actions or inactions.

   More to the point, is the Defendant prepared to stipulate that the actions in question were "under color of state law"?

6. **Instruction No. 7 Official Acting Under Color of State Law**

   See Item No. 5 above.

7. **Instruction No. 8 Deprivation of Federal Right**

   This Jury Instruction misleadingly makes it appear that there are more elements that Plaintiff must prove than set forth initially. As to intent, see Item No. 2 above.

8. **Instruction No. 9 Equal Protection Claim**

   The same problem of "intentional" arises here. See Item 2 above.

   As to the burden shifting statement, Defendant does not follow Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-149 (2000), closely enough. On rebuttal, Plaintiff can show that Defendant's statements are false OR not worthy of belief, AND THAT, THEREFORE, a

discriminatory intent may be inferred.

The extended statements as to what the jury may consider are (1) beyond what is appropriate for the instruction; (2) unbalanced, in that they fail to take into account that jury should also take into account various factors affecting Defendant's conduct, including the repeated failures to hire women and minorities to management positions, the manipulation of noticing of promotional opportunities and the manipulation of use or not use of the affirmative action officer. In short, the Defendant's statement involves an extended commentary on the evidence and is thus improper.

**9.    Instruction No. 11. Municipal Corporation**

Defendant completely misstates the law regarding liability of a municipal corporation. The statement that there must be a "policy" is wrong. See Back v. Hastings on Hudson Union Free S.D., 365 F.3d 107 (2nd Cir. 2004), supra. In Canton v. Harris, 489 U.S. 378 (1989), the U. S. Supreme Court modified the rule in Monell to allow claims where the municipality showed deliberate indifference to an existing valid policy.

**10.   Instruction No. 12   Practice and Custom**

The decision in Canton v. Harris, supra, and its progeny, E.g., County of Sacramento v. Lewis, 523 U.S. 833 (1998) and Gebser v. Lago Vista Independent School Dist., 524 U.S. 274 (1998) make it clear that that old charge is now irrelevant.

**11.   Instructions No. 13 and 14   Section 1981**

Defendant's proposed instructions fail to mention that §1981 has been held to apply to promotions: Jones et al v. R. R. Donnelley & Sons Co., 541 U.S. ____ (May 3, 2004).

While the words 'race and/or national origin was a substantial or motivating factor that prompted the MDC's decisions" are acceptable, the interpretation that follows, "in other words, that

4

the MDC had a discriminatory purpose of motive" is not. "Substantial or motivating factor" does not have the narrow meaning of "discriminatory purpose".

12.     **Instruction No. 15     Defining Racial Discrimination**

This instruction contradicts the prior instruction AND the following instruction (no. 16) AND some of instruction no. 17 by narrowing the legal wrong from race being "a substantial or motivating factor" to requiring "race alone". This is not the law. There is no saving this instruction.

13.     **Instruction No. 17     Promotion**

This instruction has been worded in a deliberately awkward manner so as to obscure its meaning to the jury. Better is: "An employer may not discriminate against an employee on the basis of race. This means, among other things, that an employee may not take race into consideration in any decision regarding a promotion." The reference to "determinative consideration" in the second paragraph contradicts the "substantial or motivating factor" standard. It must go.

14.     **Instruction No. 18     Discriminatory Intent**

See Item No. 2 above. The holding of Back v. Hastings is relevant to modify the standard to what a reasonable person would consider discriminatory. Discriminatory treatment can be inferred from mere fact differences in treatment. Powell v. Georgia Pacific Corp. 535 F. Supp. 713 (D.C. Ark. 1980).

15.     **Instruction No. 19     Title VII Pattern and Practice Claim**

It should be made clear that ONE of Plaintiff's Title VII claims is a pattern and practice claim. She also makes a strightforward claim of discrimination under Title VII, and the rules relating to pattern and practice claims do not spill over into those claims.

16.     **Instruction No. 21    Title VII Disparate Treatment Claim**

Defendant claims that proof of intentional discrimination is necessary under Title VII. This is false. See Item No. 2 above. <u>Smith v. City of Jackson</u> even refers to a lesser standard already adopted for Title VII claims. See <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 226-7 (2nd Cir. 2004):

> Fourth, although in certain circumstances a Title VII claim may be established through proof of a defendant's mere negligence, without a showing of discriminatory intent, see, e.g., Richardson v. New York State Department of Correctional Service, 180 F.3d at 441-42 (employer subject to liability if negligent in responding appropriately to a complaint of racial harassment by co-workers), a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional, see Tolbert v. Queens College, 242 F.3d 58, 69 (2d Cir. 2001) (§ 1981); Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 118 (2d Cir. 2004) (§ 1983); see generally Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987) (§ 1981); Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977) (§ 1983).

17.     **Instruction No. 22    Direct Evidence of Disparate Treatment**

The jury should be instructed that circumstantial evidence may also be used and that discriminatory purpose or intent may be inferred if they find the alleged non-discriminatory explanation of Defendant is not credible. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146-149 (2000).

18.     **Instruction No. 25    Indirect Evidence of Discrimination**

This instruction clearly predates <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146-149 (2000), and must be eliminated for wording in compliance with that case.

19.     **Instruction No. 26    Pretext**

This instruction clearly predates <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133,

146-149 (2000), and must be eliminated for wording in compliance with that case.

20.  **Instruction No. 28    Severe Conduct**

The Second Circuit Court of Appeals has recently held that repeated comments about sexual orientation are sufficient to constitute a hostile work Environment. Dawson v. Bumble, 03-7180 (2nd Cir. Feb. 17, 2005). Thus, Defendant's proposed charge is too narrow as to "offhand comments".

21.  **Instruction No. 34    Damages**

Defendant's proposed charge on damages is minimalistic and not helpful to the jury. See instead Plaintiff's proposed charge on this issue.

PLAINTIFF
DAISY CHAVEZ

By _____
Francis A. Miniter, Fed. ID No. CT09566
Miniter and Associates
100 Wells Street, Suite 1D
Hartford, CT 06103
phone 860-560-2590
fax    860-560-3238
email: miniter@attglobal.net

CERTIFICATION OF SERVICE

The undersigned does hereby certify that a true copy of the foregoing together was delivered to the following counsel of record by hand delivery on May 3, 2005.:

Holly Quackenbush Darin, Esq.
David Ryan, Esq.
Ryan & Ryan
900 Chapel Street, Suite 621
New Haven, CT 06510

_____
Francis A. Miniter

Result #1: U.S. Supreme Court Reports - SMITH v. CITY OF JACKSO...   http://www.loislaw.com/pns/docview.htp?query=%28%28intent+to+dis...

SMITH v. CITY OF JACKSON, 03-1160 (U.S. 2005)

AZEL P. SMITH, et al., PETITIONERS v. CITY OF JACKSON, MISSISSIPPI, et al.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 03-1160.

Argued November 3, 2004.

Decided March 30, 2005.

In revising its employee pay plan, respondent City granted raises to all police officers and police dispatchers in an attempt to bring their starting salaries up to the regional average. Officers with less than five years' service received proportionately greater raises than those with more seniority, and most officers over 40 had more than five years of service. Petitioners, a group of older officers, filed suit under the Age Discrimination in Employment Act of 1967 (ADEA), claiming, inter alia, that they were adversely affected by the plan because of their age. The District Court granted the City summary judgment. Affirming, the Fifth Circuit ruled that disparate-impact claims are categorically unavailable under the ADEA, but it assumed that the facts alleged by petitioners would entitle them to relief under *Griggs v. Duke Power Co.*, , which announced a disparate-impact theory of recovery for cases brought under Title VII of the Civil Rights Act of 1964 (Title VII).

*Held:*

The judgment is affirmed. 351 F.3d 183, affirmed.

JUSTICE STEVENS delivered the opinion of the Court with respect to Parts I, II, and IV, concluding:

1. The ADEA authorizes recovery in disparate-impact cases comparable to *Griggs*. Except for the substitution of "age" for "race, color, religion, sex, or national origin," the language of ADEA § 4(a)(2) and Title VII § 703(a)(2) is identical. Unlike Title VII, however, ADEA § 4(f)(1) significantly narrows its coverage by permitting any "otherwise prohibited" action "where the differentiation is based on reasonable factors other than age" (hereinafter RFOA provision). Pp. 2-4.

2. Petitioners have not set forth a valid disparate-impact claim. Two textual differences between the ADEA and Title VII make clear that the disparate-impact theory's scope is narrower under the ADEA than under Title VII. One is the RFOA provision. The other is the amendment to Title VII in the Civil Right Act of 1991, which modified this Court's *Wards Cove Packing Co. v. Atonio*, , holding that narrowly construed the scope of liability on a disparate-impact theory. Because the relevant 1991 amendments expanded Title VII's coverage but did not amend the ADEA or speak to age discrimination, *Wards Cove's* pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA. Congress' decision to limit the ADEA's coverage by including the RFOA provision is consistent with the fact that age, unlike Title VII's protected classifications, not uncommonly has relevance to an individual's capacity to engage in certain types of employment. Here, petitioners have done little more than point out that the pay plan is relatively less generous to older workers than to younger ones. They have not, as required by *Wards Cove*, identified any specific test, requirement, or practice within the pay plan that has an adverse impact on older workers. Further, the record makes clear that the City's plan was based on reasonable factors other than age. The City's explanation for the differential between older and younger workers was its

---

Result #1: U.S. Supreme Court Reports - SMITH v. CITY OF JACKSO...   http://www.loislaw.com/pns/docview.htp?query=%28%28intent+to+dis...

perceived need to make junior officers' salaries competitive with comparable positions in the market. Thus, the disparate impact was attributable to the City's decision to give raises based on seniority and position. Reliance on these factors is unquestionably reasonable given the City's goal. Pp. 11-14.

