## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ : | |
| DAISY CHAVEZ : | |
| : | No. 3:03CV1112(MRK) |
| VS. : | |
| : | July 28, 2005 |
| METROPOLITAN DISTRICT : | |
| COMMISSION : | |
| _____: | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION FOR ATTORNEYS' FEES

**I.     INTRODUCTORY**

Plaintiff opposes the Defendant's Motion for Attorneys' fees as unjustified by prevailing law. In addition, in the event that the Court should determine that attorneys' fees should be awarded, Plaintiff would request that the Court conduct an evidentiary hearing so that the claims of defendant as to the factual basis for the enormous sum sought by Defendant could be examined properly,

**II.     ARGUMENT**

**A.     LEGAL STANDARD**

While Defendant correctly cites to *Christiansburg Garment Co.* v. *EEOC*, 434 U.S. 412, 98 S. Ct. 694, (1978) as the seminal authority on the law of award of attorneys' fees to defendants in such cases, it is important to note the emphasis and interpretation that case has received in subsequent years.

Some circuits have emphasized factors that must be present to meet the "frivolous, unreasonable, and without foundation", as did the Eleventh Circuit Court of Appeals in this very recent case:

> Although attorney's fees are typically awarded to successful Title VII plaintiffs as a matter of course, prevailing defendants may receive attorney's fees only when the plaintiff's case is "frivolous, unreasonable, or without foundation." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S. Ct. 694, 700 (1978). Factors that are "important in determining whether a claim is frivolous" include "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." Sullivan, 773 F.2d at 1189. These factors "are general guidelines only, not hard and fast rules. Determinations regarding frivolity are to be made on a case-by-case basis." Id.

*Quintana v. Jenne*, June 28, 2005 03-15443 (11th Cir. 2005). *See also Wolfe v. Perry*, 02-1086 (6th Cir. 2005), Nos. 02-1086, 02-1589.Decided and Filed: June 27, 2005; *Thomas* V. *City of Tacoma*, 03-35799 (9th Cir. 2005) Nos. 03-35799, 03-35816. Filed June 8, 2005.

The Second Circuit in particular has warned the trial courts against post hoc judgment of such claims.

> As the Supreme Court cautioned in Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412 (1978) (analyzing an analogous attorneys' fee provision under Title VII), "it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." Id. at 421-22. Hindsight proves that plaintiffs' allegation of state action was very weak, but it was not completely without foundation. Accordingly, the district court abused its discretion by awarding attorneys' fees to MetLife.

*Tancredi v. Met. Life Ins.*, 378 F.3d 220 at 230 (2nd Cir. 2004). The D. C. Circuit has issued a similar cautionary opinion:

> Here as in other areas courts need to guard against being "subtly influenced by the familiar shortcomings of hindsight judgment." Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). Cf. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (courts must "resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"). Not all opinions can aspire to what was said of those of Justice Brandeis — that in them "the right doctrine emerges in heavenly glory and the wrong view is consigned to the lower circle of hell," HENRY J. FRIENDLY, Mr. Justice Brandeis — The Quest for Reason, in BENCHMARKS 291, 294 (1967) — but there is always the hope that, after decision, the "wrong view" looks considerably less plausible than it did before. But just as discovery of contraband does not establish probable cause, nor an accident negligence, nor poor returns an imprudent trustee, so too a loss on the merits does not mean that legal arguments advanced in the context of our adversary system were unreasonable.

*Taucher v. Brown-Hruska*, 396 F.3d 1168 at 1173-4 (D.C. Cir. 2005).

## B.    APPLICATION OF THE STANDARD

Plaintiff submits that not only were the claims serious and reasonable and reasonably founded, they were sufficient to reach a jury on the merits.  Indeed, as to the hostile work environment claim, the jury found that the Plaintiff did suffer from a hostile work environment and that such environment was perpetrated by the Defendant as a matter of policy or custom.  They simply did not accept the evidence that the hostile work evnironment was gender based.  But evidence there was.  While the Jury did not find in Plaintiff's favor on the discrimination claims, all that means is that they did not find the Plaintiff had succeeded by a preponderance of the evidence. This is very far from frivolous.  Addressing the several claims, Plaintiff reprises its summary of evidence on Defendant's Motion to Dismiss after Plaintiff rested.

### 1.    Hostile Work Environment - Title VII

Plaintiff has produced evidence on all of the elements of this claim.

3

       A.      Ms. Chavez was subjected to a hostile work environment.

There is ample evidence from Ms. Chavez, Mr. Thomas, Ms. Wright and Mr. Gozzo that Ms.