JUSTICE STEVENS, joined by JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER, concluded in Part III that the ADEA's text, the RFOA provision, and Equal Employment Opportunity Commission (EEOC) regulations all support the conclusion that a disparate-impact theory is cognizable under the ADEA. Pp. 4-11.

JUSTICE SCALIA concluded that the reasoning in Part III of JUSTICE STEVENS' opinion is a basis for deferring, pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, , to the EEOC's reasonable view that the ADEA authorizes disparate-impact claims. Pp. 1-5.

JUSTICE O'CONNOR, joined by JUSTICE KENNEDY and JUSTICE THOMAS, concluded that the judgment should be affirmed on the ground that disparate impact claims are not cognizable under the ADEA. Pp. 1-22.

STEVENS, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, in which SCALIA, SOUTER, GINSBURG, and BREYER, JJ., joined, and an opinion with respect to Part III, in which SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment. O'CONNOR, J., filed an opinion concurring in the judgment, in which KENNEDY and THOMAS, JJ., joined. REHNQUIST, C. J., took no part in the decision of the case.

See *United States v. Detroit Timber & Lumber Co.*, .

JUSTICE STEVENS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, and an opinion with respect to Part III, in which JUSTICE SOUTER, JUSTICE GINSBURG, AND JUSTICE BREYER join.

I

Petitioners, police and public safety officers employed by the city of Jackson, Mississippi (hereinafter City), contend that salary increases received in 1999 violated the Age Discrimination in Employment Act of 1967 (ADEA) because they were less generous to officers over the age of 40 than to younger officers. Their suit raises the question whether the "disparate-impact" theory of recovery announced in *Griggs v. Duke Power Co.*, (1971), for cases brought under Title VII of the Civil Rights Act of 1964, is cognizable under the ADEA. Despite the fact that age, it is a question that we have not yet addressed. See *Hazen Paper Co. v. Biggins*, , (1993); *Markham v. Geller*, 451 U.S. 945 (1981) (REHNQUIST, J., dissenting from denial of certiorari).

On October 1, 1998, the City adopted a pay plan granting raises to all City employees. The stated purpose of the plan was to "attract and retain qualified people, provide incentive for performance, maintain competitiveness with other public sector agencies and ensure equitable compensation to all employees regardless of age, sex, race and/or disability." On May 1, 1999, a revision of the plan, which was motivated, at least in part, by the City's desire to bring the starting salaries of police officers up to the regional average, granted raises to all police officers and police dispatchers. Those who had less than five years of tenure received proportionately greater raises when compared to their former pay than those with more seniority. Although some officers over the age of 40 had less than five years of service, most of the older officers had more.

Petitioners are a group of older officers who filed suit under the ADEA claiming both that the City deliberately discriminated against them because of their age (the "disparate-treatment" claim) and that they were "adversely affected" by the plan because of their age (the "disparate-impact" claim). The District Court granted summary judgment to the City on both claims. The Court of Appeals held that the ruling on the

Result #1: U.S. Supreme Court Reports - SMITH v. CITY OF JACKSO...    http://www.loislaw.com/pns/docview.htp?query=%28%28intent+to+dis...

former claim was premature because petitioners were entitled to further discovery on the issue of intent, but it affirmed the dismissal of the disparate-impact claim. 351 F.3d 183 (CA5 2003). Over one judge's dissent, the majority concluded that disparate-impact claims are categorically unavailable under the ADEA. Both the majority and the dissent assumed that the facts alleged by petitioners would entitle them to relief under the reasoning of Griggs.

We granted the officers' petition for certiorari, 541 U.S. ___ (2004), and now hold that the ADEA does authorize recovery in "disparate-impact" cases comparable to Griggs. Because, however, we conclude that petitioners have not set forth a valid disparate-impact claim, we affirm.

II

During the deliberations that preceded the enactment of the Civil Rights Act of 1964, Congress considered and rejected proposed amendments that would have included older workers among the classes protected from employment discrimination. General Dynamics Land Systems, Inc. v. Cline, ___ (2004). Congress did, however, request the Secretary of Labor to "make a full and complete study of the factors which might tend to result in discrimination in employment because of age and of the consequences of such discrimination on the economy and individuals affected." § 715, 78 Stat. 265. The Secretary's report, submitted in response to Congress' request, noted that there was little discrimination arising from dislike or intolerance of older people, but that "arbitrary" discrimination did result from certain age limits. Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment 22 (June 1965), reprinted in U.S. Equal Employment Opportunity Commission, Legislative History of the Age Discrimination in Employment Act (1981) (hereinafter Wirtz Report). Moreover, the report observed that discriminatory effects resulted from "[i]nstitutional arrangements that indirectly restrict the employment of older workers." Id., at 15.

In response to that report Congress directed the Secretary to propose remedial legislation, see Fair Labor Standards Amendments of 1966, Pub.L. 89-601, § 606, 80 Stat. 845, and then acted favorably on his proposal. As enacted in 1967, § 4(a)(2) of the ADEA, now codified as ___ (a)(2), provided that it shall be unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age. . . ." 81 Stat. 603. Except for substitution of the word "age" for the words "race, color, religion, sex, or national origin," the language of that provision in the ADEA is identical to that found in § 703(a)(2) of the Civil Rights Act of 1964 (Title VII). Other provisions of the ADEA also parallel the earlier statute. Unlike Title VII, however, § 4(f)(1) of the ADEA, 81 Stat. 603, contains language that significantly narrows its coverage by permitting any "otherwise prohibited" action "where the differentiation is based on reasonable factors other than age" (hereinafter RFOA provision).

III

In determining whether the ADEA authorizes disparate-impact claims, we begin with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes. Northcross v. Board of Ed. of Memphis City Schools, ___ (1973) (per curiam). We have consistently applied that presumption to language in the ADEA that was "derived in haec verba from Title VII." Lorillard v. Pons, ___ (1978). [NN] Our unanimous interpretation of § 703(a)(2) of the Title VII in Griggs is therefore a precedent of compelling importance.

In Griggs, a case decided four years after the enactment of the ADEA, we considered whether § 703 of Title VII prohibited an employer "from requiring a high school education or passing of a standardized general intelligence test as a condition of employment in or transfer to jobs when (a) neither standard is shown to be significantly related to successful job performance, (b) both requirements operate to disqualify

Result #1: U.S. Supreme Court Reports - SMITH v. CITY OF JACKSO...    http://www.loislaw.com/pns/docview.htp?query=%28%28intent+to+dis...

Negroes at a substantially higher rate than white applicants, and (c) the jobs in question formerly had been filled only by white employees as part of a longstanding practice of giving preference to whites." 401 U.S., at 425-426. Accepting the Court of Appeals' conclusion that the employer had adopted the diploma and test requirements without any intent to discriminate, we held that good faith "does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Id., at 432.

We explained that Congress had "directed the thrust of the Act to the consequences of employment practices, not simply the motivation." Ibid. We relied on the fact that history is "filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas and tests are useful servants, but Congress has mandated the common-sense proposition that they are not to become masters of reality." Id., at 433. And we noted that the Equal Employment Opportunity Commission (EEOC), which had enforcement responsibility, had issued guidelines that accorded with our view. Id., at 433-434. We thus squarely held that § 703(a)(2) of Title VII did not require a showing of discriminatory intent.

While our opinion in Griggs relied primarily on the purposes of the Act, buttressed by the fact that the EEOC had endorsed the same view, we have subsequently noted that our holding represented the better reading of the statutory text as well. See Watson v. Fort Worth Bank & Trust, ___ (1988). Neither § 703(a)(2) nor the comparable language in the ADEA simply prohibits actions that "limit, segregate, or classify" persons; rather the language prohibits such actions that "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's" race or age. Ibid. (explaining that in disparate-impact cases, "the employer's practices may be said to 'adversely affect [an individual's status] as an employee'" ___ (a)(2)). Thus the text focuses on the effects of the action on the employee rather than the motivation for the action of the employer.