Chavez was removed from a position that (a) had a budget; (b) had 19 employees reporting to her;

and (c) had a job description, and placed in a "temporary special assignment" position that had none

of these. In addition, she was obliged as a Grade 14 manager to mop and vacuum her floor, scrounge

for junk quality furniture and left in an open, noisy workspace without a cubicle or office, conditions

that no one around her, even lower ranking personnel, had to endure. Further, she was openly and

viciously berated by Mr. Anthony Milano, the Director of the Metropolitan District. Finally, when

her supervisor, Mr. Thomas, tried to give her office space, she was physically removed from it in

two hours time at the insistence of his boss, Mr. Geldof, the Director of Engineering, and there was

evidence that this incident was discussed even with Mr. Milano.  Certainly, Ms. Roughan, the

Director of Human Resourcesl, was involved in the incident and in the end Mr. Thomas had to yield

to the wishes of his superiors.

       B.      There is a specific basis for attributing the conduct that created the
                 hostile environment to her employer, the MDC.

The actions described above were taken at the highest managerial levels of the MDC and

involved Mr. Milano, the District Director, Mr. Geldof, the Director of Engineering, and Ms.

Roughan, the Human Resources Director.

       C.      Plaintiff's race, gender and/or national origin was a substantial or
                 motivating factor in he MDC's conduct.

First, there is no legitimate reason for this conduct. In all cases, when questioned, the highest

level personnel were unable to describe the duties of the "Temporary Special Assignment" or why

she should be removed from the office. Mr. Milano berated her in the presence of Mr. Thomas but

expressed no particular reason for the verbal assault on her. Second, the evidence shows that the white males who occupy the key positions at the MDC have a long history of bias against women and minorities. In particular, in 1998 and 1999, there was only one woman out of more than 20 managers, and she was in Human Resources, and when she left that position, she was succeeded by a woman who herself was succeeded by a woman. It was a designated position for a token woman.

In the year 2000, one woman was added to the managerial ranks, and by the start of 2003, there were three women out of 24 managers - and none of them in Operations. In the summer of 1998, Mr. Milano spoke to Ms Chavez about a managerial position in Operations, that received hostile comments from Operations personnel - Mr. Amaio's testimony that Mr. Pierce, a Superintendent said "Are you ready to work for a woman?" The comment is clearly hostile to women in power.

This attitude continued, as Mr. Demirgian testified that later on Mr. Hanson stated that "If Daisy Chavez got the job, he would leave the next day and a number of men would go with him." Mr.

Milano backed off on his promise and for no good reason placed her in a limbo position on September 23, 1998, from which she did not begin to emerge until the spring of 2001, but even then she was denied the supervisory tasks that went with the Special Services Administrator position to which she was then assigned. All of the three women given managerial positions were white women. There were no minorities - Hispanic or Black - among them. Indeed, the managerial ranks were and are even more sparsely occupied by minorities. Mr. Alvarado stated that he was the only Spanish-descended manager that he knew of up to his retirement in 1999. He was replaced by Mr. Thomas, a black person, with minority succeeding minority, much as woman succeeds woman there in

Human Resources. Mr. Thomas stated that since 1999 there have been no Hispanic managers at all among the 22 to 24 managers from time to time and that there was only one other black manager, who is gone now. Hostility to Hispanic personnel was evidenced at the highest levels when a Commissioner, Trudi Mero, made a gratuitous remark about Cuban-Americans that surprised and upset Mr. LaRosa. This remark was made somewhere between 1995 and 1997 and evidences a deep set hostility to Hispanics, and to foreign born personnel, at the MDC.  Defendant misses the point. Ms. Mero was refusing to treat Hispanics as minorities on the same basis as black employees.  That is discrimination per se.  The testimony of Mr. LaRosa was that Ms. Mero was a commissioner at the time she made the remark.  Defendant did not challenge this testimony or call evidence to rebut it - because it could not.  The importance of the testimony was to further evidence the pervasive long-term bias that pervaded the MDC.

Ms. Chavez had two strikes against her. She was both a woman and a minority, and a foreign born minority at that. There are absolutely no minority women managers at the MDC, nor from the evidence does it appear there ever were. This despite the obvious fact that the Hartford area is inhabited by a substantial number of Hispanic and Black people who provide an excellent source of minority employees.

Then there was the pervasive in indifference to affirmative action as evidenced by the dropping of an Affirmative Action Plan from 1997 to 2002.

All in all, there were many factors which the jury could have used to determine that gender or race were the causative motivators for the discrimination.  The dearth of women and minorities in the managerial ranks was by itself evidence on which a jury could have found a causal connection between gender or race or both and the hostile environment which it did find.  The comments show

6

a truly negative attitude among the managers of the MDC toward women and minorities, and women in particular. The testimony evidenced that this hostility was known by the actual decision-makers and that they responded to it.