Griggs, which interpreted the identical text at issue here, thus strongly suggests that a disparate-impact theory should be cognizable under the ADEA. Indeed, for over two decades after our decision in Griggs, the Courts of Appeal uniformly interpreted the ADEA as authorizing recovery on a "disparate-impact" theory in appropriate cases. It was only after our decision in Hazen Paper Co. v. Biggins, ___ (1993), that some of those courts concluded that the ADEA did not authorize a disparate-impact theory of liability. Our opinion in Hazen Paper, however, did not address or comment on the issue we decide today. In that case, we held that an employee's allegation that he was discharged shortly before his pension would have vested did not state a cause of action under a disparate-treatment theory. The motivating factor was not, we held, the employee's age, but rather his years of service, a factor that the ADEA did not prohibit an employer from considering when terminating an employee. Id., at 612. While we noted that disparate-treatment "captures the essence of what Congress sought to prohibit in the ADEA," Id., at 610, we were careful to explain that we were not deciding "whether a disparate impact theory of liability is available under the ADEA. . . ." Ibid. In sum, there is nothing in our opinion in Hazen Paper that precludes an interpretation of the ADEA that parallels our holding in Griggs.

The Court of Appeals' categorical rejection of disparate-impact liability, like JUSTICE O'CONNOR's, rested primarily on the RFOA provision and the majority's analysis of legislative history. As we have already explained, we think the history of the enactment of the ADEA, with particular reference to the Wirtz Report, supports the pre-Hazen Paper consensus concerning disparate-impact liability. And Hazen Paper itself contains the response to the concern over the RFOA provision.

The RFOA provision provides that it shall not be unlawful for an employer "to take any action otherwise prohibited under subsectio[n] (a) . . . where the differentiation is based on reasonable factors other than age discrimination . . . ." 81 Stat. 603. In most disparate-treatment

Result #1: U.S. Supreme Court Reports - SMITH v. CITY OF JACKSO...    http://www.loislaw.com/pns/docview.htp?query=%28%28intent+to+dis...

cases, if an employer in fact acted on a factor other than age, the action would not be prohibited under subsection (a) in the first place. See *Hazen Paper*, 507 U.S., at 609 ("[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age."). In those disparate-treatment cases, such as in *Hazen Paper* itself, the RFOA provision is simply unnecessary to avoid liability under the ADEA, since there was no prohibited action in the first place. The RFOA provision is not, as JUSTICE O'CONNOR suggests, a "safe harbor from liability," *post*, at 5 (emphasis deleted), since there would be no liability under § 4(a). See *Texas Dept. of Community Affairs v. Burdine*, ___ (1981) (noting, in a Title VII case, that an employer can defeat liability by showing that the employee was rejected for "a legitimate, non-discriminatory reason" without reference to an RFOA provision).

In disparate-impact cases, however, the allegedly "otherwise prohibited" activity is not based on age. *Ibid.* ("[C]laims that stress 'disparate impact' [by contrast] involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another . . .'" (quoting *Teamsters v. United States*, ___, n. 15 (1977))). It is, accordingly, in cases involving disparate-impact claims that the RFOA provision plays its principal role by precluding liability if the adverse impact was attributable to a non-age factor that was "reasonable." Rather than support an argument that disparate impact is unavailable under the ADEA, the RFOA provision actually supports the contrary conclusion.

Finally, we note that both the Department of Labor, which initially drafted the legislation, and the EEOC, which is the agency charged with responsibility for implementing the statute, have consistently interpreted the ADEA to authorize relief on a disparate-impact theory. The initial regulations, while not mentioning disparate impact by name, nevertheless permitted such claims if the employer relied on a factor that was not related to age. 29 CFR § 860.103(f)(1)(i) (1970) (barring physical fitness requirements that were not "reasonably necessary for the specific work to be performed"). See also § 1625.7 (2004) (setting forth the standards for a "disparate impact" claim).

The text of the statute, as interpreted in *Griggs*, the RFOA provision, and the EEOC regulations all support petitioners' view. We therefore conclude that it was error for the Court of Appeals to hold that the disparate-impact theory of liability is categorically unavailable under the ADEA.

IV

Two textual differences between the ADEA and Title VII make it clear that even though both statutes authorize recovery on a disparate-impact theory, the scope of disparate-impact liability under ADEA is narrower than under Title VII. The first is the RFOA provision, which we have already identified. The second is the amendment to Title VII contained in the Civil Rights Act of 1991, 105 Stat. 1071. One of the purposes of that amendment was to modify the Court's holding in *Wards Cove Packing Co. v. Atonio*, ___ (1989), a case in which we narrowly construed the employer's exposure to liability on a disparate-impact theory. See Civil Rights Act of 1991, § 2, 105 Stat. 1071. While the relevant 1991 amendments expanded the coverage of Title VII, they did not amend the ADEA or speak to the subject of age discrimination. Hence, *Wards Cove*'s pre-1991 interpretation of Title VII's identical language remains applicable to the ADEA.

Congress' decision to limit the coverage of the ADEA by including the RFOA provision is consistent with the fact that age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment. To be sure, Congress recognized that this is not always the case, and that society may perceive those differences to be larger or more consequential than they are in fact. However, as Secretary Wirtz noted in his report, "certain circumstances . . . unquestionably affect older workers more strongly, as a group, than they do younger workers." Wirtz Report 28. Thus, it is not surprising that certain employment criteria that are routinely used may be reasonable despite their adverse impact on older

---

Result #1: U.S. Supreme Court Reports - SMITH v. CITY OF JACKSO...    http://www.loislaw.com/pns/docview.htp?query=%28%28intent+to+dis...

workers as a group. Moreover, intentional discrimination on the basis of age has not occurred at the same levels as discrimination against those protected by Title VII. While the ADEA reflects Congress' intent to give older workers employment opportunities whenever possible, the RFOA provision reflects this historical difference.

Turning to the case before us, we initially note that petitioners have done little more than point out that the pay plan at issue is relatively less generous to older workers than to younger workers. They have not identified any specific test, requirement, or practice within the pay plan that has an adverse impact on older workers. As we held in *Wards Cove*, it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." 490 U.S., at 656 (emphasis added) (quoting *Watson*, 487 U.S., at 994). Petitioners have failed to do so. Their failure to identify the specific practice being challenged is the sort of omission that could "result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances . . .'" 490 U.S., at 657. In this case not only did petitioners thus err by failing to identify the relevant practice, but it is also clear from the record that the City's plan was based on reasonable factors other than age.

The plan divided each of five basic positions - police officer, master police officer, police sergeant, police lieutenant, and deputy police chief – into a series of steps and half-steps. The wage for each range was based on a survey of comparable communities in the Southeast. Employees were then assigned a step (or half-step) within their position that corresponded to the lowest step that would still give the individual a 2% raise. Most of the officers were in the three lowest ranks; in each of those ranks there were officers under age 40 and officers over 40. In none did their age affect their compensation. The few officers in the two highest ranks are all over 40. Their raises, though higher in dollar amount than the raises given to junior officers, represented a smaller percentage of their salaries, which of course are higher than the salaries paid to their juniors. They are members of the class complaining of a "disparate impact" of the award.

Petitioners' evidence established two principal facts: First, almost two-thirds (66.2%) of the officers under 40 received raises of more than 10% while less than half (45.3%) of those over 40 did. Second, the average percentage increase for the entire class of officers with less than five years of tenure was somewhat higher than the percentage for those with more seniority. Because older officers tended to occupy more senior positions, on average they received smaller increases when measured as a percentage of their salary. The basic explanation for the differential was the City's perceived need to raise the salaries of junior officers to make them competitive with comparable positions in the market.

Thus, the disparate impact is attributable to the City's decision to give raises based on seniority and position. Reliance on seniority and rank is unquestionably reasonable given the City's goal of raising employees' salaries to match those in surrounding communities. In sum, we hold that the City's decision to grant a larger raise to lower echelon employees for the purpose of bringing salaries in line with that of surrounding police forces was a decision based on a "reasonable factor other than age" that responded to the City's legitimate goal of retaining police officers. Cf. *MacPherson v. University of Montevallo*, 922 F.2d 766, 772 (CA11 1991).

While there may have been other reasonable ways for the City to achieve its goals, the one selected was not unreasonable. Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement.

Accordingly, while we do not agree with the Court of Appeals' holding that the disparate-impact theory of recovery is never available under the ADEA, we affirm its judgment.

It is so ordered.

method of achieving the desired result of remedying practices that had an adverse effect on older workers. Finally, we agree that the differences between age and the classes protected in Title VII are relevant, and that Congress might well have intended to treat the two differently. See infra, at 7 (O'CONNOR, J., concurring in judgment). However, Congress obviously considered those classes of individuals to be sufficiently similar to warrant enacting identical legislation, at least with respect to employment practices it sought to prohibit. While those differences, coupled with a difference in the text of the statute such as the RFOA provision, may warrant addressing disparate-impact claims in the two statutes differently, see infra, at 11-12, it does not justify departing from the plain text and our settled interpretation of that text.