Even Defendant's own witnesses - top-ranking ones at that admitted to this last problem. Anthony Milano testified that he chose not to keep his 1998 promises because of concern for upheaval. That corroborated the testimony from Plaintiff's witnesses that gender based hostility from lower managers affected decision making by upper management, indeed, the highest management. Nor did the Defendant dare call Mr. Hanson, who was promoted despite his openly misogynist attitudes, to rebut the testimony. The further evidence that there are still no women in managerial positions in Operations shows that his threat of upheaval has had a long term impact, and remains effective today. No CEO has dared to challenge it.

D.    The MDC's Actions proximately caused injuries to Mrs. Chavez

There was much testimony about the emotional distress that this caused her directly (when Mr. Milano verbally abused her) and indirectly, with the interminable humiliation and embarrassment of her physical work circumstances and dead-ending of her job future. Ms. Wright testified to a change in her demeanour and personality, and Ms. Chavez testified to becoming quite physically ill from the stress.

**2.    Hostile Work Environment - § 1983 - "Official Policy"**

The evidence of the almost complete lack of women and minorities in managerial positions (EE-15 and above) 40 years after the 1964 Civil Rights Act passed indicates an intention of preserving the good old boy system. The MDC did nothing to change until the Harper verdict hit

them in the face, and even then change was reluctant and resisted. The actions described occurred at the highest levels of management, indicating that this attitude was accepted by the top personnel. There is evidence that when Mr. Milano briefly considered Ms. Chavez for the position of Assistant Manager of Operation, there was a gender backlash and he acceded to it. He immediately deadended her to solve this problem. The highest levels of management kept her in miserable working conditions, and this included Mr. Milano, Mr. Geldof and Ms. Roughan.

The failure to maintain an Affirmative Action Plan for five years could only occur at the highest levels of management of the MDC. That failure is evidence that is just did not matter to the District Director, his advisors or the Commissioners themselves.

### 3.     Retaliation under Title VII

#### A.     The Protected Activity

In August 2001, Ms. Chavez filed her first CHRO complaint that forms the basis of the first action consolidated for trial here.

#### B.     The Adverse Employment Action

The adverse employment action had already occurred as described above in the section on Hostile Work Environment. But it did continue. To this day, she has the substandard furniture marking her as "inferior". To this day, she is not allowed to perform the managerial and supervisory functions of the position that she occupies. The MDC continued an overt oppression of her unabated.

#### C.     The Protected Activity was a substantial and/or motivating factor in the adverse employment action.

It is submitted that given the unresolved nature of her claims, the MDC has chosen to continue the already taken adverse employment actions as a punitive lesson to her and to others. The fact that despite all the evidence of something as simple as the substandard furniture, the MDC has

8

not even shown good faith enough to correct that condition prior to trial. This failure is evidence of an intense retaliatory intention. There is no need for something as simple and obvious as that to go unaltered.

> D.     The adverse action was the proximate cause of injury to Ms. Chavez

See the equivalent discussion under the topic "Hostile Work Environment".

### 4.     Retaliation Under Section 1983

The only additional issue is that of "Official Policy". See the equivalent discussion of this issue above in the Hostile Work Enivronment - 1983 section.

### 5.     Failure to Promote - Title VII

> A1.     Ms. Chavez' gender was a substantial motivating factor in the MDC's decision not to promote her to any of the six positions

As noted above, in the time frame under consideration, there were very, very few women managers at the MDC. In 1999, less than 5%; in 2000, less than 10%, in 2003, 39 years after the EEOC law came into effect, less than 15%. Yet women account for slightly more than half the populations of Connecticut. There was evidence (from Mr. Amaio and Mr. Demirgian) that persons in substantial managerial positions were openly opposed to a woman taking a management position in operations. There were also blatant attempts to keep her out of the running for various positions. E.g., Exhibit 30H, taking points away from her managerial performance as Customer Service Administrator; Exhibit 29E, informing her that she did not meet the minimum qualifications for the position of Manager of Environment, Health and Safety, thus delaying her application until after the interviewees were selected. There was evidence that a male applicant for one position who did not even have a Bachelor's degree was selected instead of Ms. Chavez who was educationally more qualified and experientially at least as qualified. There was evidence that her 1999 application was

first declined as unqualified, then after the qualifying evidence was presented, it was simply ignored and forgotten. She was not even given the courtesy of a response, even though her qualifications on the engineering side were not questioned again until 2002, when it was again convenient to delay her application. Finally, there was the official position to ignore affirmative action by failing to maintain an Affirmative Action Plan throughout the whole period in question.