[fn8] B. Lindemann & D. Kadue, Age Discrimination in Employment Law 416, and n. 16 (2003) (citing Holt v. Gamewell Corp., 797 F.2d 36, 37 (CA1 1986); Maresco v. Evans Chemetics, 964 F.2d 106, 115 (CA2 1992); Blum v. Witco Chemical Corp., 829 F.2d 367, 372 (CA3 1987); Wooden v. Board of Ed. of Jefferson Cty., Ky., 931 F.2d 376, 379 (CA6 1991); Monroe v. United Airlines, 736 F.2d 394, 404, n. 3 (CA7 1984); Dace v. ACF Industries, 722 F.2d 374, 378 (CA8 1983), modified, 728 F.2d 976 (1984) (per curiam); Palmer v. United States, 794 F.2d 534, 536 (CA9 1986); Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419 (CA10 1993) (assuming disparate-impact theory); MacPherson v. University of Montevallo, 922 F.2d 766, 771 (CA11 1991); Arnold v. United States Postal Service, 863 F.2d 994, 998 (CADC 1988) (assuming disparate-impact theory)).

[fn9] See, e.g., Mullin v. Raytheon Co., 164 F.3d 696, 700 (CA1 1999) ("[P]lectonic plates shifted when the Court decided [Hazen Paper]"); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1048 (CA6 1998) ("[T]here is now considerable doubt as to whether a claim of discrimination may exist under a disparate-impact theory" (internal quotation marks and citation omitted). See also Lindemann & Kadue, at 417-418, n. 23 (collecting cases). In contrast to the First, Seventh, Tenth, and Eleventh Circuits, which have held that there is no disparate-impact theory, the Second, Eighth, and Ninth Circuits continue to recognize such a theory. Id., at 417, and n. 22.

[fn10] We did note, however, that the challenged conduct was actionable under § 510 of the Employee Retirement Income Security Act of 1974. 507 U.S., at 612.

[fn11] We note that if Congress intended to prohibit all disparate-impact claims, it certainly could have done so. For instance, in the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), Congress barred recovery if a pay differential was based "on any other factor" -- reasonable or unreasonable -- "other than sex." The fact that Congress provided that employees could sue only reasonable factors in defending a suit under the ADEA is therefore instructive.

[fn12] Exhibit C, Record 1192.

[fn13] App. to Pet. for Cert. 41a.

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I concur in the judgment of the Court, and join all except Part III of its opinion. As to that Part, I agree with all of the Court's reasoning, but would find it a basis, not for independent determination of the disparate-impact question, but for deferral to the reasonable views of the Equal Employment Opportunity Commission (EEOC or Commission) pursuant to Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See General Dynamics Land Systems, Inc. v. Cline, 540 U.S. 581, 600 (2004) (SCALIA, J., dissenting).

This is an absolutely classic case for deference to agency interpretation. The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., confers upon the EEOC authority to issue "such rules and regulations as it may consider necessary or appropriate for carrying out the ADEA. § 628. Pursuant to this authority, the EEOC promulgated, after notice-and-comment rulemaking, see 46 Fed. Reg. 47724, 47727 (1981), a regulation that reads as follows:

---

THE CHIEF JUSTICE took no part in the decision of this case.

[fn1] App. 15.

[fn2] See 110 Cong. Rec. 2596-2599 (1964) (amendment offered by Rep. Dowdy, voted down 123 to 94); Id., at 9911-9913, 13490-13492 (amendment offered by Sen. Smathers, voted down 63 to 28).

[fn3] Like Title VII with respect to all protected classes except race, the ADEA provides an affirmative defense to liability where age is "a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." § 4(f)(1), 81 Stat. 603; Cf. Civil Rights Act of 1964, § 703(e), 78 Stat. 256 ("Notwithstanding any other provision of this title, . . . it shall not be [unlawful] to perform any of the prohibited activities . . . in §§ 703(a)-(d)] on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business enterprise . . .").

[fn4] Cesar Mayer & Co. v. Evans, 441 U.S. 750 (1979) (interpreting § 14(b) of the ADEA in light of § 705(c) of Title VII); Western Air Lines, Inc. v. Criswell, 472 U.S. 400 (1985) (interpreting ADEA's bona fide occupational qualification exception in light of Title VII's BFOQ exception); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985) (interpreting the ADEA to apply to denial of privileges cases in a similar manner as under Title VII).

[fn5] The congressional purposes on which we relied in Griggs have a striking parallel to two important points made in the Wirtz Report. Just as the Griggs opinion ruled out discrimination based on racial animus as a problem in that case, the Wirtz Report concluded that the high school diploma requirement, which was unrelated to job performance, had an unfair impact on African-Americans who had received inferior educational opportunities in segregated schools, 401 U.S., at 430, the Wirtz Report identified the identical obstacle to the employment of older workers. "Any formal employment standard which requires, for example, a high school diploma will obviously work against the employment of many older workers -- unfairly if, despite his limited schooling, an older worker's years of experience have given him the relevant equivalent of a high school education." Wirtz Report 21. Thus, just as the statutory text is identical, there is a remarkable similarity between the congressional goals we cited in Griggs and those present in the Wirtz Report.

[fn6] In reaching a contrary conclusion, JUSTICE O'CONNOR ignores key textual differences between § 4(a)(1), which does not encompass-disparate-impact liability, and § 4(a)(2). Section (a)(1) makes it unlawful for an employer "to fail or refuse to hire . . . any individual . . . because of such individual's age." (Emphasis added.) The focus of the section is on the employer's actions with respect to the targeted individual. Paragraph (a)(2), however, makes it unlawful for an employer "to limit . . . his employees in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." (Emphasis added.) Unlike in paragraph (a)(1), there is thus an incongruity between the employer's actions -- which are focused on his employees generally -- and the individual employee who adversely suffers because of those actions. Thus, an employer who classifies his employees without respect to age may still be liable under the terms of this paragraph if such classification adversely affects the employee because of that employee's age -- the very definition of disparate impact. JUSTICE O'CONNOR is therefore quite wrong to suggest that the textual differences between the two paragraphs are unimportant.

[fn7] JUSTICE O'CONNOR reaches a contrary conclusion based on the text of the statute, the legislative history, and the structure of the statute. As we explain above, n. 6, supra, her textual reasoning is not persuasive. Further, while Congress may have intended to remedy disparate-impact type situations through "non-coercive measures" in part, there is nothing to suggest that it intended such measures to be the sole

"When an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a 'factor other than' age, and such a practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity." ___ (d) (2004).

The statement of the EEOC which accompanied publication of the agency's final interpretation of the ADEA said the following regarding this regulation: "Paragraph (d) of § 1625.7 has been rewritten to make it clear that employment criteria that are age-neutral on their face but which nevertheless have a disparate impact on members of the protected age group must be justified as a business necessity. See Laugesen v. Anaconda Corp., 510 F.2d 307 (6th Cir. 1975); Griggs v. Duke Power Co., ___ (1971)," 46 Fed. Reg., at 47725. The regulation affirmed, moreover, what had been the longstanding position of the Department of Labor, the agency that previously administered the ADEA, see ante, at 10; 29 CFR § 860.103(f)(1)(i) (1970). And finally, the Commission has appeared in numerous cases in the lower courts, both as a party and as amicus curiae, to defend the position that the ADEA authorizes disparate-impact claims. Even under the unduly constrained standards of agency deference recited in United States v. Mead Corp., ___ (2001), the EEOC's reasonable view that the ADEA authorizes disparate-impact claims is deserving of deference. Id., at 229-231, and n. 12. A fortiori, it is entitled to deference under the pre-Mead formulation of Chevron, to which I con- tinue to adhere. See ___, 533 U.S., at 256-257 (SCALIA, J., dissenting).

JUSTICE O'CONNOR both denies that the EEOC has taken a position on the existence of disparate-impact claims and asserts that, even if it has, its position does not deserve deference. See post, at 18-21 (opinion concurring in judgment). The first claim cannot be squared with the text of the EEOC's regulation, quoted above. This cannot possibly be read as agnostic on the question whether the ADEA prohibits employer practices that have a disparate impact on the aged. It provides that such practices "can only be justified as a business necessity," compelling the conclusion that, absent a "business necessity," such practices are prohibited.

JUSTICE O'CONNOR would not defer to the EEOC regulation, even if it read as it does, because, she says, the regulation "does not purport to interpret the language of § 4(a) at all," but is rather limited to an interpretation of the "reasonable factors other than age" (RFOA) clause of § 4(f)(1) of the ADEA, which she says is not at issue. Post, at 19. This argument assumes, however, that the RFOA clause operates independently of the remainder of the ADEA. It does not. Section 4(f)(1) provides, in relevant part:

"It shall not be unlawful for an employer, employment agency, or labor organization . . . to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section . . . where the differentiation is based on reasonable factors other than age . . . ." ___ (f)(1) (emphasis added).

As this text makes clear, the RFOA defense is relevant only as a response to employer actions "otherwise prohibited" by the ADEA. Hence, the unavoidable meaning of the regulation at issue is that the ADEA prohibits employer actions that have an "adverse impact on individuals within the protected age group." ___ (d) (2004). And, of course, the only provision of the ADEA that could conceivably be interpreted to effect such a prohibition is § 4(a)(2) - the provision that JUSTICE O'CONNOR maintains the EEOC "does not purport to interpret . . . at all." Post, at 19.