Defendant's own witnesses testified to institutionalized gender and racial bias.  David Donovan testified that the Operations Department never had a woman manager or woman administrator.  It never had an Hispanic manager or Hispanic administrator.  It never had a black manager; but did have on black administrator seven or eight years ago.

George Sparks, the former CEO, acknowledged that after the Affirmative Action Officer ("AAO") was appointed, the proposed appointment of a woman to the position of Manager of Environment, Health and Safety was sent to him for his review, but that the proposed appointment of a man to the position of Assistant Manager of Operations was not.  He was deliberately by-passed and the witness acknowledged that the AAO was very unhappy about it.  The testimony added further depth to the evidence that decisions were gender based.

Then there was the shocking testimony from George Sparks who selected Harvey Wall for Assistant Manager of Operations over Plaintiff, that no one bothered to check why Mr. Wall left the Colchester Company so abruptly after a rather short stay has Manager ( i.e., CEO) of the facility. It is a valid inference from the testimony that it was overlooked because he was a man.  A woman - indeed, Daisy Chavez - would not get such gentle or negligent treatment.

A2.     Her race and national origin were also motivating factors.

As noted above, all of the three women given managerial positions were white women. There were no minorities - Hispanic or Black - among them. Indeed, the managerial ranks were and are even more sparsely occupied by minorities. Mr. Alvarado stated that he was the only Spanish descended manager that he knew of up to his retirement in 1999. He was replaced by Mr. Thomas, a black person, with minority succeeding minority, much as woman succeeds woman there in Human Resources. Mr. Thomas stated that since 1999 there have been no Hispanic managers at all among the 22 to 24 managers from time to time and that there was only one other black manager, who is gone now. Hostility to Hispanic personnel was evidenced at the highest levels when a Commissioner, Trudi Mero, made a gratuitous remark about Cuban-Americans that surprised and upset Mr. LaRosa who testified about it. This remark was made somewhere between 1995 and 1997 and evidences a deep set hostility to Hispanics, and to foreign born personnel, at the MDC. And again, concern about minority rights was so minimal at the MDC that during the relevant period of time, there was no Affirmative Action Plan at all.

B.     The failure to promote caused injury to Ms. Chavez

Ms. Chavez testified to the differential in pay scale and the economic losses she has suffered as a result of the failure to promote. She has also testified to the harm to her career caused by the dead-ending of her position. In addition, she has testified to the on-going frustration in trying to gain recognition of her ability and promotion to the levels to which she can work. As Mr. Gozzo said, she is "a very smart woman".

11

### 6.    Failure to Promote - § 1983

The official action requirement has been discussed above. All of the decisions regarding promotion involved, first and universally, the Department of Human Resources, and we have evidence of hostility or indifference on the part of Ms. Roughan, the former director of Human Resources, who was there for three of the promotion situations. Second, all other personnel involved in these decisions were high level managers of the MDC. From the ongoing 40 year failure to comply with Equal Employment Opportunity requirements and guidelines, it is apparent that the highest levels of management, including the Commissioners themselves, had to acquiesce in the policy of not hiring or promoting women and minorities into managerial positions. Remember, there has never been a woman manager in Operations. Remember, too, there has never been a minority woman manager in the MDC.

### 7.    § 1981 Claims

The marshalling of evidence under the previous sections will suffice for these claims as well.

### III.    CONCLUSION

For the reasons set forth herein, Defendant's post-trial Motion for Attorneys' Fees should be denied. There was plenty of evidence on which a jury could have chosen to find for Plaintiff, if it had wished to do so. The failure of Plaintiff to get 51% of the jury's confidence hardly indicates that the claim was frivolous, unreasonable or without foundation.

PLAINTIFF
DAISY CHAVEZ


By_____

       Francis A. Miniter
       Miniter and Associates
       100 Wells Street, Suite 1D
       Hartford, CT 06103
       phone 860-560-2590
       fax    860-560-3238
       email: miniter@attglobal.net
       Fed. ID No. CT09566

CERTIFICATION OF SERVICE

The undersigned does hereby certify that a true copy of the foregoing together with all attachments thereto was delivered to the following counsel of record by placing the same in the U.S. Postal Service, regular mail, postage prepaid, on July 29, 2005:

Holly Quackenbush Darin, Esq.
David Ryan, Esq.
Ryan & Ryan
900 Chapel Street, Suite 621
New Haven, CT  06510


_____
Francis A. Miniter

14