Lastly, JUSTICE O'CONNOR argues that the EEOC's interpretation of what is "otherwise prohibited" by the ADEA is not entitled to deference because the Court concludes that the same regulation's interpretation of another term - the term "reasonable factors other than age," which the regulation takes to include only "business necessity" - is unreasonable. Post, at 21. Her logic seems to be that, because the two interpretations appear in the same paragraph, they should stand or fall together. She

cites no case for this proposition, and it makes little sense. If the two simultaneously adopted interpretations were contained in distinct paragraphs, the invalidation of one would not, of course, render the other infirm. (JUSTICE O'CONNOR does not mean to imply, I assume, that our rejection of the EEOC's application of the phrase "reasonable factors other than age" to disparate impact claims in paragraph (d) of § 1625.7 relieves the lower courts of the obligation to defer to the EEOC's other applications of the same phrase in paragraph (c) or (e).) I can conceive no basis for a different rule simply because the two simul- taneously adopted interpretations appear in the same paragraph.

The EEOC has express authority to promulgate rules and regulations interpreting the ADEA. It has exercised that authority to recognize disparate-impact claims. And, for the reasons given by the plurality opinion, its position is eminently reasonable. In my view, that is sufficient to resolve this case.

[fn1] See, e.g., Brief for EEOC as Amicus Curiae Supporting Plaintiffs-Appellees in Meacham v. Knolls Atomic Power Laboratory, No. 02-4083(L) etc. (CA2), p. 12, available at http://www.eeoc.gov/briefs/meacham.txt (all internet materials as visited Mar. 24, 2005, and available in the Clerk of Court's case file) ("The Commission has consistently defended [the interpretation announced in ___ (d) (2004)], arguing that a claim of discrimination under a disparate impact theory is cognizable."); Brief for EEOC as Amicus Curiae Supporting Plaintiffs-Appellants Seeking Reversal in Sitko v. Goodyear Tire & Rubber Co., No. 02-4083 (CA6), p. 8, available at http://www.eeoc.gov/sitko/sitkov.txt (pending); EEOC v. McDonnell Douglas Corp., 191 F.3d 948, 950-951 (CA8 1999).

[fn2] Perhaps JUSTICE O'CONNOR adopts the narrower position that, while the EEOC has taken the view that the ADEA prohibits actions that have a disparate impact, it has stopped short of recognizing "disparate impact claims." Post, at 18 (opinion concurring in judgment) (emphasis added). If so, this position is equally misguided. The EEOC need not take the extra step of recognizing that individuals harmed by prohibited actions have a right to sue; the ADEA itself makes that automatic. ___ (c) ("Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter . . .").

[fn3] JUSTICE O'CONNOR argues that the regulation does not necessarily construe subsection (4)(a)(2) to prohibit disparate impact, because disparate treatment also can have the effect which the regulation addresses - viz., "an adverse impact on individuals within the protected age group." ___ (d). See post, at 20. That is true enough. But the question here is not whether disparate treatment claims (when they have a disparate impact) are also covered by the regulation; it is whether disparate impact claims of all sorts are covered; and there is no way to avoid the conclusion (consistently reaffirmed by the agency's actions over the years) that they are. That is also a complete response to JUSTICE O'CONNOR's point that the regulation could not refer to § 4(a)(2) because it includes "applicants for employment," who are protected only under § 4(a)(1). Perhaps applicants for employment are covered only when, as JUSTICE O'CONNOR posits, disparate treatment results in disparate impact; or perhaps the agency's attempt to sweep employment applications into the disparate impact prohibition is mistaken. But whatever in addition it may cover, or may erroneously seek to cover, it is impossible to contend that the regulation does not cover actions that "limit, segregate or classify" employees in a way that produces a disparate impact on those within the protected age group; and the only basis for its interpretation that those actions are prohibited is § (4)(a)(2).

JUSTICE O'CONNOR, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in the judgment.

"Disparate treatment . . . captures the essence of what Congress sought to prohibit in the [Age Discrimination in Employment Act of 1967 (ADEA)], ___ et seq.] It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." Hazen Paper Co. v. Biggins, ___ (1993). In the nearly four decades since the

ADEA's enactment, however, we have never read the statute to impose liability upon an employer without proof of discriminatory intent. See ibid.; *Markham v. Geller*, 451 U.S. 945 (1981) (REHNQUIST, J., dissenting from denial of certiorari). I decline to join the Court in doing so today.

I would instead affirm the judgment below on the ground that disparate impact claims are not cognizable under the ADEA. The ADEA's text, legislative history, and purposes together make clear that Congress did not intend the statute to authorize such claims. Moreover, the significant differences between the ADEA and Title VII of the Civil Rights Act of 1964 counsel against transposing to the former our construction of the latter in *Griggs v. Duke Power Co.*, ____ (1971). Finally, the agencies charged with administering the ADEA have never authoritatively construed the statute's prohibitory language to impose disparate impact liability. Thus, on the precise question of statutory interpretation now before us, there is no reasoned agency reading of the text to which we might defer.

I

A

Our starting point is the statute's text. Section 4(a) of the ADEA makes it unlawful for an employer:

"(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age. . . ." ____ (a).

Neither petitioners nor the plurality contend that the first paragraph, § 4(a)(1), authorizes disparate impact claims, and I think it obvious that it does not. That provision plainly requires discriminatory intent, for to take an action against an individual "because of such individual's age" is to do so "by reason of" or "on account of" her age. See Webster's Third New International Dictionary 194 (1961); see also *Teamsters v. United States*, ____, n. 15 (1977) ("'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their [protected characteristic]. Proof of discriminatory motive is critical" (emphasis added)).

Petitioners look instead to the second paragraph, § 4(a)(2), as the basis for their disparate impact claim. But petitioners' argument founders on the plain language of the statute, the natural reading of which requires proof of discriminatory intent. Section 4(a)(2) uses the phrase "because of . . . age" in precisely the same manner as does the preceding paragraph — to make plain that an employer is liable only if its adverse action against an individual is motivated *by* the individual's age.

Paragraphs (a)(1) and (a)(2) do differ in one informative respect. The employer actions targeted by paragraph (a)(1) — i.e., refusing to hire, discharging, or discriminating against — are inherently harmful to the targeted individual. The actions referred to in paragraph (a)(2), on the other hand — i.e., limiting, segregating, or classifying — are facially neutral. Accordingly, paragraph (a)(2) includes additional language which clarifies that, to give rise to liability, the employer's action must actually injure someone: The decision to limit, segregate, or classify employees must "deprive or tend to deprive [an] individual of employment opportunities or otherwise adversely affect his status as an employee." That distinction aside, the structures of paragraphs (a)(1) and (a)(2) are otherwise identical. Each paragraph prohibits an employer from taking specified adverse actions against an individual "because of such individual's age."

---

The plurality instead reads paragraph (a)(2) to prohibit employer actions that "adversely affect [an individual's] status as an employee[] because of such individual's age." Under this reading, "because of . . . age" refers to the cause of the adverse effect rather than the *motive* for the employer's action. See ante, at 6. This reading is unpersuasive for two reasons. First, it ignores the obvious parallel between paragraphs (a)(1) and (a)(2) by giving the phrase "because of such individual's age" a different meaning in each of the two paragraphs. And second, it ignores the drafters' use of a comma separating the "because of . . . age" clause from the preceding language. That comma makes plain that the "because of . . . age" clause should not be read, as the plurality would have it, to modify only the "adversely affect" phrase. See, e.g., *United States v. Ron Pair Enterprises, Inc.*, ____ (1989) (interpreting statute in light of the drafters' use of a comma to set aside a particular phrase from the following language); see also B. Garner, A Dictionary of Modern Legal Usage 101 (2d ed. 1995) ("Generally, the word *because* should not follow a comma"). Rather, the "because of . . . age" clause is set aside to make clear that it modifies the entirety of the preceding paragraph: An employer may not, because of an individual's age, limit, segregate, or classify his employees in a way that harms that individual.

The plurality also argues that its reading is supported by the supposed "incongruity" between paragraph (a)(2)'s use of the plural in referring to the employer's actions ("limit, segregate, or classify his employees") and its use of the singular in the "because of such individual's age" clause. (Emphases added.) Ante, at 7, n. 6. Not so. For the reasons just stated, the "because of . . . age" clause modifies all of the preceding language of paragraph (a)(2). That preceding language is phrased in *both* the plural (insofar as it refers to the employer's actions relating to employees) and the singular (insofar as it requires that such action actually harm an individual). The use of the singular in the "because of . . . age" clause simply makes clear that paragraph (a)(2) forbids an employer to limit, segregate, or classify his employees if that decision is taken because of *even one* employee's age and that individual (alone or together with others) is harmed.

B

While § 4(a)(2) of the ADEA makes it unlawful to intentionally discriminate because of age, § 4(f)(1) clarifies that "[i]t shall not be unlawful for an employer . . . to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section . . . where the differentiation is based on reasonable factors other than age . . . ." ____ (f)(1). This "reasonable factors other than age" (RFOA) provision "insure[s] that employers [are] permitted to use neutral criteria" other than age. *EEOC v. Wyoming*, ____ (1983), even if this results in a disparate adverse impact on older workers. The provision therefore expresses Congress' clear intention that employers not be subject to liability absent proof of intentional age-based discrimination. That policy, in my view, cannot easily be reconciled with the plurality's expansive reading of § 4(a)(2).

The plurality however, reasons that the RFOA provision's language instead confirms that § 4(a) authorizes disparate impact claims. If § 4(a) prohibited only intentional discrimination, the argument goes, then the RFOA provision would have no effect, because any action based on a factor other than age would not be "otherwise prohibited" under § 4(a). See ante, at 9-10. Moreover, the plurality says, the RFOA provision applies only to employer actions based on reasonable factors other than age — so employers may still be held liable for actions based on unreasonable non-age factors. See ante, at 10.

This argument misconstrues the purpose and effect of the RFOA provision. Discriminatory intent is required under § 4(a), for the reasons discussed above. The role of the RFOA provision is to afford employers an independent safe harbor from liability. It provides that, where a plaintiff has made out a prima facie case of intentional age discrimination under § 4(a) — thus "creat[ing] a presumption that the employer unlawfully discriminated against the employee," *Texas Dept. of Community Affairs v. Burdine*, ____ (1981) — the employer can rebut this case by producing evidence that its action was based on a

reasonable non-age factor. Thus, the RFOA provision codifies a safe harbor analogous to the "legitimate, non-discriminatory reason" (LNR) justification later recognized in Title VII suits. Ibid.; *McDonnell Douglas Corp. v. Green*, (1973).

Assuming the *McDonnell Douglas* framework applies to ADEA suits, see *O'Connor v. Consolidated Coin Caterers Corp.*, , (1996), this "rebuttal" function of the RFOA provision is arguably redundant with the judicially established LNR justification. See ante, at 9-10. But, at most, that merely demonstrates Congress' abundance of caution in codifying an express statutory exemption from liability in the absence of discriminatory intent. See *Fort Stewart Schools v. FLRA*, , (1990) (provisions that, although "technically unnecessary," are sometimes "inserted out of an abundance of caution — a drafting imprecision venerable enough to have left its mark on legal Latin (ex *abundanti cautela*)"). It is noteworthy that even after *McDonnell Douglas* was decided, lower courts continued to rely on the RFOA exemption, in lieu of the LNR justification, as the basis for rebutting a prima facie case of age discrimination. See, e.g., *Krieg v. Paul Revere Life Ins. Co.*, 718 F.2d 998, 999 (CA11 1983) (per curiam); *Schwager v. Sun Oil Co. of Pa.*, 591 F.2d 58, 61 (CA10 1979); *Bittar v. Air Canada*, 512 F.2d 582, 582-583 (CA5 1975) (per curiam).

In any event, the RFOA provision also plays a distinct (and clearly non-redundant) role in "mixed-motive" cases, in such cases, an adverse action taken in substantial part because of an employee's age may be "otherwise prohibited" by § 4(a). See *Desert Palace, Inc. v. Costa*, , (2003); *Price Waterhouse v. Hopkins*, , (1989) (O'CONNOR, J., concurring in judgment). The RFOA exemption makes clear that such conduct is nevertheless lawful so long as it is "based on a reasonable factor other than age.

Finally, the RFOA provision's reference to "reasonable" factors serves only to prevent the employer from gaining the benefit of the statutory safe harbor by offering an irrational justification. Reliance on an unreasonable non-age factor would indicate that the employer's explanation is, in fact, no more than a pretext for intentional discrimination. See *Reeves v. Sanderson Plumbing Products, Inc.*, , (2000); see also *Hazen Paper*, 507 U.S., at 613-614.

II

A

The legislative history of the ADEA confirms what its text plainly indicates — that Congress never intended the statute to authorize disparate impact claims. The drafters of the ADEA and the Congress that enacted it understood that age discrimination was qualitatively different from the kinds of discrimination addressed by Title VII, and that many legitimate employment practices would have a disparate impact on older workers. Accordingly, Congress determined that the disparate impact problem would best be addressed through non-coercive measures, and that the ADEA's prohibitory provisions should be reserved for combating intentional age-based discrimination.

Although Congress rejected proposals to address age discrimination in the Civil Rights Act of 1964, § 715 of that Act directed the Secretary of Labor to undertake a study of age discrimination in employment and to submit to Congress a report containing "such recommendations for legislation to prevent arbitrary discrimination in employment because of age as he determines advisable." 78 Stat. 255. See *General Dynamics Land Systems, Inc. v. Cline*, , (2004); *EEOC v. Wyoming*, supra, at 229. In response, Secretary Willard Wirtz submitted the report that provided the blueprint for the ADEA. See Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment (June 1965), reprinted in U.S. Equal Employment Opportunity Commission, Legislative History of the Age Discrimination in Employment Act 83 (1981) (hereinafter Wirtz Report or Report). Because the ADEA was modeled on the Wirtz Report's findings and recommendations, the Report provides critical insights into the statute's meaning. See generally Blumrosen, Interpreting the ADEA: Intent or Impact 14-20, in Age Discrimination in Employment Act: A Compliance Manual for Lawyers and Personnel Practitioners 83-89 (M. Lake ed. 1982); see also *General Dynamics*, supra,

---

at 587-590 (relying on the Wirtz Report to interpret the ADEA); *EEOC v. Wyoming*, 460 U.S., at 230-231 (discussing the Report's role in the drafting of the ADEA).

The Wirtz Report reached two conclusions of central relevance to the question presented by this case. First, the Report emphasized that age discrimination is qualitatively different from the types of discrimination prohibited by Title VII of the Civil Rights Act of 1964 (i.e., race, color, religion, sex, and national origin discrimination) addressed by Title VII — in stark contrast to the types of discrimination addressed by Title VII — the Report found no evidence that age discrimination resulted from intolerance or animus towards older workers. Rather, age discrimination was based primarily upon unfounded assumptions about the relationship between an individual's age and her ability to perform a job. Wirtz Report 2. In addition, whereas ability is nearly always completely unrelated to the characteristics protected by Title VII, the Report found that, in some cases, "there is in fact a relationship between [an individual's] age and his ability to perform the job." Ibid. (emphasis deleted).

Second, the Wirtz Report drew a sharp distinction between "arbitrary discrimination" (which the Report clearly equates with disparate treatment) and circumstances of practices having a disparate impact on older workers. See id., at 2, 21-22. The Report defined "arbitrary" discrimination as adverse treatment of older workers "because of assumptions about the effect of age on their ability to do a job when there is in fact no basis for these assumptions." Id., at 2 (emphasis in original). While the "most obvious kind" of arbitrary discrimination is the setting of unjustified maximum age limits for employment, id., at 6, naturally the Report's definition encompasses a broad range of disparate treatment.

The Report distinguished such "arbitrary" (i.e., intentional and unfounded) discrimination from two other phenomena. One involves differentiation of employees based on a genuine relationship between age and ability to perform a job. See id., at 2. In this connection, the Report examined "circumstances which unquestionably affect older workers more strongly, as a group, than they do younger workers," including questions of health, educational attainment, and technological change. Id., at 11-14. In addition, the Report assessed "institutional arrangements" — such as seniority rules, workers' compensation laws, and pension plans — which, though intended to benefit older workers, might actually make employers less likely to hire or retain them. Id., at 2, 15-17.

The Report specifically recommended legislative action to prohibit "arbitrary discrimination," i.e., disparate treatment. Id., at 21-22. In sharp contrast, it recommended that the other two types of "discrimination" — both involving factors or practices having a disparate impact on older workers — be addressed through non-coercive measures: programs to increase the availability of employment, continuing education, and adjustment of pension systems, workers' compensation, and other institutional arrangements. Id., at 22-25. These recommendations found direct expression in the ADEA, which was drafted at Congress' command that the Secretary of Labor make "specific legislative recommendations for implementing the [Wirtz Report's] conclusions." Fair Labor Standards Amendments of 1966, § 606, 80 Stat. 845. See also *General Dynamics*, 540 U.S., at 589 ("[T]he ADEA . . . begins with statements of purpose and findings that mirror the Wirtz Report").

B

The ADEA's structure confirms Congress' determination to prohibit only "arbitrary" discrimination (i.e., disparate treatment based on unfounded assumptions), while addressing practices with a disparate adverse impact on older workers through non-coercive measures. Section 2 — which sets forth the findings and purposes of the statute — draws a clear distinction between "the setting of arbitrary age limits regardless of potential for job performance" and "certain otherwise desirable practices [that] may work to the disadvantage of older persons." § 2(a)(2). In response to these problems, § 2 identifies three purposes of the ADEA: "[1] to promote employment of older persons based on their ability rather than age; [2] to prohibit arbitrary age

employes gains experience and seniority. See, e.g., *Finnegan v. Trans World Airlines, Inc.*, 967 F.2d 1161, 1164 (CA7 1992) ("Virtually all elements of a standard compensation package are positively correlated with age"). Accordingly, many employer decisions that are intended to cut costs or respond to market forces will likely have a disproportionate effect on older workers. Given the myriad ways in which legitimate business practices can have a disparate impact on older workers, it is hardly surprising that Congress declined to subject employers to civil liability based solely on such effects.

III

A

The plurality and JUSTICE SCALIA offer two principal arguments in favor of their reading of the statute: that the relevant provision of the ADEA should be read *in pari materia* with the parallel provision of Title VII, and that we should give interpretive weight or deference to agency statements relating to disparate impact liability. I find neither argument persuasive.

The language of the ADEA's prohibitory provisions was modeled on, and is nearly identical to, parallel provisions in Title VII. See *McKennon v. Nashville Banner Publishing Co.*, ___ (1995); *Lorillard v. Pons*, ___ (1978). Because *Griggs*, supra, held that Title VII's § 703(a)(2) permits disparate impact claims, the plurality concludes that we should read § 4(a)(2) of the ADEA similarly. *Ante*, at 4-9.

Obviously, this argument would be a great deal more convincing had *Griggs* been decided before the ADEA was enacted. In that case, we could safely assume that Congress had notice (and therefore intended) that the language at issue here would be read to authorize disparate impact claims. See, e.g., *Department of Energy v. Ohio*, ___ (1992); *Holmes v. Securities Investor Protection Corporation*, ___ (1992). But *Griggs* was decided four years after the ADEA's enactment, and there is no reason to suppose that Congress in 1967 could have foreseen the interpretation of Title VII that was to come. See *Fogerty v. Fantasy, Inc.*, ___, n. 9 (1994); see also *supra*, at 10-11 (discussing novelty of disparate impact theory at the time of the ADEA's enactment).

To be sure, where two statutes use similar language we generally take this as "a strong indication that [they] should be interpreted *pari passu*." *Northcross v. Board of Ed. of Memphis City Schools*, ___ (1973) (per curiam). But this is not a rigid or absolute rule, and it "readily yields" to other indicia of congressional intent. *General Dynamics*, 540 U.S., at 595 (quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, ___ (1932)). Indeed, "the meaning [of the same words] well may vary to meet the purposes of the law.'" *United States v. Cleveland Indians Baseball Co.*, ___ (2001) (alteration in original) (quoting *Atlantic Cleaners & Dyers*, supra, at 433). Accordingly, we have not hesitated to give a different reading to the same language - whether appearing in separate statutes or in separate provisions of the same statute - if there is strong evidence that Congress did not intend the language to be used uniformly. See, e.g., *General Dynamics*, supra, at 595-597 ("age" has different meaning where used in different parts of the ADEA); *Cleveland Indians*, supra, at 213 ("wages paid" has different meanings in different provisions of Title 26 U.S.C.); *Robinson v. Shell Oil Co.*, ___ (1997) ("employee" has different meanings in different parts of Title VII); *Fogerty*, supra, at 522-525 (Copyright Act's attorney's fees provision has different meaning than the analogous provision in Title VII, despite their "virtually identical language"). Such is the case here.

First, there are significant textual differences between Title VII and the ADEA that indicate differences in congressional intent. Most importantly, whereas the ADEA's RFOA provision protects employers from liability for any actions not motivated by age, see supra, at 4-7, Title VII lacks any similar provision. In addition, the ADEA's structure demonstrates Congress' intent to combat intentional discrimination through § 4's prohibitions while addressing employment practices having a

discrimination in employment; (and 3) to help employers and workers find ways of meeting problems arising from the impact of age on employment." § 621(b).

Each of these three purposes corresponds to one of the three substantive statutory sections that follow. Section 3 seeks to "promote employment of older persons" by directing the Secretary of Labor to undertake a program of research and education related to "the needs and abilities of older workers, and their potentials for continued employment and contribution to the economy." § 622(a). Section 4, which contains the ADEA's core prohibitions, corresponds to the second purpose: to "prohibit arbitrary age discrimination in employment." Finally, § 5 addresses the third statutory purpose by requiring the Secretary of Labor to undertake a study of "institutional and other arrangements giving rise to involuntary retirement" and to submit any resulting findings and legislative recommendations to Congress. § 624(a)(1).

Section 4 — including § 4(a)(2) — must be read in light of the express statutory purpose the provision was intended to effect: the prohibition of "arbitrary age discrimination in employment." § 621(b). As the legislative history makes plain, "arbitrary" age discrimination had a very specific meaning for the ADEA's drafters. It meant disparate treatment of older workers, predominantly because of unfounded assumptions about the relationship between age and ability. See supra, at 8-10. Again, such intentional discrimination was clearly distinguished from circumstances and practices merely having a disparate impact on older workers, which — as ADEA §§ 2, 3, and 5 make clear — Congress intended to address through research, education, and possible future legislative action.

C

In addition to this affirmative evidence of congressional intent, I find it telling that the legislative history is devoid of any discussion of disparate impact claims or of the complicated issues such claims raise in the ADEA context. See Gold, Disparate Impact Under the Age Discrimination in Employment Act of 1967, 25 Berkeley J. Emp. & Lab. L. 1, 40 (2004). At the time the ADEA was enacted, the predominant focus of anti-discrimination law was on intentional discrimination; the concept of disparate impact liability, by contrast, was quite novel. See, e.g., Gold, *Griggs'* Folly: An Essay on the Theory, Problems, and Origin of the Adverse Impact Definition of Employment Discrimination and a Recommendation for Reform, 7 Indus. Rel. L. J. 429, 518-520 (1985); Blumrosen, Strangers in Paradise: *Griggs v. Duke Power Co.* and the Concept of Employment Discrimination, 71 Mich. L. Rev. 59, 69-71 (1972). Had Congress intended to inaugurate disparate impact liability in the ADEA, one would expect to find some indication of that intent in the text and the legislative history. There is none.

D

Congress' decision not to authorize disparate impact claims is understandable in light of the questionable utility of such claims in the age-discrimination context. No one would argue that older workers have suffered disadvantages as a result of entrenched historical patterns of discrimination, like racial minorities have. See *Massachusetts Bd. of Retirement v. Murgia*, ___ (1976) (per curiam); see also Wirtz Report 5-6. Accordingly, disparate impact liability under the ADEA cannot be justified, and is not necessary, as a means of redressing the cumulative results of past discrimination. Cf. *Griggs*, 401 U.S., at 430 (reasoning that disparate impact liability is necessary under Title VII to prevent perpetuation of the results of past racial discrimination).

Moreover, the Wirtz Report correctly concluded that — unlike the classifications protected by Title VII — there often is a correlation between an individual's age and her ability to perform a job. Wirtz Report 2, 11-15. That is to be expected, for "physical ability generally declines with age," *Murgia*, supra, at 315, and in some cases, so does mental capacity, see *Gregory v. Ashcroft*, ___ (1991). Perhaps more importantly, advances in technology and increasing access to formal education often leave older workers at a competitive disadvantage vis-á-vis younger workers. Wirtz Report 11-15. Beyond these performance-affecting factors, there is also the fact that many employment benefits, such as salary, vacation time, and so forth, increase as an

disparate impact on older workers through independent non-coercive mechanisms. See supra, at 8-11. There is no analogy in the structure of Title VII. Furthermore, as the Congresses that adopted both Title VII and the ADEA clearly recognized, the two statutes were intended to address qualitatively different kinds of discrimination. See supra, at 7-8. Disparate impact liability may have a legitimate role in combating the types of discrimination addressed by Title VII, but the nature of aging and of age discrimination makes such liability inappropriate for the ADEA. See supra, at 12-13.

Finally, nothing in the Court's decision in Griggs itself provides any reason to extend its holding to the ADEA. As the plurality tacitly acknowledges, ante, at 6, the decision in Griggs was not based on any analysis of Title VII's actual language. Rather, the ratio decidendi was the statute's perceived purpose, i.e.,

"to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S., at 429-430.

In other words, the Court in Griggs reasoned that disparate impact liability was necessary to achieve Title VII's ostensible goal of eliminating the cumulative effects of historical racial discrimination. However, that rationale finds no parallel in the ADEA context, see Morgan, 427 U.S., at 313-314, and it therefore should not control our decision here.

Even venerable canons of construction must bow, in an appropriate case, to compelling evidence of congressional intent. In my judgment, the significant differences between Title VII and the ADEA are more than sufficient to overcome the default presumption that similar language is to be read similarly. See Fogerty, supra, at 523-524 (concluding that the "normal indication" that similar language should be read similarly is "overborne" by differences between the legislative history and purposes of two statutes).

B

The plurality asserts that the agencies charged with the ADEA's administration "have consistently interpreted the [statute] to authorize relief on a disparate-impact theory." Ante, at 10. In support of this claim, the plurality describes a 1968 interpretive bulletin issued by the Department of Labor as "permitt[ing]" disparate impact claims. Ibid. (citing 29 CFR § 860.103(f)(1)(i) (1970)). And the plurality cites, without comment, an Equal Employment Opportunity Commission (EEOC) policy statement construing the RFOA provision. Ante, at 11 (citing _____ (2004)). It is unclear what interpretive value the plurality means to assign to these agency statements. But JUSTICE SCALIA, at least, thinks that the EEOC statement is entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., _____ (1984), and that "that is sufficient to resolve this case." Ante, at 5 (opinion concurring in part and concurring in judgment). I disagree and, for the reasons that follow, would give no weight to the statements in question.

The 1968 Labor Department bulletin to which the plurality alludes was intended to "provide a practical guide to employers and employees as to how the office representing the public interest in its enforcement will seek to apply it." 29 CFR § 860.1 (1970) (quoting Skidmore v. Swift & Co., _____ (1944)). In discussing the RFOA provision, the bulletin states that "physical fitness requirements" and "[e]valuation factors such as quantity or quality of production, or educational level can qualify as reasonable non-age factors, so long as they have a valid relationship to job qualifications and are uniformly applied. §§ 860.103(f)(1), (2). But the bulletin does not construe the ADEA's prohibitory provisions, nor does it state or imply that § 4(a) authorizes disparate impact claims. Rather, it establishes "a non-exclusive objective

test for employers to use in determining whether they could be certain of qualifying for" the RFOA exemption. Public Employees Retirement System of Ohio v. Betts, _____ (1989) (discussing 1968 bulletin's interpretation of the § 4(f)(2) exemption). Moreover, the very same bulletin states unequivocally that "[t]he clear purpose [of the ADEA] is to insure that age, within the limits prescribed by the Act, is not a determining factor in making any decision regarding the hiring, dismissal, promotion or any other term condition or privilege of employment of an individual." § 860.103(c) (emphasis added). That language is all about discriminatory intent.

The EEOC statement cited by the plurality and relied upon by JUSTICE SCALIA is equally unhelpful. This "interpretative rule or policy statement," promulgated in 1981, superseded the 1968 Labor Department bulletin after responsibility for enforcing the ADEA was transferred from Labor to the EEOC. See 46 Fed. Reg. 47724 (1981). It states, in relevant part:

"[W]hen an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a 'factor other than' age, and such a practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity." _____ (d) (2004).

Like the 1968 bulletin it replaces, this statement merely spells out the agency's view, for purposes of its enforcement policy, of what an employer must do to be certain of gaining the safety of the RFOA haven. It says nothing about whether disparate impact claims are authorized by the ADEA.

For JUSTICE SCALIA, "[t]his is an absolutely classic case for deference to agency interpretation." Ante, at 1 (opinion concurring in part and concurring in judgment). I disagree. Under Chevron, we will defer to a reasonable agency interpretation of ambiguous statutory language, see 467 U.S., at 843-844, provided that the interpretation has the requisite "force of law." Christensen v. Harris County, _____ (2000). The rationale for such deference is that Congress has explicitly or implicitly delegated to the agency responsible for administering a statute the authority to choose among permissible constructions of ambiguous statutory text. See Chevron, supra, at 844. The question now before us is not what it takes to qualify for the RFOA exemption, but rather whether § 4(a)(2) of the ADEA authorizes disparate impact claims. But the EEOC statement does not purport to interpret the language of § 4(a)(2) at all. Quite simply, the agency has not actually exercised its delegated authority to resolve any ambiguity in the relevant provision's text, much less done so in a reasonable or persuasive manner. As to the specific question presented, therefore, the regulation is not entitled to any deference. See John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank, _____ , and n. 17 (1993); see also SEC v. Sloan, _____ (1978); Adamo Wrecking Co. v. United States, _____, and n. 5 (1978).

JUSTICE SCALIA's attempt to link the EEOC's RFOA regulation to § 4(a)(2) is premised on a dubious chain of inferences that, in my view, highlights the hazards of his approach. Because the RFOA provision is "relevant only as a response to employer actions 'otherwise prohibited' by the ADEA," he reasons, the "unavoidable meaning" of the EEOC statement is that the agency "interprets the ADEA to prohibit employer actions that have an 'adverse impact on individuals within the protected age group.'" Ante, at 4 (opinion concurring in part and concurring in judgment) (quoting _____ (d) (2004)). But, of course, disparate treatment clearly has an "adverse impact on individuals within the protected age group." Ibid., and JUSTICE SCALIA's reading of the EEOC's rule is hardly "unavoidable." The regulation says only that if an employer wants to rely on a practice — say, a physical fitness test — as the basis for an exemption from liability, and that test adversely affects older workers, the employer can be sure of qualifying for the exemption only if the test is sufficiently job related. Such a limitation makes sense in disparate treatment cases. A test that harms older workers and is unrelated to the job may be a pretext for — or even a means of effectuating — intentional discrimination. See supra, at 6-7. JUSTICE SCALIA completes his

analytical chain by inferring that the EEOC regulation must be read to interpret § 4(a)(2) to allow disparate impact claims because that is the only provision of the ADEA that could "conceivably" be so interpreted. Ante, at 4 (opinion concurring in part and concurring judgment). But the support for that inference is doubtful, to say the least. The regulation specifically refers to employment practices claimed as a basis for "different treatment of employees or applicants for employment." ___ (d) (2004) (emphasis added). Section 4(a)(2), of course, does not apply to "applicants for employment" at all — it is only § 4(a)(1) that protects this group. See ___ (a). That suggests that the EEOC must have read the RFOA to provide a defense against claims under § 4(a)(1) — which unquestionably permits only disparate treatment claims, see supra, at 2.

This discussion serves to illustrate why it makes little sense to attribute to the agency a construction of the relevant statutory text that the agency itself has not actually articulated so that we can then "defer" to that reading. Such an approach is particularly troubling where applied to a question as weighty as whether a statute does or does not subject employers to liability absent discriminatory intent. This is not, in my view, what Chevron contemplated.

As an interpretation of the RFOA provision, moreover, the EEOC regulation is both unreasonable on its face and directly at odds with the Court's holding in today's case. It says that the RFOA exemption is available only if the employer's practice is justified by a "business necessity." But the Court has rejected that reading of the RFOA provision, and rightly so: There may be many "reasonable" means by which an employer can advance its goals, and a given non-age factor can certainly be "reasonable" without being necessary. Ante, at 14; see also Western Air Lines, Inc. v. Criswell, ___ (1985) (distinguishing "'reasonable necessity'" standard from "'reasonableness'"). Of course, it is elementary that "no deference is due to agency interpretations at odds with the plain language of the statute itself." Betts, 492 U.S., at 171. The agency clearly misread the RFOA provision it was attempting to construe. That error is not necessarily dispositive of the disparate impact question. But I think it highlights the improvidence of giving weight (let alone deferring) to the regulation's purported assumption that an entirely different provision of the statute, which is not even the subject of the regulation, authorizes disparate impact claims. In my view, we should simply acknowledge that this regulation is of no help in answering the question presented.

IV

Although I would not read the ADEA to authorize disparate impact claims, I agree with the Court that, if such claims are allowed, they are strictly circumscribed by the RFOA exemption. See ante, at 13-14. That exemption requires only that the challenged employment practice be based on a "reasonable" non-age factor — that is, one that is rationally related to some legitimate business objective. I also agree with the Court, ante, at 11, that, if disparate impact claims are to be permitted under the ADEA, they are governed by the standards set forth in our decision in Wards Cove Packing Co. v. Atonio, ___ (1989). That means, as the Court holds, ante, at 12, that "a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." Wards Cove, supra, at 657 (emphasis added); see also Watson v. Fort Worth Bank & Trust, ___ (1988) (opinion of O'CONNOR, J.). It also means that once the employer has produced evidence that its action was based on a reasonable non-age factor, the plaintiff bears the burden of disproving this assertion. See Wards Cove, supra, at 659-660; see also Watson, supra, at 997 (opinion of O'CONNOR, J.). Even if petitioners' disparate impact claim were cognizable under the ADEA, that claim clearly would fail in light of these requirements.

[fn1] It is in this connection that the Report refers to formal employment standards requiring a high school diploma. See Wirtz Report 3. The Wirtz Report did say that such a requirement would be "unfair" if an older worker's years of experience had given him an equivalent education. Ibid. But the plurality is mistaken to find in this disparate a congressional "goal" of eliminating job requirements with a disparate impact on older workers. See ante, at 6, n. 5. Rather, the Wirtz Report discussed the diploma requirement in the context of a broader discussion of the effects of "wholly impersonal forces — most of them part of what is properly, if sometimes too casually, called progress." Wirtz Report 3. These forces included "the pace of changing technology, changing jobs, changing educational requirements, and changing personnel practices," which "increase[d] the need for special efforts if older workers' employment prospects are to improve significantly." Ibid. (emphasis added); see also id., at 11-15 (discussing the educational attainments of older workers, together with health and technological change, in a section entitled "The Necessary Recognition of Forces of Circumstance"). The Report recommended that such forces be addressed through non-coercive instead of prohibitory measures, and it specifically focused on the need for educational opportunities for older workers. See id., at 23-25.

[fn2] Because the EEOC regulation does not actually interpret the text at issue, we need not address the degree of deference to which the regulation would otherwise be entitled. Cf. General Dynamics Land Systems, Inc. v. Cline, ___ (2004) (declining to address whether EEOC's regulations interpreting the ADEA are entitled to Chevron deference).

EXXON MOBIL CORP. v. SAUDI BASIC INDUSTRIES CORP.

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

See United States v. Detroit Timber & Lumber Co., ___

Copyright © 2005 Loislaw.com, Inc. All Rights Reserved